HENRY J. LYNN *et al. v.* M. T. POLK *et al.*

1. JUDICIAL DEPARTMENT. *Powers of. Legislative department.* The judicial·department of Tennessee has no authority to invalidate an act of the Legislature because it was procured to be passed by bribery of the members of the Legislature.

FREEMAN, J., dissenting, and TURNEY, J., expressing no opinion.

2. CONSTITUTIONAL LAW. *Coupons receivable for taxes.* The act, entitled " an act to compromise and settle the bonded indebtedness of the State of Tennessee," approved April 6, 1881, making coupons receivable for taxes, is unconstitutional and void.

DEADERICK, C. J., and EWING, Sp. J., dissenting.

3. SAME. *Legislative department. State sovereignty.* The legislative department cannot surrender the powers and attributes of sovereignty essential to the well-being and existence of the State.

4. SAME. *Powers of the legislative department. Revenue.* The Legislature cannot irrevocably appropriate (though in the form of a legislatorial contract) a material part of the public revenue, to purposes preferred above, and which postpone the matters of public current necessary expense.

5. SAME. *Same.* The Legislature cannot make such an appropriation for a period beyond the term of its existence.

DEADERICK, C. J., and EWING, Sp. J., dissenting.

6. SUIT AGAINST THE STATE.· A bill to enjoin the funding board, created by the act of 1881, from funding the bonded indebtedness of the State, is not a suit against the State, nor a suit against officers of the State, within the meaning of the act of 1873, ch. 13.

EWING, Sp. J., dissenting.

7. SAME. *Unconstitutional act.* An officer while executing an unconstitutional act, is not acting by authority of the State.

8. CHANCERY PLEADINGS AND PRACTICE. *Bill quia timet.* Tax-payers, citizens of the State, may maintain a bill *quia timet* to restrain the executive officers of the State from funding the public indebtedness under an unconstitutional and void act.

EWING, Sp. J., dissenting.

8L 121
110  73

8L  121
116  240
117   88
117   91
117   92

9. SAME. *Same. Necessary parties.* The holders of Tennessee bonds are not necessary parties to such a suit.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville.    A. G. MERRITT, Ch.

J. J. VERTREES, E. T. TALIAFERRO, GEO. GANTT, S. A. CHAMPION, DAVID CAMPBELL, N. N. COX, A. S. MARKS, and HENRY CRAFT argued the case for the complainants.

A. D. BRIGHT, R. McPHAIL SMITH, SP'L HILL, ED. BAXTER, W. M. SMITH and T. H. MALONE argued the case for the defendants.

TURNEY, J., said:

On the 5th of April, 1881, the Legislature passed an act entitled "an act to settle and compromise the bonded indebtedness of the State." The 3d section of the act is as follows:

"Be it further enacted, that the coupons on said compromise bonds, on and after their maturity, shall be receivable in payment for all taxes and debts due the State, except for taxes for the support of the common schools and for the payment of the interest upon the common school fund, and said coupons shall show upon their face that they are so receivable."

The 9th section provides the form of the compromise bond, in which it is declared: "The coupons of the bonds as they become due are receivable for

all taxes and debts due the State of Tennessee"— omitting the exception designated by the 3d section.

The 10th section makes it the duty of the funding board (composed of the Secretary of State, Comptroller and State Treasurer), immediately upon the receipt of the original bond or bonds and the issuance of the compromise bond or bonds, to cancel said original bond or bonds.

This bill was filed on the 24th of May, 1881, attacking the act for various· causes, among them alleging its unconstitutionality, and alleging that complainants are all resident citizens of the State of Tennessee; have been for many years; are now holders of property not exempt from taxation; and that they pay taxes to the State on their property. The bill charges that defendants are preparing with all possible haste to commence the work of funding. One of the circuit judges for the State granted a fiat enjoining action upon the part of Polk, Nunn and Nolan, the members of the funding board. There was a motion to dissolve the injunction. On its hearing the chancellor, of his own motion, dismissed the bill, and complainants appealed.

In support of the action of the chancellor, it is, first, insisted complainants cannot sue at this time and in this manner. As we have seen, they are citizens and tax-payers of the State. It must be that, to the extent of taxes for which they are respectively liable, each has an interest in the questions raised. The act of the Legislature and the defense to the bill constitute an effort in the direc-

tion to make each pay such an amount of money as may be assessed upon his property, to the end that the law shall be carried out. The act points as distinctly to each of the complainants and as directly affects his estate as if he were mentioned by name, his property enumerated in a statement of its character and kind, with an actual calculation of the proportion of the amount of the debt and interest it must pay, with the bonds and coupons specifying the facts and the individual obligation of each complainant. If the law is valid, it makes an increase of taxes to be collected of each tax-payer, to be proportioned in the distribution of the additional levy of the annual three per cent. interest on the funded debt. The act, while in its present shape, is merely a proposal to contract. If the injunction is cut loose, and the creditors accept its terms and fund their debts, it is then an executed contract, and gives to the creditor the right and power to collect by law three per cent. of taxes annually, more than can now be collected by law. Without the contract the creditor is unable to force a payment of any part of the debt due him. The argument that the tax-payer is bound in honor and morals to pay, under existing laws, the debt and six per cent. interest, and therefore can sustain no injury from a compulsion to pay by law one-half that interest, and therefore ought not to be heard to complain, cannot avail with the courts. We have nothing to do with the honor or morals of complainants; these they must decide upon for themselves. The only question for us to decide, upon the

Lynn *v.* Polk.

right to sue, is, have complainants an interest in the subject-matter of the suit such as will entitle them to invoke the judgment of the court upon legal questions? It is an inherent power of courts of equity to prevent, as well as to redress grievances, and if it is unlawful to compel debtors to pay three per cent. upon a contract drawing six per cent., but which rested upon no law save the honor and morals of the debtor, then the debtor may say he is aggrieved, and ask the intervention of the courts to prevent the enforcement in part of that agreement which the creditor accepted solely upon his faith in the honor of the debtor. In such case, why may he not say, "the law must leave us as it found us"? And as it is, the creditor is not permitted to say to the debtor, "your security of honor and morals is not available, and I will make a contract to bind you in law as well as morals." Then, as these complainant tax-payers could not by the law at the time of the contract, and which is part of that contract, be compelled to pay anything, now that it is attempted to change the contract and the law, so as to compel the payment of three per cent. yearly on the $27,000,000 of indebtedness, or their proportionate share of the additional annual tax of $810,000, it must be that they have a direct and personal interest in the questions, and are proper parties to make them.

I am unable to appreciate the argument that, in any event, the suit is prematurely brought; that if complainants would have the right to sue at all, they must wait for some wrong, actual or threatened. The

latter has already transpired, so far as the abstract right to sue is involved. As we have seen, the defendants are making all possible haste to comply with the act, fund the debt, and fasten the *per centum* on the tax-payer. This is not denied. On the contrary, the effort to be relieved of the injunction sustains the allegation. If, when the act is a complete or executed contract and is being directly enforced, the tax-payer may resist it and relieve himself from its impositions, I can see no good and substantial reason why he may not strike it at the threshold and destroy it in its half-grown life. If the taxpayer may move at all, he may certainly move when he is imminently threatened, as here. A preparation to affect him is the beginning of his right of action, and he may commence defensive and protective proceedings. If the tax-payer may not move in this matter no one can, and there may be a palpable and egregious wrong without any means of redress—a condition never admitted in the law.

If there is no precedent for taking cognizance of the question, we must do as the courts of all ages have done in novel matters,—make one, founded in reason and solid justice. On this question we really need no case antecedent; general principles are broad enough to and do embrace it. I think, however, we have precedents in our reports. In *Bradley* v. *Commissioners, etc.,* 2 Hum., 428, the Legislature had passed an act establishing the new county of Powell, and appointing commissioners to organize it. The bill was filed to enjoin the commissioners from or-

.ganizing the county as directed by act of 1832. It was argued that one or two private individuals could not seek the aid of a court of chancery for the purpose of the bill. Judge Turley said: "The convention of the State, which formed the Constitution, thought proper to place restrictions upon the power of the Legislature to form new counties, and of consequence, any attempt to do so contrary to the restriction is a void exercise of the power, *which can and must be stopped by the judicial department of the State.* There is no other place to which an appeal can be made, and *if the courts cannot interfere, the Constitution, if violated, is a dead letter.* * * * It is the inability of courts of law to operate prospectively by prohibition for the prevention of mischief, that has established upon clear and definite grounds that portion of chancery jurisdiction which rests upon the doctrine of *quia timet.* It embraces a great variety of interests, which we need not and do not design to investigate here. It sufficeth for this case to say, that *it always applies where great and irreparable* mischief may be the consequence of the illegal action, which the common law courts cannot stop. * * * If the establishment of the county be unauthorized, its organization ought to be prohibited, and this no court but one of chancery can do. It is submitted, whether one or two private individuals can seek the aid of a court of chancery for this purpose. We think that any person aggrieved by the proceedings may apply for the remedy."

In that case the bill was filed to prevent action

on the part of those named in the act as its execu-
tors.   *Two citizens* complained "that they were about
to be aggrieved."   In this case the complaint is, to
say the least, equally as strong, and the grievance to
be suffered equally as great.   The cases are in prin-
ciple identical.   In the one preventive relief was
granted, then why should not the same relief be had
in the other?

The same principle governed and was announced
in the cases of *Cocke* v. *Gooch*, 5 Heis., 305, decided
in 1871, and *Bouldin* v. *Lockhart*, 1 Lea, 195, de-
cided in 1878.

In *Ford* v. *Farmer*, 9 Hum., 154, *Bradley* v. *Com-
missioners* was reviewed and reaffirmed.   In the *later*
case, Judge Turley said: "The act of the Legisla-
ture is a nullity and void, and *every act* done in
pursuance of it is void, and *not merely voidable*,—an
act which they have no right to pass, an authority
which they could not delegate,—and the acts of the
commissioners stand just as though they were self-
constituted authorities, and the officers and others as
usurpers without color of authority."

It is next insisted "the suit is against the State."

We are referred to ch. 13, sec. 2, of the Acts of
1873, which is: "That no court in the State of
Tennessee has, nor shall hereafter have any power,
jurisdiction or authority to entertain any suit against
the State, or against any officer of the State acting
by authority of the State, with a view to reach the
State, its treasury, funds or property."

The court must necessarily inquire, are the defend-

ants officers of the State? The act does not make them so by simply constituting the incumbents of the offices of Treasurer, Comptroller and Secretary of State a funding board. The selection was a means of convenience and a mode of preventing vacancies by so arranging the appointments as to have always a full board, notwithstanding deaths, resignations, removals, etc. It would have answered the same end to have declared that the sheriffs or any other officers in three of the counties in the State should have constituted the board. But if we admit that a funding board properly created are officers of the State, then are these in the present case so created, and are they acting by *"authority of the State?"* The authority of the State can only exist in a commission or command issued or given in conformity to the requirements of the Constitution. A legislature is the creature of the Constitution, and cannot rise above it or go beyond it. The Constitution is its chart and guide, and by it the Legislature must be governed and controlled. Whenever the law-making power violates the Constitution, its act is a nullity, and, being a nullity, is not an authority of the State. Some cases are presented in which it is said that it can make no difference that the law under which the officer assumes to act is unconstitutional, that still he is an officer of the State, and a suit against him is a suit against the State. No good reason, it seems to me, is given for such holding, nor am I able to see how it is possible to give a reasonable reason for such holding. It can only be worked out through the assumption

9—VOL. 8.

that the Legislature, the creature, is superior to the Constitution, the creator. Legislatures may be abolished by constitutions, but constitutions can never be abolished by legislatures. One may make and unmake, may create or destroy, enlarge or contract the other, while that other, dependent upon the one for its creation and life, must yield to it implicit obedience and reverential deference. The officers of the State constituting the three departments of government derive all power and authority from the Constitution. That instrument is the master, the governmental departments the servants. The one is the work of the people and can only be invaded, altered or changed by the people. The latter are works of the Constitution through the people. By what rule does the servant rise above the master? There is no higher law than the Constitution, and if its written and solemn injunctions may be lightly overlooked, the experiment of attempting a limit or restriction to power is a failure and the Constitution "a dead letter."

If the mandates of the Constitution are to be observed, there is not, nor can there be such thing as an officer of the State acting by authority of the State in pursuance of an unconstitutional law. If the officer and his office are created by the unconstitutional exercise of power or the exercise of power not conferred by the Constitution, the first is a violation of power, the second its usurpation. A law unconstitutional is void, and confers neither right nor authority. Officers created by it are wrongdoers whenever they attempt its execution.

I am compelled to confess my utter incompetency to comprehend the reasoning upon which it has been holden that unconstitutional enactments may be, or must be treated as authority of the State.    To my mind, it is the climax of absurdity.

Then, if the funding act of 1881 is unconstitutional, this suit, against officers brought into being by it, is not a suit against "officers of the State," but is a suit against persons attempting to commit a wrong, and may be maintained.    See cases already cited from 2 Hum., 9 Hum., 5 Heis. and 1 Lea.

The argument that the bondholders are not before the court, and that therefore the relief sought (other questions out of the way) cannot be granted, is untenable for the reason that the bondholders are as yet no parties to the action charged to be the purpose of the defendants.    The act is now merely in the nature of a proposition to be offered to the bondholders by the defendants; there is nothing up to this time connecting them with the defendants or the act they are proposing to execute.    The bill is filed to prevent the tender of a contract of settlement, and therefore the bondholders are neither necessary or even proper parties.

The next question is: Is the act called the funding or 100-3 statute constitutional?

Several objections are assigned in the bill and also in argument of counsel.    The first I will notice is, that section 3 of the act violates so much of art. 11, sec. 12, of the State Constitution as ordains:    "The State taxes derived hereafter from polls shall be ap-

propriated to educational purposes, in such manner as the General Assembly shall from time to time direct by law." This section of the act only excepts from payment in coupons such taxes as are for the support of the common schools and for the payment of interest upon the common school fund. A reading of the 12th section of the Constitution referred to shows very plainly that the common school fund is one thing and the educational fund to be raised from polls quite another. The common school fund is defined as a fund heretofore appropriated by law by the General Assembly for the use of common schools. The educational fund is to be hereafter derived from polls, and may be more comprehensively appropriated to educational purposes, including not only common schools, but colleges, academies, public and private schools, libraries, in fact every enterprise that may in its nature be "educational" or an "educational purpose." Besides, it is made the duty of the Legislature, by sec. 28 of art. 2 of the Constitution, to levy a poll tax of not less than fifty cents nor more than one dollar, and by sec. 1 of art. 4 it is ordained that each voter shall give to the judges of election satisfactory evidence that he has paid his poll tax, without which his vote cannot be received. Thus we see that the Constitution not only creates a general educational fund, but guarantees its perpetual existence by making the elective franchise depend upon contribution to it.

Now, if sec. 3 of the act is valid, it will divert this educational fund from a constitutional to a legislative appropriation, and in a very different direction

to the organic intention. For the present, the poll-tax fund may be protected under the third section by virtue of sec. 962*a* of the Code, but if the funding act becomes the law, the Legislature would be cut off from the constitutional right of repealing that section of the Code and applying the fund to an educational purpose other than common schools. It is only so long as it remains a common school fund that it is not payable in coupons. Whenever it is impressed by the Legislature with another than a common school feature, it fails of the protection of exception. It is, it seems to me, begging the question to suppose the present law of the Code will never be repealed. The Legislature has the right to repeal, and it is not our province to impugn that right by suppositions.

The question, then, is, which must succumb, the Constitution or the act of the Legislature?

In this connection, it may as well be noticed that the exception of the third section of the act is omitted in the ninth, prescribing the form and conditions of the compromise bonds. That form, which is as much a part of the act as the third section, makes the coupons receivable for all taxes and debts, thereby including the common school fund and the interest upon it, so that in fact the entire 12th section of article 11 is directly violated.

It is also objected that the Legislative enactment violates sec. 24 of art. 2 of the Constitution, which declares: "No money shall be drawn from the treasury but in consequence of appropriations made by

law; an accurate statement of the receipts and expend=
itures of the public money shall be attached to and
published with the laws at the rise of each stated
session of the General Assembly." This clause of the
Constitution must be considered in connection with
sec. 3 of the same article, which is: "The legislative
authority of the State shall be vested in a General
Assembly, which shall consist of a Senate and House
of Representatives, both dependent on the people, who
shall hold their offices for two years from the day of
the general election."

To rightly construe these two clauses, I will try
to put them into one and give them such meaning
as it seems to me was the purpose of their authors.
I render them thus: The Legislature shall consist of
a Senate and House of Representatives, the term of
office as Senators and Representatives to be just two
years from the day of the general election. At the
end of the two years their representative capacity
ceases, and it will be for the people to say at the
ballot-box who shall compose the Legislature for the
next two years. Each Legislature shall cause to be
made and published with the laws it shall have made
an accurate statement of the receipts and expenditures
of the public money for the last two years before the
rise of its session. It may have the power during
its session to make the necessary appropriations of
money to be drawn from the treasury in conformity
to such law as it may pass for that purpose, the
money so appropriated to be drawn and used for the
benefit of the State in the vacation between one stated

session of the Legislature and the beginning of the next.

It is conceded to be the general rule that one legislature cannot bind or commit its successor to its laws or policy. It was certainly the policy of the people in convention to so frame their organic law as to enable them to test the wisdom, from its results, of any legislative act, and to reserve to themselves, to be exercised through their legislatures, the right of repealing or modifying legislation to conform to their needs and wants, hence a limitation upon the terms of office of the law-making department. It was the object of the convention to leave no room for confusion or dilemma because of inability to reach the treasury; and also, at the same time protect it from drainage by a legislature for a longer time than its own existence. The unforeseen exigencies that might arise, the changes that might come to the State, its wants, its advancement, its prosperity or adversity, were studiously left for the consideration and action of each biennial General Assembly. The two years afford ample time for development and the suggestion of the necessary changes in laws, and to bring to public attention the demand for taxation, and its amount, and the capacity of the people to pay it.

It seems to me clear indeed that it was the fixed determination in the adoption of the clauses last cited, that no legislature should exceed the length of its own life in its appropriations of public moneys, and that each legislature should only be credited with foresight

sufficient to provide for the contingencies of the two years intervening between stated sessions.

I do not doubt the power of the Legislature of 1881 to have provided for the payment. of the interest on the State debt for two years, and to have made an appropriation of money therefor. This action would not have interfered with its successor.

If it be determined that it may have gone further, as it has attempted in the act before us, and have appropriated for ninety-nine years, the result is that each of about fifty consecutive legislatures must of necessity take, as a basis of their action in providing for the expenses of the State and the revenue to be collected, the law of that Legislature, and declare that an annual tax of about $810,000, is already riveted upon them and must be paid before the natural, necessary and inevitable governmental expenses; that it has priority over every other consideration, and is the beginning point in the item of taxes to be assessed. It must decide that whatever may be the condition of the State, either for prosperity or adversity, in peace or war, in health or pestilence, in plenty or famine, still nothing can be drawn from the treasury until the creditor has been paid annually eight-tenths of a million dollars. This obstruction must be removed before any legislature can give its attention to the affairs of State. Such contingencies were meant to be guarded against in the limitations upon the legislature in the length of official term and mode of drawing money from the treasury.

One general assembly has as much in its favor

the presumption that it will do right, as another. The same confidence is reposed in all alike; the duties of one are precisely in all things as those of another. The constitutional powers of the law-making body of 1881 are in nothing different from those that will attach to the legislatures of ten, twenty or ninety-nine years hence; all are alike defined and restricted. It is presumed that each legislature will hereafter do all in its legitimate sphere to protect, defend and preserve the honor, faith and credit of the State, and that it will use all possible lawful means to pay or settle the debt of the State for which its faith and credit are pledged. It was to this the creditor looked when he became such, and I think he is in no danger of loss by repudiation. He has not now, at all events, a right to demand or expect a first mortgage upon the life of the State, *i. e.,* its taxes and taxing power.

Another purpose of the restrictions mentioned is to prevent oppression and secure protection, not only against extravagance and corruption, but against mistake. This act, if recognized, will very likely become oppressive. When we consider the uncertainty of the future, and the great length of time during which the contract is proposed to operate, not only as a legislative enactment, but also in effect as an organic one, we cannot conclude the convention meant to confer such latitudinal authority upon the legislature as is here assumed. Put the question to any thoughtful man, would the convention, if it had been proposed, have given to the legislature the authority

to fix by statute a specified tax upon the people for a long term of years to pay interest upon the public debt? The answer would be promptly, no. Ask further, why not? The answer is, because that convention was framing a chart for the safety and good government of the people of the State, and would not have been willing to have risked so much to the frail judgment of legislators, to say nothing of their exposures to temptation to dishonesty. To have granted the power, would have been against the plain and obvious dictates of reason. In the case of *Bank of the State* v. *Cooper*, 2 Yer., 603, Judge Green says: "It does not follow that because there may be no restriction in the Constitution prohibiting a particular act of the legislature, that such act is therefore constitutional. Some acts, though not expressly forbidden, may be against the plain and obvious dictates of reason. The common law, saith Lord Coke, adjudgeth a statute so far void." I think the principle sound, and, in the absence of constitutional restriction, would apply it in this case.

Another and the most serious objection to the act is, the legislature, being the financial agent of the State and having no authority to delegate that agency, has in fact assumed to do so by this legislation. If the proposal to compromise is held good and shall be accepted by the bondholders, it will then be out of the power of any legislature to at all interfere with the law under any circumstances. The provision that the coupons shall be receivable for taxes and all debts due the State, becomes a contract. The language of

the provision gives to the holder the right to employ such means and legal process as will compel compliance, and so far, the financial agency will be transferred to the creditors and through them to the courts, thus taking the management and control of the treasury out of the hands of the legislature and placing them beyond the protection of the courts of the State. The moment the contract is executed it becomes the subject of Federal jurisdiction, and all the State courts are subordinate jurisdictions, and whatever may be the rulings of the State courts, and wherever suit may be instituted for the enforcement of the contract, the Supreme Court of the United States will have the final, and of course conclusive, jurisdiction; and its decisions will be binding upon the State courts.

This will be a surrender of sovereignty. The State will no longer be its own guardian, with power to make provision for its support and existence, but will be the ward of the Federal Government for ninety-nine years, its estate to be administered at the beck and nod of the bondholder,—a centralization of the worst form.

A further consequence of the act will be a surrender by the State of its inherent, as well as constitutional right of determining when and in what court and in what form it may be sued, or of withholding or withdrawing its liability to suit at its pleasure.

It is the right and duty of the State to hold its own purse strings, to be its own financial agent, to provide for its own necessities, and to maintain its own sovereignty. These rights and duties must be

exercised and performed at any cost and under all circumstances. If the act before us is declared to be constitutional, they are all gone, by an absolute transfer to the bondholder, to be administered in a foreign court.

I think the act unconstitutional and void, and that the injunction was properly granted and should be made perpetual.

By this opinion I am not to be understood as favoring repudiation. I want the State to be honest.

I express no opinion on the question of bribery, because I think the constitutional objection to the statute the primary one; that being resolved adversely to the law, is conclusive of the whole case. I think the settlement of one question controlling and overwhelming all others, is as far as a court should go in any case. It is always time enough to solve legal problems when they are material to results.

FREEMAN, J., said :

On the 5th day of April, 1881, the Legislature passed a bill entitled " An act to compromise and settle the bonded indebtedness of the State of Tennessee." Its provisions, so far as material, may be gathered from the following statement, and citations from the act :

It provided for funding the bonded indebtedness of the State, with past due interest, up to July, 1881, by new bonds, to be issued through the agency of what is called a " Funding Board," bearing date July 1, 1881.   These bonds are to bear interest at the rate of three per cent. per annum, payable semi-annually in the city of New York, coupons for the interest to be attached to each bond.

By the third section of the act it is provided, " That the coupons on said compromise bonds, on and after their maturity, shall be receivable in payment for *all* taxes and debts due the State, except for taxes for the support of the common schools and for the payment of the interest upon the common school fund, and said coupons shall show upon their face that they are so receivable."

By sec. 5.  " The Secretary of State, Comptroller and State Treasurer, shall *constitute* a *board*, to be designated a funding board, *any two* of which shall constitute a quorum for the transaction of any and all business for which said board was created.   Said board

may sit or hold meetings for the transaction of the business created by this act, at such times and places as they may deem wise and proper, to enable holders of Tennessee bonds and coupons to fund the same under the provisions of this act."

This board by next section is, among other things, authorized, when any legally issued bonds of the State or coupons are presented to it, to examine and audit the same, and if found genuine, prepare compromise bonds, as directed, and deliver them to holders, taking up the old bonds.

There are other provisions to effectuate the purposes of the act, that need not now be referred to, except to say that the form and language of the bond is given in specific terms in the 9th section of the act, and for some reason, the exceptions in the 3d sec. of the act are not included in it or mentioned. Its language is: "The coupons of the bonds, as they become due, are receivable for all taxes and debts due the State of Tennessee." The fact is added, that the bond and coupon are issued in pursuance of the act, giving its title and date. It is seen, that taxes for the support of the common schools, or for payment of interest on the common school fund, are not excluded from payment in these coupons by the terms of the contract on its face.

The above, with such references to the act as may be necessary, will serve to present the questions raised by the bill in this case, so far as they grow out of the provisions of the enactment under consideration.

On the 25th of May, 1881, complainants, number-

ing upwards of thirty persons, citizens of various counties of the State, filed the bill in this case, against defendants by name, who are respectively, for the time being, the Secretary of the State, Comptroller of the Treasury, and the Treasurer, and as such constitute the "Funding Board," "created" and provided for by the act, praying for an injunction inhibiting said parties composing said board from auditing the bonds of the State, or issuing the compromise bonds and coupons as authorized.

I shall not attempt to state in detail the large amount of matters found in the bill, much of which I think irrelevant and superfluous, and to say the least of it, not necessary to present the questions raised for decision by the court. It suffices to say, that the injunctive power of the court is invoked on the ground that the act of 1881 is unconstitutional, for reasons given at much length in the bill, and also, that the authority to issue the new bonds, and the whole scheme for funding the past due indebtedness of the State was procured by fraud, and by bribing members of the Legislature. The details constituting these charges will be noticed in their order, when the questions are hereafter discussed.

This case is one of the highest gravity ever submitted to this court, seldom equalled in any court, both by reason of the large amount involved or to be affected by its decision, as well as the weighty questions of law, constitutional and general, presented for solution. It has been argued at unusual length, and with an ability worthy of its importance. Its dis-

cussion has brought into play the best talent of the bar of our State, and they have shown themselves worthy of the high reputation borne by them, by the learning, force and eloquence with which the case has been urged upon the attention of the court, on each side of the contest. It now becomes the duty of this court to investigate and settle the issues made and debated so ably before us.

In doing so, we have felt the gravity of the duty imposed, and have given to all the questions presented, our most earnest considerstion. With the policy or wisdom of the measure before us we have no concern, as a court. With the party or political combinations or accretions that may have gathered around this or any other measure, as Judges, we have neither sympathy or the opposite. We shut our eyes to everything except the simple question, What is the law of the case? When that is seen, as we understand it, it must be fearlessly announced, in the calm spirit that belongs to our high places. Consideration of consequences is not for us—only duty is to be known, and faithfully done. Where it leads, is our pathway—its voice is to us the imperative, which we cannot disobey, and which we would not disobey if we could.

Owing to the importance and weight of this case, contrary to our usual practice, it has been deemed proper that each Judge, who may choose, shall give his own opinion, and the reasons leading to his own conclusions. I now proceed to the discussion of the questions deemed material to the decision of the case as it stands before us.

Several questions, that may be called preliminary to the main issues raised by the bill, are presented, and urged with great earnestness by counsel for respondents. It is proper to dispose of these first. To do so, a short statement of the proceedings in the court below must be made.

In accord with our practice, the bill was presented to one of the circuit judges for his *fiat* authorizing a preliminary injunction to be issued. This was obtained, and the injunction issued in accord therewith. Thereupon, after service of process, the defendants regularly appeared in the chancery court at Nashville, where the bill had been filed, and moved the dissolution of the injunction, basing this motion alone on the face of the bill and charges therein contained. From these it was maintained, the motion to *dissolve* should be allowed, as the decree of the chancellor recites, for want of jurisdiction, and for want of equity on the face of the bill. These are the specific points presented as the basis for the motion to dissolve the injunction—not to dismiss the bill. After argument by counsel on both sides, the decree states: "The court being of opinion that there is no equity upon the face of the bill, of its own motion, it is ordered, adjudged and decreed, that said bill be dismissed with with costs, etc." From which decree the complainants appeal to this court.

On this statement of facts, in strictness it might be said, that the only question before us is, whether it is such a case as authorized the chancellor, without a motion to dismiss for want of equity, or any de-

10—VOL. 8.

murrer to the bill pointing out objections, on his own
motion, to dismiss, because there was no equity what-
ever in the matters stated. The rule in such case
has been repeatedly stated by this court, perhaps
as well in the case of *Thompson* v. *Paul*, 8 Hum.,
116–117, as in any other: "If from the face of the
bill it appears the court has no jurisdiction of the
case, or if it contain no matter of equity whatever
the chancellor may properly dismiss on mere motion
(that is his own motion) at the appearance term or
at any subsequent stage of the proceeding." It is
added, that. where a case is made for equitable relief,
but it is defectively stated, the chancellor cannot thus
dismiss; or, to use the language of Judge Cooper, in
*Quinn* v. *Leake*, 1 Tenn. Ch., 70: "When admitting
all the facts stated in the bill, whether well or de-
fectively pleaded, the complainant is entitled to no
relief." See, also, 3 Head, 366; 9 Heis., 270.

It seems clear, on principle, that the only question
before us fairly is as to the sufficiency of the matter
of the bill, either well or defectively pleaded, to en-
title complainants to any relief whatever—" the bill
standing," as said by this court, "as if all its allega-
tions are to be taken as true"—that is, all its alle-
gation of facts: 9 Heis., 270.

In this view it might well be held, that unless
the court in this state of case could say, that under
no circumstances a decree could be pronounced against
these parties on the facts alleged, or that it had no
power to make a decree against the parties before it,
all the facts being admitted or proven as stated, the

·action of the chancellor would be erroneous and ought to be reversed.

The question so much pressed on our consideration, that this is a suit against the State, and is, therefore, one that cannot be prosecuted, would be excluded from our consideration in this view, unless it could be shown that under no circumstances could the court hear and determine a case where the State, or her officers—for it is assumed · defendants are officers in this sense, in argument—are defendants.· If the power to hear and decide in such a case is forbidden absolutely by law, then as no decree could be rendered by the court for want of jurisdiction, it might be that the chancellor could even on this ground, consistent with the principles we have referred to, dismiss the bill on his own motion.  But certainly not if the objection is one in the nature of a personal privilege, which had not been claimed by the State or parties representing her, and authorized to act for her.

The act of 1873 is relied on in support of the position, that the suit is forbidden or cannot be maintained. ·We refer to it now for the purpose, however, of seeing whether it forbids all action by the court, or only gives the right, at her option, to interpose the objection by the State.

The language of the act is: "No court in the State of Tennessee has, nor shall hereafter have, any power, jurisdiction or authority to entertain any suit against the State, or against any officer of the State, acting by authority of the State, with a view to reach the State, its treasury, funds or property, and all such

suits now pending, or hereafter brought, shall be dismissed, as to the State or such officers, on motion, plea, or ·demurrer of *the law officer of the State, or counsel employed by the State.*" If this act had stopped at the first clause, its language would have forbidden all right on the part of the court to exercise jurisdiction in the cases specified absolutely, as far as the Legislature had the power so to do. But when it is added, how advantage shall be taken of the exemption, and who shall interpose such objection, it is clear, it is an optional defense. It requires action on the part of the State, active interposition on the part of her law officer or counsel employed for the State, by motion, plea, or demurrer. These steps are not such as belong to the province of the court. To make a motion *for* the law officer of the State, or counsel employed by the State, file a plea for him, or a demurrer, would be a most incongruous proceeding by a court—one unheard of in any system of practice known to us. The language of the statute excludes such a course. The nature of the defense equally does so— it being one in the nature of a personal privilege, an exemption, which the State ought in reason to have as much freedom to waive, as any private party.

The uniform practice, and practical construction of the statute since its passage, in cases of suits against the Comptroller to compel issuance of warrants or claims disputed, is most persuasive evidence in favor of this view. Numerous cases of this kind have been before this court. See *Burch, Comptroller* v. *Baxter,* 12 Heis., 601: *Akers & Union and American Pub.*

Lynn *v.* Polk.

*Co.* v. *Burch, Comptroller, Ibid,* 607; *Marchbanks* v. *Gaines, Comptroller,* MS., Nashville, 1880, and other cases.

Most of these cases were represented by the then attorney general, Col. Heiskell, who is said to have been the author of the act of 1873, and who knew its purpose, if any one did. The same practice has continued under the present learned attorney general, as we know. See *Uhl* v. *Gaines,* 4 Lea, 352. This practice, and the action of this court in those cases, can only stand on the ground we have stated. This court could not gravely hear cases, as a mere advisory body, nor has it power so to do.

No motion being made, either by the State or counsel employed by the State, to dismiss on this account, nor plea, or demurrer filed (nor can we know that any will ever be made by the State, nor even by the defendants to the case), we cannot treat the case as if this had been done—the case standing here on the issues before the court below, and the record then made. To do so, would be to make a case, not review what has been done. The result would be that the record, on this point, raises fairly no question, except the single one, whether the chancellor on his own motion could dismiss the bill, because the State was sued through the officers forbidden to be sued by the statute. He does not assume to have acted on this question, but on the general question of " no equity on the face of the bill;" and as I think he had no power to raise the question on his own motion, this question might well be settled on

this ground. I do not think it is before us for ad-- judication. The premise in fact has to be made in. the record, where it does not exist, in order to raise the question now for our consideration. This we have no authority to do.

But I think proper not only to express the above opinion on this point, but in view of the dignity of this case, and the earnestness with which the question has been urged, to add my views on the precise question made. Is this a suit against the State in any legitimate sense? Is it a suit against an officer, by any sound rule of law established, or under our constitution, that can be defeated on these grounds? By sec. 17 of our bill of rights, it is declared: "That all courts shall be open; and every man for any injury done him in his lands, goods, person or reputatation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." The exceeding breadth of these words, literally at any rate, would certainly have included an injury done by the State. But the convention chose to prescribe a limitation or qualification to the language, and added, suits may be brought against the State, in such manner and in such courts as the Legislature may by law direct. It could not be questioned, if the last words had not been added, that even the right to sue the State would have been granted absolutely, in all the cases where a remedy had been affirmed in the first part of the clause. But the convention chose to qualify this right to sue. the State by leaving the manner, and the courts in

which such suits should be brought, to the legislative department. Consequently, it has been held and practiced on in this State, that until the Legislature acts, the right to sue the State under this section cannot be effectual for want of this action. I approve this construction on this point.

But I think it clear, this language of the bill of rights does not allow the absolute exemption from suit, by the Legislature, of any person or officer, simply as such, but only the State, and may be included under that term. From this it results that whenever the question is made as a defense to a suit commenced, that the State cannot be sued, and her exemption from suit interposed to defend the suit, the inquiry is, whether in the sense of this clause of the constitution, the State is sued in any proper sense, and if not, all others may be, if they have wronged the citizen or are about to do so, in such manner as will meet the requirements of a court of equity in such cases. He must have redress for that wrong "by due course of law, and right and justice administered without sale, denial or delay." The act of 1873, sec. 2, cited above, even as to "any officer of the State, acting by authority of the State," etc., requires, as we have shown, the objection to be made, and the defense to be interposed, by motion, plea or demurrer of the law officer of the State or counsel employed *for* the State. I might dismiss this question here, as no such motion, plea or demurrer appears in the record, either by the law officer of the State, or counsel employed for the State, nor indeed by any one else, nor is the State

represented by counsel, as far as we know, at all in the contention before us.

But is this suit "against the State or any officer of the State, acting by authority of the State, with a view to reach the State, its treasury, funds or property," within the language of the act of 1873? On this question I cannot entertain a doubt. The defendants are in no legitimate sense of the term, certainly not within the intent and meaning of this statute, officers of the State at all. It is the funding board that is sued, in the only way it could be done, that is, by making the persons composing it defendants, it not being incorporated. That board, as a legal entity is, to use the language of the statute, "created" by the act. It is, to continue the use of the language of the act, "constituted," or made up, of the Secretary of the State, Comptroller of the Treasury and State Treasurer, and designated a Funding Board." That is, the men who shall for the time being fill these offices are designated, as the constituent elements, making up the unit created by the act, designated a funding board. This unit, so constituted, acts as one, any two of them constituting a quorum for the transaction of the business in hand. I cannot see how this legal thing thus created can be conceived of as an officer of the State. It certainly is not the comptroller, nor treasurer, nor secretary of the State, for it is inconceivable that the three men filling these offices should be combined into one, and be either officer. The acts of the board are no more the acts of these officers as such, than would be the case if

one justice of the peace, one constable, and the sheriff of Davidson county had constituted the board, would have made the act of the board the official act of either of these officers. This unit is constituted of these officers, but itself is no officer of the State, and is not so designated in the act. In fact it is but a funding board—nothing more. It is no more an officer or its constituent elements in this respect officers of the State, than were the commissioners appointed by the Legislature to lay off the county of Powell, in the case of *Bradley* v. *Commissioners*, 2 Hum., 428, officers of the State, or in any other case of the kind, where such commissioners have been so appointed by act of the Legislature. The idea that a funding board, constituted of *three* men, is *an* officer of the State, in the language of the act of 1873, is inconceivable. It is not an officer of the State, and *cannot be.*

The board is simply three parties acting as such, and claiming to be authorized to fund the past due indebtedness of the State, and the right to do so, by authority of an enactment of the Legislature. This is their letter of authority, and under this they justify, and claim the right to do what they propose to do. The question is, whether what is authorized to be done, is a valid, legally authorized act, or is it in violation of the constitution, and a nullity. If the latter, the board has no authority to issue these bonds, and may be restrained from doing so, by any party liable to be injuriously affected by their act. A citizen, a taxpayer, is certainly so liable, at any rate has as direct interest in the question as any other party,

as the effect of what is done is *prima facie*, and it may be certainly, to fix a charge upon his property for the period of ninety-nine years. Where such a burden is proposed to be fixed on all the people of the State, under such circumstances, surely no court of equity could hesitate, if the act is done in violation of the constitution, to give preventive relief, *quia timet*, and forbid it being done.

It is certain, on the face of the bill the State is not a party. I think it equally certain that no officer of the State as such is a party—only the funding board. It claims to act under the authority of what purports to be an act of the Legislature. If that act is valid, then the authority is complete—if not, there is no authority for the action of the board, and they cannot represent the State, even if the board was an officer of the State. It is correctly said by the Supreme Court of the United States, in the case of *Board of Liquidation* v. *McComb*, 11 Otto, 541: "If an officer plead the authority of an unconstitutional law for the non-performance or violation of his duty. it will not prevent the compulsory process of mandamus. An unconstitutional law will be treated as null and void." See also, 9 Wall., 859; 16 Wall., 220. This principle certainly applies with full force to such a board as the one now before us.

To say that a simple enactment of the Legislature. is to be conclusive evidence of authority, though it be unconstitutional and void, and that no court could question it, is to make a valid and void enactment of equal force, and to authorize arbitrary power on the

part of the Legislature, with no check upon that body whatever.

It is no intrusion by the court upon the province or sphere of the Legislature. It is their duty and right to enact; but ours to judge whether the act is valid, or beyond the powers conferred on that body, whenever that is fairly presented for our adjudication. The fact, that the Governor, nor any other party, as the result of holding this enactment invalid, (if it should so be found), would not and could not legally proceed to do what they might otherwise do, is nothing more than results in any case where a law is declared unconstitutional. It is then by the proper authority adjudged to be no law, and consequently no authority for any action by any one under it.

We had a case lately before us at Knoxville, where the validity of the law authorizing assessment and valuation of the property of the railroads of the State was in issue. The Governor by the statute appointed the assessors. This had been done for several years, but after this period, the question came before us, and the law was held unconstitutional and void. No one certainly ever thought that this was an invasion of the right of the Governor to appoint the board of assessors, nor of the province of the Legislature, when the law was held unconstitutional. The Governor, however, will appoint no more railroad assessors, simply because it has been settled by the proper authority that the acts they were to perform are in violation of the constitution, and the Legislature could confer no authority to do an act in violation of the constitution,

nor the Governor be bound, or have the right, to execute an unconstitutional enactment, when so declared by this court. I have no doubt of the correctness of the conclusion reached on this question.

I but add here, that the contention, that this bill cannot be sustained because the State should be a party, and is not, I do not think well taken, as it goes on the proposition that in every case where a party seeks to act by virtue of an enactment of the Legislature, the State must be a party before the validity of the law can be adjudicated. I take it, this proposition would not be seriously insisted on. I need not discuss it.

The question of whether these parties as taxpayers and citizens of the State, can file a bill to restrain the issue of these bonds, if issued in violation of the constitution, I shall dispose of shortly. · I cannot doubt the right to bring such suit, under settled principles in this State.

The pinciple on which the jurisdiction of the court of chancery rests in a case like this, is stated by Judge Turley in the case of *Bradley* v. *Commissioners, etc.*, 2 Hum., 432–3, so clearly that we need but use his language to find all that may be rendered on this question. After referring to the incompleteness of legal remedies, he says: "It is this inability of courts of law to operate prospectively by prohibition, for the prevention of mischief, that has established upon clear and definite grounds that portion of chancery jurisdiction which rests on the doctrine of *quia timet*. It embraces a great variety of interests, which

we need not investigate here. It sufficeth for this. case to say, that it always applies where great and irreparable mischief may be the consequence of illegal action, which the common law courts, from their mode of proceeding, cannot stay; such as we think this one to be. If the establishment of the county," he adds, " be unauthorized, the organization ought to be prohibited, and this no court but one of chancery can do."

The bill in that case was filed by two citizens against commissioners appointed by an act of the Legislature to lay off and organize a new county, and in pursuance of this authority they were proceeding to perform the duty required of them. The bill, among other things, stood on the ground that the new county would not have the number of square miles required by the constitution. On this ground, as clearly made out by the proof, the court put its decision. The new county was to be made up of fractions taken from three other counties, one of which was the county of Hawkins. The bill was filed solely by two citizens of Hawkins to enjoin the organization of the county— the complainants residing in the portion of Hawkins that would go into the new county. The sole ground in the bill for its relief was that the act to he done and performed by the action of the commissioners, would be a violation of the constitution; and on this ground the court placed the jurisdiction, or right on their part to file the bill, saying: " It is submitted whether one or two private individuals can seek the aid of a court of chancery for this purpose. We think

that any person aggrieved by the proceeding may apply for the remedy."

This is a strong case in another aspect of it. It is a legislative function undisputed, to lay off new counties. The commissioners were but the appointed agents of the legislative department for carrying out what the Legislalure had appointed—had expressed as its will. But that expression or act was in violation of the constitution; and this court, at that early day— forty years ago—unhesitatingly gave the remedy, in favor of the citizen whose right was only to be affected to the extent of changing the county in which he would live, by the organization of a new one. It was not even sought to sustain the jurisdiction by pointing out, as has since been done, how his burdens might be increased by new taxes for court-house and public buildings, and in other ways; but the jurisdiction of the court was established on the broad ground that the constitution was about to be violated, and the citizen's right would be thereby so much affected, as that he might ask a court of chancery to prevent it. The court said the act was in violation of the constitution, "and, as a consequence, any attempt to organize the county contrary to its restrictions was a void exercise of power which can and must be stopped by the judicial department of the State. There is no other place to which an appeal can be made, and if courts cannot interfere, the constitution, if violated, is a dead letter."

Since that case, the jurisdiction then established has been exercised unhesitatingly in all like cases—indeed

it has become one of the settled principles of our State jurisprudence; so embedded in it as not to be shaken; so consonant as I think with sound principle; so in accord with the genius and spirit of our institutions; giving such a guaranty for the security of the people from aggression or infringement of their constitution 'on the part of the Legislature, so long as their judiciary are to be trusted, that I would sanctify it, and preserve it for all time.    I may add, when the judiciary of the State cannot be trusted, or fails to restrain 'unconstitutional action on the part of the Legislature, our free institutions are fearfully imperilled. In this high place, above passions, independent of the drifting waves of popular sentiment or prejudice, should be found the safeguard of our liberties.    It has been so in the past.    I trust it may always be so found in the future.    No one should fear to submit the constitutionality of a law to the arbitrament of the only department which is or can be organized, with peculiar adaptations to perform this high duty.    It was truly and wisely said by Judge Turley: "There is no other place to which an appeal can be made, and if courts cannot interfere, the constitution is a dead letter."

The opposite theory, and the one maintained in argument, that the act of the Legislature is conclusive authority for the act of this board, would, if carried out, make the Legislature independent of the constitution, with no check upon their action whatever.  Suppose an enactment should authorize the property of the citizen to be taken for the use of the State under

the right of eminent domain, with no provision for compensation, and appoint a board to take possession. Would any man hesitate to say a court of chancery would enjoin these commissioners or board from doing it? Would an act of the Legislature be held conclusive authority in such a case? Assuredly not. Why? Because it would be in violation of the constitution. It is not seen that there could be any difference in principle, between that case and this, assuming the act to be unconstitutional.

We need but notice an argument pressed probably in another connection, but one that may well be met here. It is, that if the law is repealable, this is the remedy; and if unconstitutional, the act will be void— that is, the contract proposed to be made. The fact that a law is repealable is no remedy against its execution for the citizen, nor is repeal a remedy at all when applied to courts, for no man can enforce it; and we may add, the Legislature may repeal a constitutional law, as well as an unconstitutional enactment. But this has no relation to what a court shall do when the act is called in question in that forum.

As to the ulterior remedy of the taxpayer, or the State, after the contract is completed, we need not say how that is. It may not be effective, but that is not the question. No court in all the future can give the complete and adequate remedy now sought, by *preventing* the mischief, if it be a wrong; and the question whether it will be a wrong, is the very question on which the remedy rests. If there is a wrong, prevention is better than remedial relief—meets the whole

case at once; while as to the taxpayer, whose property is to be charged with the burden of meeting the liability to be created, he would have to meet it, if at all, subject at least to many embarrassments not now found, and by each for himself resisting the payment of the tax. This might be the source of infinite litigation, as we see the taxes at present are not assessed, so as to levy a special tax for the payment of this debt. We hardly see how he could meet the case on the ground suggested. Be this as it may, I am sure the relief now sought is the proper remedy.

It was suggested in argument, that the taxpayer was not injured, because the old debt, which this was to fund, was the same in amount, and the interest at six per cent., while this was to bear but three. But the answer is, it is not whether he owes another valid debt, heavier than this, but whether the specific liability now proposed to be created is a valid one. Whether the taxpayer might not have misunderstood what is best for him, is not important. That is for him to say. But that he has the right to resist the wrong in the particular form attempted, if a wrong, regardless of its prudentials, is to me a proposition not admitting of doubt.

The only other matter I notice in this connection is, that the State can, and ought to bring the suit. I only answer, that may or may not be; but whether true or not, it cannot affect the right of the party who in fact has to pay the money—to furnish it, either voluntarily or have it exacted from him, before

11—VOL. 8.

the State can disburse it—to assert his own right and resist his own threatened wrong.

I now proceed to the main question on the merits of the bill. On this I premise, that the question is not whether the State of Tennessee may not fund her past due indebtedness—that is taken for granted; nor whether she may not provide the means for paying the bonds given. The real question is: Whether the precise bonds this funding board, the defendants, are proposing to issue, creating the precise liability, provided for in the act of April, 1881, in the form proposed, are authorized by the Constitution, or can be constitutionally and legally issued? Can this proposed contract be made, with all its liabilities and incidents? Shall *it* be consummated, not another? Is it forbidden by the Constitution fairly construed, either expressly, or by fair and necessary implication?

To this grave question I now address myself. I shall endeavor to discuss it in view of its gravity and importance. I think proper to say, that I cannot fully sympathize with the somewhat conventional tone usually adopted by courts in approaching the discussion of a question involving the constitutionality of an act of the Legislature. It seems to be assumed that this department of the government treads on ground where, for some reason, it must walk with bated breath and a sense of awe in the presence of the mighty power of a co-ordinate department, that does not accord with my view of the sense of perfect freedom with which a judge should perform his high functions. It has even been sometimes said that, if

possible, we must reconcile the act with the Constitution,—that we must hesitate before pronouncing an act of the representatives of the sovereign power void. To all this I respectfully demur. In declaring a law unconstitutional, the courts as much represent the sovereign will of the people as the other department in enacting a law. The duty to do so is one confided to them, and imposed in no uncertain terms,—fastened by the solemnities of an oath, and sanctified, in the United States, by all the traditions and practice of these tribunals. As the peculiarity, and grand distinguishing feature of our American constitutional system,—one that gives more of stability to constitutional freedoms and guaranties than all others; one so essential to the preservation, unimpaired, of the essential rights of a free people,—I hold it should assert itself in the true spirit of independence, and the high dignity which the consciousness of discharging so responsible a trust should ever impart to him who does duty at the command of, and in obedience to, the embodied will of a free and high-spirited people, jealous of their liberties. The sacred trust reposed, should inspire the judge with the deepest sense of responsibility, but no fear; and in this, the true spirit of a manhood born of the free institutions he is to sacredly guard, he should discharge this duty as he does every other, looking only to the right, and daring to do, without shrinking, all it may demand. To assume that I, as a judge, must do this work under the feeling that I must not do it if I can avoid it—must let the enactment, contrary to the Constitution, stand,

if I can find any means by which it can be done,—to me seems antagonistic to the spirit indicated, and what I ought not to feel. The Legislature, in enacting a measure, do what is deemed their duty in their sphere. When that act comes in question before me as a judge, I am simply to do. mine. It is passed with a knowledge of the fact that courts are to decide on its validity. It comes to these courts with this inherent element fixed by the Constitution, and I cannot feel the slightest hesitancy in doing it. That duty is not to seek, or even desire to find, how not to do it; but frankly, fearlessly and truly to do my duty, and thus meet the responsibilities of my high place. In this free spirit, yet with a most real sense of the grave responsibility upon me, I shall attempt to discharge the duty of the hour.

The enactment before us comes in the form of a law, and must so be treated. Its contents must be fairly considered and weighed, its purpose seen and understood; and if these are in violation of the supreme law of the land, then it is stripped of its form and becomes a nullity—is void. It is my imperative duty so to declare, and if I so find, *it shall be done.* I can consider no consequences; care, as a judge, nothing for what may be said or thought by others. The party accretions and combinations, as I have said, if such there be, that have gathered around this question, are matters with which I have no concern. With the policy, or impolicy of the measure, I have nothing to do. The only question is, Does it accord with, or does it violate the Constitution I am here

to maintain inviolate? If it does, it must go down, and I must say so, though I might as a citizen have approved. To the test of the Constitution, fairly expounded in all its grants and all its limitations, in view of all it contains bearing on the questions at issue, it must be brought; and if it bears it, well; if not, ill. To this all must bow, or a constitution is an idle form, a lifeless corpse, that had as well be buried out of sight, as an encumbrance and fetter on the free action of the legislative department.

In the discussion of this question, I am compelled to deal with the elemental principles that enter into and animate the Constitution, which embodies the powers conferred by the people on the law-making department of their government. The nature of the thing known as a constitution, must be somewhat considered, as well as the inherent limitations that, from that nature, of necessity belong to it, and are therefore of itself a part.

What is a constitution? An apparently simple question, but really presenting a most complex idea. I would define it for my purpose at present, as the written charter, enacted and adopted by the people of a State, through a convention of representatives, or in any other way the people may choose to act, by which a government for them is ordained and established, and by which the people give organic and corporate form to that ideal thing, a State, for all time to come, or during the life of the State. In it must be found the powers of that government, and the distribution of those powers among the several departments and

agencies, to use them for the purposes therein pre-
scribed, but for no other.   When this is completed
and assented to by the people—ratified, the organic
life of the State begins, and is complete when all the
functions assigned are in full and free operation within
their respective spheres, as marked out in the Consti-
tution.   To the life of a *free* State it is essential
that no power from without shall (except by its con-
sent authoritatively given) hold any control, or exer-
cise any domination whatever over the vital action, or
over any vital function of the organism into which
has gone the life, and which carries the will, of the
people who ordained it.   It must be in the fullest
sense a complete autonomy, acting from its own cen-
tral impulses, doing its own will, and independent of
the will of all others.   To the extent that this gov-
ernment is dominated in its vital functions by any
other power or authority, is its freedom impaired, its
vital power lessened.   As complete domination is com-
plete slavery, so partial domination, without consent,
is slavery to the extent it may be claimed and exer-
cised.   This seems to me self-evident.   No State or
individual is free where another dominates the will of
that State or individual.

It is obvious that the first and underlying thing,
or that which is the first element entering into the
idea of the existence of an organized State, is that of
*life*—the free exercise of its essential functions.   The
organic thing was not ordained as a theory, nor sim-
ply to give expression to principles of right; but for
action—that action to be the life of a free people.

To its departments are assigned duties and functions. These are essential to the life of the State; the *exercise* of them *is* its life.   Impeding their freedom, directing their movement, repressing or expressing the will of the State, by a power from without, is to make that other master the State to the extent it yields this power,—but a mechanism, moved or restrained by a power from without, dominated by another will, and not the free, self-poised thing, acting solely from its own inherent motive power, given out on the motions of its own unfettered spirit.   It cannot be conceived that authority could be conferred by a free people in the organization of such a State, or that it would give power alone to any department of that government ordained for freedom, to make it subject to the will of any other power on earth, in regard to the movement of any of its vital functions, for this would be to give the power to destroy that which was ordained to live; to plant the seeds of death in the bosom of that which is established for life, and only life,—which life consists only in free action within a prescribed sphere.   Whenever such a power is attempted to be exercised by any department, it comes stamped with a contradiction on its face. Nothing shows it valid, except a plain and unmistakably written grant by the people in their supreme law; and then all must say, it would be an incongruity, a monstrosity, that could only excite astonishment and wonder.   The power to impair or weaken, dominate or *direct* the action of a *free* government, is a contradiction in terms.   The expression of the first

idea destroys the meaning of the other. Domination
and freedom are essential contradictions. The two
things cannot co-exist. The extent of the exercise of
the one, marks with perfect accuracy the amount of
the loss of the other.

Assuming these premises, I now lay down a few
general principles of construction to guide in ascertain-
ing the meaning, in fixing and ascertaining what are
the powers conferred, and what withheld, in the in-
strument which I am to construe and apply. I think
them axiomatic in our constitutional jurisprudence, and
entitled to be so considered, because they are based
in necessary truth. The opposite of them must be a
contradiction in the nature of things.

I use and adopt, as has often been done by this
court, the language of Judge Denio, in the case of
*People* v. *Draper*, 15 N. Y., 543, as appropriate on
this question. He says: "In inquiring whether a
given statute is unconstitutional, it is for those who
question its validity to show that it is forbidden. I
do not mean that the power must be expressly inhib-
ited, for there are but few positive restraints on the
legislative power contained in that instrument. But
the *affirmative* provisions of the Constitution are far
more fruitful of restraints upon the Legislature. Every
positive direction contains an implication against any-
thing contrary to it, or which would frustrate or dis-
appoint the purpose of that provision. The frame of
the government; the grant of legislative power itself;
the organization of the executive authority; the erec-
tion of the principal courts of justice, create implied

limitations upon the law-making power as strong as
though a negative was expressed in each instance."

These broad general principles are necessarily true,
as will be seen, and rest on the principle that an
affirmative prescription involves a prohibition that its
opposite shall be at the same time, because the exist-
ence of the one of necessity excludes its opposite.
The principle has been well stated by Judge Catron,
in the case of *Norment* v. *Smith*, 5 Yer., 272: "When-
ever a State constitution prescribes a particular man-
ner in which power shall be executed, it prohibits any
other mode of executing such power. On that par-
ticular subject the authority is exhausted by the con-
stitutional provision, and an attempt to render it nu-
gatory by law, would be an attempt at repeal."

Whatever not authorized by the State Constitution,
interferes with or limits the free exercise of the pow-
ers conferred on the Legislature, is contrary to and
in violation of that power. It is a check or burden
imposed upon its free action. Whatever is in con-
travention of the *frame* of government, to use the
word of Judge Denio, is forbidden; or, to state the
principle more succinctly, whatever would defeat, im-
pede, hamper, control, impair or weaken the free, un-
trammeled exercise of powers conferred, or the dis-
charge of the duties imposed on the Legislature, must
of necessity be in violation of the Constitution of the
State and forbidden to be done. Whatever tends to
interfere with the arrangements of the Constitution,
and hinder those arrangements from being carried out
with perfect freedom as required, cannot be permitted.

No power exists in the legislative department to give. any other power control over the agencies organized to carry out those arrangements, except that power so. to act on the part of the Legislature is expressly, or by necessary implication, shown to exist and be conferred in the Constitution. All presumptions are against such power, in the nature of things, till the contrary is shown. To do so, is to abnegate their own functions, and transfer the trust reposed in them to that extent to another. If that other be a different government, to that extent it is slavery.

As a matter of course, I recognize in all these general propositions the fact, that in the Federal government there are certain powers of domination and control over the States, and to that authority as possessed I yield a prompt and cheerful obedience. But this does not contravene the principles laid down, but is strictly in accord with them. The powers thus. exercised are granted powers from the States, or people thereof, therefore exercised by their consent. The government exercising them, to the extent it does so, within the terms of the grant, is the government of the State or its people, as much and as legitimately as is the State government itself. Its proper sway, therefore, is not tyranny, but only the performance of beneficial functions, designed for and calculated to promote the good of all.

I now propose to bring the enactment under consideration, in its salient features, to the test of these principles.

The question to be considered mainly, if not ex-

clusively, so far as the face of the enactment is concerned, is what is known as the coupon feature, found in sec. 3: "That the coupons on said compromise bonds, on and after their maturity, shall be receivable for all *taxes* and *debts* due the State, except for taxes for the support of the common schools and for the payment of the interest upon the common school fund, and said coupons shall show upon their face that they are so receivable."

I remark, first, that this section contains a new feature on the bonds of this, or as far as we know, any other State, except certain bonds issued a few years since by our sister State of Virginia. The old bonds, which they are to take up, have the traditional and well-known pledge of "the faith, honor and credit of the State, solemnly pledged," for the prompt payment of the principal and interest therein promised to be paid. This bond, as directed, contains that solemn pledge of these, but in addition has the added terms of contract, that the coupons of the bonds, as they become due, are receivable for all taxes and debts due the State.

I may say here, that, under the old bond, the rights of parties were understood. The undertaking was to pay; but the only security given was the pledge of the faith, honor and credit of the State, solemnly plighted. I heartily accord with the sentiment, that this pledge, when authoritatively made, should be held as sacred as the life-blood of her sons—should ever be made good to the extent of its terms; that the honor, faith and credit thus plighted cannot be

forfeited or tampered with without dishonor, and to do so would be a stain on her fair escutcheon.

But this pledge is given, to be redeemed by the collection and disbursement of her revenues, the same to be levied by the free· action of her Legislature, charged with still higher and precedent duties, to preserve and keep free from all contingency of impairment or hindrance the vital functions of the State. It was to be met by the action of the Legislatures as they might assemble, free to look to the exigencies of the ·State, with no compulsory power over it,—only subordinated to the Constitution of the State. Revenue to be assessed and collected by the free action of the Legislature, from time to time, as it might direct, in view of the pledge given, it is true, but of necessity not excluding from consideration on the part of that body the condition and exigencies incident to the life of a State were to be the sources of payment. This was all well understood, and entered into and made elements in the contract, as plainly as if it had been written in words on its face. Certain it is, there entered into this contract no element of ·coercion—no power to legally enforce or oblige the ·State to comply with her promise and make good her plighted faith.

In the contract proposed to be made under this act, the same pledge is given, the same honor, faith and credit are plighted, and so far the contracts are the same. But, in addition; there is proposed in the new contract a new element, stipulations for an additional security for the performance of what is promised—a

security deemed so valuable, that the holders of the bonds agree to renew them, running for ninety-nine years, and receive for all that period only three per cent. per annum interest, the old bonds bearing six. The bond is on the same State, with the same resources, as the old bond. I therefore assume, the liberal extension of time, a credit given for ninety-nine years, and a loss of half the rate of interest for that period, is deemed but a fair consideration for the additional security obtained.

Be this as it may, we find the contract proposed in the enactment, and the question is whether the legislative department of the State had the power to authorize the making such contract.

To test this, I first look at the precise effect of what has been done. What is the nature of this new agreement? Does it in this form assume the complete essentials of a legal contract made between individuals? In the old contract, it had only the elements that enter into an agreement and pledge of a State. No legal obligement attached to it. It had no principle of enforceability in it; no lien on her resources; and no coercive power over these revenues attached to it, or inhered in it. Is this element found in the new one now proposed? If so, what is it, and what is the effect of this element? Had the Legislature the power, under the Constitution, to give, grant or confer on any body such power, in the form here given, and to be enforced by the means by which this can be enforced? These are vital questions, as I think, on which the solution of the issue now un-

der consideration to a large extent, if not entirely, depends.

First, is the element of coercion, of enforceability, in the contract? It certainly is so intended, and would be so understood by the holder of the new bond. Is it a fact, as a matter of law however? That this is true, cannot be doubted if once the contract is executed and the bonds issued, and the power conceded to make the contract. The creditor holding the coupons, whenever they are due, can enforce their collection. He has given to him, then, the power to *compel,* by his own act, the payment of his debt, and an appropriation of the revenues of the State to this end. It is so nominated on the face of the bond, and so written on the coupon that evidences the indebtedness so far as the interest is concerned, and that runs for ninety and nine years,—the life of three generations. This cannot be doubted as being what the contract will contain, and what it means. It is not questioned, we understand, in the arguments of learned counsel. In fact, we believe, is justified frankly, as proper and right. It is said in Burroughs on Public Securities, 594, in giving the effect of such stipulations: "Such provisions give an increased value both to the bonds themselves and to the coupons. It is an assurance to the holder that whatever may be the condition of the treasury, he has a mode of enforcing the payment of interest which other creditors do not possess. So long as the municipality or the State finds it necessary to levy and collect taxes, so long will there be a demand for the coupons. It is, in substance, a

first mortgage upon the revenues of the municipality or the State. The duty of the tax officers is merely ministerial, and can always be enforced by the courts, so that these holders of coupons may stand at the door of the treasury and receive the first fruits of the public revenues. Whatever may be the necessities of the State for the use of funds in conducting the government, they are all to be postponed until the public creditor with the first mortgage is paid."

This is a strong statement, but is substantially true. The contract is certainly in the nature of a mortgage, for it gives a *right* to appropriate the revenues of the State by the holder whenever his debt becomes payable. The right of the mortgagee is to do the same, either by entry on condition broken at common law, or by strict foreclosure in a court of equity under the old rule, or, under our practice, by a sale under a decree of a court of chancery. In this case, however, the party has secured to him by the contract the right to appropriate the revenues of the State to his payment by his own act. He has but to tender his coupons to the tax collector, and he is by the law bound to receive them, and thus his debt is paid. In this aspect, it is more analagous to our deed of trust, made to the creditor himself, to secure the payment of his debt when due, with power of immediate sale on default, and appropriation of the proceeds to its satisfaction. Should the tax collector refuse to receive it, then a legal proceeding to enforce the right would be his remedy. If the State said her tax collector should not be sued in any way, and repealed our act

of 1873 authorizing suit after tender, giving no rem-
edy at all, the case could be taken to the Supreme
Court of the United States, if the State court decided
against him, and there it would no doubt be held to
impair the obligation of the contract, and the courts
of our State be compelled by mandate of that court
to enter the proper judgment, as held by that court;
and so the right would be enforced, and that by a
foreign jurisdiction, if necessary. The supreme court
having jurisdiction over the question, and revisory
power over the State courts, in such a case, the State
courts would, as in duty bound, perhaps follow the
Federal decisions, and administer the remedy. I need
not, however, point out how the right could be en-
forced. It suffices, the contract is that the party
may enforce the payment for himself, and so he has,
by its terms, his remedy in his own hands. Through
the State courts, under the act of 1873, it may not
be a very effective one practically, and such I think
is the case; but the *contract* is the question now,
and not the efficiency with which it may be enforced.
If the right to do so in some form is in the bond,
then the question of the power to make such a con-
tract, is the test, and not the efficiency or inefficiency
of the remedy for its enforcement. As to remedies
through the Federal courts, I need not stop to dis-
cuss them here. They are ample, and would give
efficiency to the right of the holder of the coupon, so
far as legal or judicial action is concerned. I take
it this is not denied by learned counsel. We need
but point to the Bank of Tennessee cases and others

of that class to show how that power may be efficiently brought to bear to compel the performance of this contract, if it once pass into the stage of completion. See *Furman* v. *Nichol,* 8 Wall., 44; *Keith* v. *Clark,* 97 U. S., 454. I stop here to say, that the question of the liability of the State in the matter of the issues of the Bank of Tennessee, as an executed contract, has gone into judgment in the Supreme Court of the United States; and if it had not already done so, that court, holding it a contract, would certainly have enforced it whenever brought into question. The fact that this court might hold the contract unconstitutional subsequent to completion of the contract, would not control that court. See *State Bank of Ohio* v. *Knoop,* 16 How., top p., Curtis ed., 191; *Talcott* v. *Township of Pine Grove,* U. S. 6th Circuit, 1 Bond, 121 *et seq.,* where the cases are all collected. See, also, the doctrine, as now held, same case, in Supreme Court of United States, affirming decree of the circuit court, 19 Wall., 666. I quote the syllabus of the opinion of that court, showing how far the court goes to enforce such obligations, even when issued in violation of the Constitution of the State and held void by its own supreme court. It is:

"The decisions of the highest courts of the State to the contrary will not be respected by this court when such decisions are not satisfactory to the minds of the judges here, and when the matter in question is bonds issued in negotiable form by a township of that State, and now in the hands of a citizen of another State or a foreigner, *bona fide* for value paid.

12—VOL. 8.

Questions relating to bonds issued in a negotiable form, under such an act, involve questions relating to commercial securities; and whether, under the Constitution of the State *such* securities are valid or void, belongs to the domain of general jurisprudence."

See, also, 16 Wall., 667–8. I need not comment. The principle is well known and settled. That court would as certainly enforce the coupon feature, and protect it from impairment by repeal, suspension or modification by the Legislature or any other power of the State, as that the sun rises and sets. In fact no one, I take it, questions this, least of all the holders of the bonds. It suffices to say, that these decisions and the well known and settled rules established in the Supreme Court of the United States, together with the experience of the State on the question in the cases of the Bank of Tennessee, do not invite this court to go a step further than safe and assured constitutional exposition shall require, in affirming a power in the Legislature to make like contracts. We should at least tread cautiously on such ground.

But to the argument. That the Legislature has not the power to abnegate any of its essential functions, or to confer on any one, or any body, authority or power of compulsory control, either directly or indirectly, over its free action in their performance, would seem to be self-evident. To make the laws that shall govern a free people, that body itself must be free to adopt all such measures as the varying exigencies and wants of her people may demand. The true principle cannot be better stated, perhaps, than

in the language of Mr. Greenleaf, cited by Judge Cooley in his Const. Limitations, 344, note 2. He says: "An important distinction should be observed between those powers of government which are essential attributes of sovereignty, indispensable to be always preserved in full vigor, such as the power to create revenues for the public purposes, to provide for the common defense, to provide safe and convenient ways for the public necessity and convenience, and to take private property for public uses, and the like, and those powers not thus essential, such as the power to alienate the lands and other property of the State, and to make contracts of service, and of purchase and sale, or the like. Powers of the former class are essential to the constitution of society, as without them no political community can well exist; and necessity requires that they should continue unimpaired. They are entrusted to the Legislature to be *exercised*, not to be bartered away; and each Legislature should assemble with the same measure of sovereign power which was held by its predecessors. Any act of the Legislature disabling itself from the future exercise of powers entrusted to it for the public good must be void, being in effect a covenant to desert its paramount duty to the whole people."

These are words of weight and wisdom, and the principles stated embody the necessary limitations inherent in the Constitution of a free State.

That the coupon contract gives the holder power over the revenues of the State, is not questioned; power to appropriate them at his option to the payment of his

debt, whether she will or not, at any future day. This is the terms of his contract. That option is conferred by the act in plain terms. But it is said it can never come into play except the State make default; that this cannot be presumed, and therefore it is harmless. That is, however, but to state a fact, that, put in simple language, is, that the party cannot enforce his debt till it becomes due, and if it is paid he will have no debt to enforce, and there the matter would end. But the real question is, Has he the power, by contract, to enforce his claim on the revenues of the State, by appropriating them to his payment in the manner prescribed, whenever the contingency may occur on which that right arises?—not when it has not arisen.

What, then, in this aspect of the question is the actual effect of what is proposed? Does it fix a contract liability, in the nature of a first mortgage, on all the revenues of the State; give control over its vital functions; compel in any way the action of its Legislature; impair the freedom of action of that body, and make it subordinate to any extent to the will of another? If so, does such a power exist in the Legislature, or can it be conferred on another?

That this contract gives a compulsory power over all Legislatures for ninety-nine years, seems to me beyond question; not directly applied it is true, but certain, effective and secure. The creditor has his own option to enforce it, and has the power of the Federal courts to give imperative efficiency to his will. The debt may be assumed to be twenty-seven mill-

ions; the sum necessary to meet the coupons annually, $810,000. When the future Legislatures of the State assemble for the next ninety years, that body is in the condition of the mortgagor who has given a mortgage upon the crop he has raised that year. His wife and children and himself need clothing and all necessaries of life. They *must* be FED or die. He *must* sell that crop for enough to pay that debt and have a surplus for these demands that touch on life itself, or they must suffer or perish. That debt, however, stands *first*, and the iron chain of a contract, enforceable by all the power of the State through her courts, is linked to it, and fastens it on the proceeds of his labor. Does he act with the freedom of an unfettered man in the disposition of the proceeds of that year's labor? Is there not a power above and over him that holds him in its grasp, that compels him first to work for it, and then *compels* the appropriation of the proceeds of that labor? But the Legislature of the State is not in his precise condition. It has duties confided to it—imperative trusts, which it has no power to bargain, sell, assign or transfer. These are fixed in the Constitution of the State, which it has no power to violate. Its action beyond the sphere marked out, is a nullity and binds no one. It cannot abnegate its powers, or transfer them to another. Its duties are first to provide for the wants of the State. Government is a necessity to the life of the State. Officers to perform those functions an essential element of the life of the organism. It manifests its life by action, or lives through these func-

tionaries, and without them the constitution of government is a thing of no more vital power than is one of the many constitutions forged so rapidly in the days of the French revolution by her fruitful statesmen, as it lies in the archives of France or stands on the printed page of history. To live the life designed by the State is the underlying and paramount purpose of the establishment of the government at all. The legislative department has no power conferred to impair, weaken or destroy that life. For it, it must provide, and provide *first*, because the free life of the State is the first and highest duty imposed on it. This must of necessity be preferred to all other claims. No debt or contract can ever rise above this. This is necessarily so, for the debt, if paid, must be paid by and through the action of the State. That action can only be by her officers. The Legislature must levy the taxes, and these be collected by her officers, the collection enforced by her courts, and then disbursed by her appointed disbursing agencies. The Governor, as her executive, is a necessary part of her machinery for all her functions, his duty being to see that her laws are faithfully executed. The existence of all this machinery in full vigor and efficiency is a necessary and pre-existent conception, involved in the very idea of paying at all, or performing any contract or duty. Therefore the Legislature, as one department of the government, by necessary implication, is forbidden to grant any power or control by any one over the life of the State through these functionaries; but above all, over the Legisla-

ture itself.    That is · the department to which is con-
fided the trust of providing for the life of all the·
others.    In performing that duty, it is the guardian
of the life of the State and the representative of its
·freedom.    It can never trammel, by contract, its·
power to perform that trust, nor fasten a chain by
contract, rightfully, on itself, that shall interfere with·
the perfect freedom of its constitutional action.    It
must be left to perform all its work as free from·
control from without as should ever be the free spirit
of her own sons, bound only by the Constitution of
the State and of the United States, these being but· the
embodiments of her own free will.    If this contract
is permitted to be executed, it will be a legal chain
that cannot be broken, and a force for . coercion on
her Legislature, not directly applied to that body, but
equally as effective, that will compel its action and
give. that action its direction.    This control the Leg-
islature is forbidden to give, by the principles I have·
laid down, and the effort to give it is beyond the
power of that body.

     Let us see how this control is operative.    In the·
future, when the Legislature meets, and looks over the
estimates of expenditure for the next two years, which
it is its duty to provide, and . appropriate specifically
to each item the amount required, which cannot other-
wise be paid, there will always be an item of interest on
these coupons, which will stand on ground higher than
all the others.    To meet the others is, in the case of
the official salaries, and of their own, with other like
items, an imperative duty, involving, as we have shown,

the life of the State. But this claim by contract is now *before* and above all these. It stands backed by a power, silent and with a harmless appearance, embodied in a few simple words, but imperative as fate, with a word of command that compels its voice to be heard and obeyed. That item *must* first be provided for. Why? If it is not, when it falls due, the creditor can compel its payment through the tax collectors. All the revenue that may be levied, or collected, till this is paid, may be stopped, and only coupons come into the treasury. They are to be cancelled; and if this were not so, they would not pay salaries, nor support the life of the State.

Let us look at this for a moment. Suppose the Legislature should propose to levy a special tax for official salaries of the State officers, in the form of so much on the hundred dollars of taxable property, as is now done by the act of 1873, sec. 38, for the support of common schools; and should then appropriate this to the payment of these salaries in the appropriation bill; under this contract, the holder of a due coupon, or the holders might tender the coupons in payment of the whole tax, and thus absorb it. In fact the salaries of all the officers of the State, and of the Legislature itself, could be more than absorbed by the amount of this interest. And so, if all the legitimate and actual ascertained expenses of the State were itemized, and provided for by a special tax, as might be done, this debt could be interposed, and by the terms of the contract enforced, over the means provided for these purposes. It is a lien preferred,

and has precedence over them. The creditor could, if he chose, intercept these revenues, like a process of garnishment, and of his own will say, "the salaries and expenses of the State are now subject to my direction. I will adjudge these shall be used to pay my debt, and so appropriate them. The necessary expenses of the State must defer to my claim." So it is nominated in the bond, and there is no evasion, when his right accrues. This demonstrates, that this is power over the very life of the State, and that it is an effective one; and to preserve that life, the Legislature will be *compelled* to meet his demand first.

The case I have put, however, only brings out the operation of this power on these special taxes, if laid in that form. That it is certainly accurate, is shown by an illustration at hand. Suppose there had been no exception in the enactment, as found in the third section, of "taxes levied for the support of the common schools," would not that tax be subject to this contract, and might it not all have been paid, under this act, in coupons—in other words, appropriated by the creditor to his debt, though levied for the specific purpose of the suport of the schools? If this be so, it inevitably follows, that any tax levied for any purpose, not excepted, is subject to the charge of this mortgage.

That this power, if exercised in the specific way pointed out, gives the creditor power over the life of the State, is too clear for question. But the principle is precisely the same, when no such special tax is levied. The power is over all the taxes and debts

due the State, with the exceptions in sec. 3; and what is over the whole, is necessarily a power over the parts. So that the real question is, whether the Legislature can, in any contingency, give such power of preference to a creditor over the salaries of officers—her necessary expenses to pay which is essential to her existence—in a word, over all her revenues, and make these subordinate to his claim by contract, to be enforced through his own will, or through the agency of the Federal courts—or in fact any other. But this hereafter.

The point now is to show that it is compulsory power over the action of the Legislature. In view of the rights of the creditor under this contract to enforce it in the way we have stated, the compulsion is on the Legislature to levy a tax, and realize it so as to have it in hand on the 1st day of January and July of each year. The penalty is, that the bond will be forfeited, and the mortgage enforced, and the normal life of the State be in the hands of the creditor. All her sources of revenue are mortgaged to him. She can only prevent its enforcement, and the revenues necessary for her existence, from being appropriated by him, by responding to his demands promptly and certainly. To this she is compelled. If she fails she perishes, or her life is choked to the extent of the failure. Is such a Legislature the free, unfettered representative, and can it give voice to the will of a free people? Does it meet with the same unfettered power to do its own will, as Legislatures before have met? It is said, it is the duty of the

State to meet her debt promptly; conceded; but is that duty higher than to live? Is it above the duty to provide for the necessary expenses of the State? If not, then a contract that puts a claim above them must be void. Has the Legislature the power to give a preference to this duty, over that of the higher and vital duty of paying the salaries of her officers? I unhesitatingly affirm, no—and cannot doubt the correctness of the conclusion.

But again. These essential duties are left to the free action of the Legislature by the constitution. They are more imperative by far than the duty of paying the creditor his interest. Why should the one be left free by the constitution, and by contract the other made compulsory? Yes, compulsory, by a power over the State's vitals. Free it was intended she should be in her action as to her own government and people, and that freedom cannot be mortgaged as a security for the bond of her creditor. Can it be bargained and bartered in the market by the Legislature, like a worn-out garment? If so, instead of being the proud representatives of freemen, it is but fit to stand for slaves, and obey the behests of a master. This is not what the constitution designs, and can never be allowed.

If the Legislature can by contract give creditors the power to compel the levy of eight hundred thousand dollars per annum for their benefit, why may it not by the same means contract, that they shall compel the levy of two millions, or ten? Concede the *power*, and who can mark the limit of its exercise, or

say thus far shalt thou go and no farther? No court can fix the boundary line where the power ceases to exist; and so, the principle conceded, it involves the right to give creditors the power to compel the levy of all the taxes that could be levied, and so give them the control over the entire taxing power of the State; and thus the full power, which the Legislature itself has over this vital governmental and legislative function, may be the subject of contract. This is to bargain away the government itself—a thing not marketable, or transferable, as I understand the principles of our constitution. Add to this, however, the proposition, that such a contract may be obtained by bribery and the corrupt use of money, and that the courts can give no help, as is the contention of the defendants—that the only remedy is, not to vote for the faithless representative next time, or to expel him the Legislature; but the people must pay; the debt be valid; and then our constitutional system is but a farce—the rights of the people a myth.

But, why shall the Legislature not thus give control over its free action? The answer is, it holds all its powers as a trust, and the duties of that trust, the functions of the trustee charged with them, can never be sold, never trammelled, never subordinated to the will of another, by contract, without interfering with, and frustating the objects of the trust, and defeating or obstructing the arrangements of the constitution. Such a bargain is, therefore, by necessary implication, forbidden. When exercised under this compulsion, the Legislature would not act as the law-making depart-

ment of the State, from its own free, untrammelled
impulse, at its own will, as the representative of the
will of the people, but would be under the control
and compulsion of its creditor, whose will it is bound
to obey, at the peril of the life of the State, and in
this, would be *his* representative or agent, rather than
the representative of the *people* who elected them.
This can only be a gross departure from the terms
of the trust under which it holds its power; its con-
summation, the enslavement of the State to the extent
the power exercised.

We have two illustrations in our own Reports, that
occur to me now, of the principle that the Legisla-
ture cannot transfer control over its own functions.

The case of *Marr* v. *Enloe*, 1 Yer., 453, was an
attempt by the Legislature to confer on the counties,
through their county courts, the power to levy a tax
to meet the current expenses of the county. This
was done before the constitution of 1834 had given
the authority, as now exists, to authorize counties and
incorporated towns to levy taxes for county and cor-
poration purposes. This court, by Judge Catron, with
more than ordinary vigor, repudiated such a right, and
held the law unconstitutional and void, saying: "Is
taxing the people an act of legislation? That the tax-
ing power belongs to the Legislature, and that exclu-
sively, and is, if not the most important, at least
of equal magnitude with any power entrusted by the
constitution to the general assembly, is a truism never
doubted or denied in Tennessee. Can this constitu-
tional right, by an act of the general assembly, be

vested in a few individuals in each county, who are not *dependent* on the people, to tax without limit, and even spend at pleasure, without responsibility and without control?" The justices were not then elective, but appointed by the Governor. After denouncing this tyranny, he holds the act a nullity.

In the case of *The State* v. *Armstrong*, 3 Sneed, 634, this court, through Judge McKinney, in terms of vigorous reprobation, held an act void, that proposed to confer on the courts the power to grant charters of incorporation, though the powers of such corporation were all defined by the act, when created. The principle on which this was done is, that it was an attempt to confer the right to exercise legislative power on the county, which power was confided to that body alone.

These cases are not identical with the one now in hand, but the analogy is striking, and the principle the same. The transfer of the power to the county court in one case, and in the other to the circuit and chancery courts, was but giving to these bodies the control of that power to the extent indicated. To this extent it was a complete control, and was a direct exercise of the power. But there is no difference in principle, whether I give a man the right to do an act that I am to do, or more circuitously, I confer on him the power to compel or control my own action. To the extent that he exercises that control, and may use that power effectively, it is an exercise of the power which I was bound to exercise—only he uses me as his instrumentality. All action under the

will of another is enforced, and not free, and is but the act in fact of that other, disguise it as we may.

So in this case, the Legislature has given the creditors power to compel the Legislatures for ninety-nine years to levy a tax sufficient to meet their debt, in preference to all other claims on the State—her official salaries and all, and this at the peril of enforcement of their mortgage, though it should paralyse all the departments of government; and under this compulsion it is agreed, and so written, all future Legislatures for this period shall act. Is not this practically the transfer of power and control over the Legislative department, and is not such control, in fact, the right to compel the *mode* of action, to the extent of the debt, of that body? And if so, what is thus compelled, is but the act of the party compelling, and not of the mere instrumentality, the Legislature. Therefore, in the exercise of the taxing power, so vital to the State, the Legislature to the extent of paying this debt, acts solely as the agent of these creditors, under their will, and do their bidding, and in this the people can have no voice in the future, nor that body any freedom. It is dominated by the necessities of this contract, and thus the legislative body of a free people reduced to the position of servants of a master, rather than a body of freemen.

The principle of the cases cited, forbids us to recognize such power. In fact it is evident that to the extent of the debt due these parties, they can compel the action of the Legislature, and in this is found the real security which inheres in this contract. As I

have shown, all the revenues of the State, with two special exceptions in sec. 3, are subject to this mortgage. That is as clear as sunlight. The fact that the exceptions are put in the act, to secure interests deemed too sacred to be charged, is unmistakable evidence that the Legislature so understood what they were doing, and did what I have maintained they have done. I am compelled to hold, that body has no power to do this, unless I can agree that a creditor may be given rights that shall override the right of the people to have a free and unfettered Legislature. In other words, that the Legislature can destroy or fetter, or burden, the very central force, that sends vitality through the whole body politic. This I can never do.

That this power is in violation of the express affirmation of the constitution, and in derogation of its clear and definite prescription, is demonstrable.. By the constitution it is provided, the Governor " shall, at stated times, receive a compensation for his services ": Art. 3, sec. 7. By art. 2, sec. 23, the compensation of the Legislature is fixed to be paid them for their services. By art. 6, sec. 7: " The Judges of the supreme or inferior courts shall at stated times receive a compensation for their services, to be ascertained by law." In addition, numerous officers are provided for, and all must be paid out of the revenues of the State, in some form; for offices under our system, involve duties and salaries, as necessary incidents to office. Payment of these is necessary to the continued action of the government. Such as I have

mentioned above are required to be paid at stated times, and, as a matter of course, paid in money. When these coupons mature, they have the preference; they may be tendered, by the terms of the contract, and thus the taxes levied and received may come into the treasury, as coupons, till they are absorbed. They will not pay salaries, they are not money; with them no salaries can be paid, no expenses of the State can be met. Then here is a contract to do, and be compelled to do, what if done, as agreed, may deprive the State of the power to do what the constitution says shall be done; and under the settled Federal law as to contracts, it must stand as a contract, as unchangeable as the laws of the Medes and Persians, and no power beneath the sun 'can change, alter or impair the force of its obligation, if once completed. I cannot, as a Judge of a free State, assent to the proposition, that such a power is confided to the Legislature under our constitution. If this shall be permitted to pass into complete execution, and this court fail to lay its hand upon it. and restrain, then the act is irrevocable—the chain can never be broken. With these convictions, I should be recreant to the trust reposed in me, and an unfaithful guardian of the constitutional rights of a generous people who have honored me by my high place, if I should fail to say, that for myself it shall not be done.

An argument, ingeniously framed and most skillfully put, has been made, to the effect that the coupons can never be tendered till after maturity, and this can never occur till after default on the part of the State

in payment of the interest, and this cannot be presumed will occur.

The answer is, this does but state a fact, that the right can never arise till the debt is due; but the question is not how or when the right over the State's revenues shall arise, or under what conditions may it be exercised, but can such a power be granted to arise at any time, under any conditions? The fact that it can only be prevented by a certain defined course of action, is an element that renders it obvious, and demonstrates its controlling power. The contract by its terms, it is necessarily conceded by this argument, gives the compulsory power over the Legislature which I have argued it does; and to the extent the power of compulsion is given, and to the whole extent, has the Legislature transferred into the hands of others than itself, the legislative power of the State conferred on them as a sacred, inalienable trust, to be exercised by that body under the limitations of the constitution, but subject to no other restaint, no other will, nor obedient to no person, whether individual or governmental, beneath the sun.

It has been said, that the State can only be subject to the influence of this contract by violating her plighted faith, and failure to keep her promise. Theoretically this may be so, but practically I must know from the nature of the thing provided, and from my knowledge of the operations of our system of laws and governmental machinery, that this is a mistake—if by default and breach of promise, is meant a willful violation of the terms of her contract, or willful

failure to provide the means of paying the interest to the day. It possibly may in most cases be done, but it is probable in many cases it cannot be done, without at least doing in fact, what the Legislature is compelled to do by this enactment, that is, by giving a preference to this claim over the support of the State itself.

After the first of January, there must be first gathered into the treasury and laid aside, the sum, or about the sum, necessary to meet the semi-annual interest, say $405,000, and so again after the first of July. The taxes being levied in one aggregate mass for this and all other expenses, unless it be that no pressure of misfortune, no drouths, nor epidemics, with baleful breath and black wing—no monetary crises or revulsions, such as, vivid in the memory of all, occured in 1873—no such long period of universal pressure as followed, is again to come—then such a failure will come, and no human foresight can avoid it, no skill evade it. And then what must be the result? The officers of the State must go unpaid, their services be performed on a credit or not at all; the functions of government be performed without the vital force of money to support them, and the other creditors of the State be postponed to the claims of the mortgagee under this mortgage. Either this must follow, or what is still more revolting, the State must, like the mortgagor we have referred to, when his crop has failed, his labor been unrewarded though faithfully given, stand, at the end of the year, before his creditor, with bowed head and broken spirit, and ask or

beg for indulgence, nogotiate for dely, and pray that the mortgage be not enforced. It is at *his* option, however, whether he do so, or grant further time to breathe. The contract she has made then will be felt to be too heavy a burden to be borne by a free people, and in her madness, she may be driven in desperation to repudiate her debts, and break the toils, like a giant bound, that have been unwittingly placed by her representatives about her, to fetter her free limbs. I would not see her thus bound, because I believe that free from bonds she yet may be trusted to keep her faith, and maintain her honor unsullied. If the opposite be the fact, then no legal cobwebs will hold her to her duty, and the bond is as worthless as the paper on which it is inscribed.

Our statute book, since 1873, if not before, abundantly sustain what I have said. Statute after statute stands on it since then suspending the enforced collection of the taxes, even for the support of the life of the State, and we all remember the issuance of warrants receivable for taxes some years since. Some have had experience in receiving them for hard toil in her service. We cannot but assume that all this was not of choice, but the result of influences beyond the control and foresight of our Legislature. He who assumes that no such times will come again, must assume that history never repeats herself, and in the blindness characteristic of hopeful youth, expect that sunshine, prosperity, and above all, stability and fixity, shall characterize all the future years—the ever shifting surging elements that make up our national life,

will cease to wreck fortunes or blast hopes—the polit-
ical sky be forever unclouded—the financial movements
of our Republic be in the future conducted by more
than human wisdom, uninfluenced by the madness of
speculation—secured against all its reckless consequences.
He who can believe this, may well look for the mil-
lennial day to dawn; for if he is right, the world's
redemption from evil certainly draweth nigh. But
sober wisdom can indulge no such dreams, and must
look for a prophecy of the future, in the records of
the past; and this gives no uncertain utterance. Its
lesson is one of warning, and assurance that the thing
that hath been, will surely be again, and no wisdom
or device of men will make the life of man or State,
anything but one of mixed evil and good, of pros-
perity and adversity. When the one or the other, no
one can say.

One other view of this question may be given.
The only assumption on which what is proposed can
even plausibly be palliated is, that the charge in fact
will not absorb all the available revenues of the State
at any time, or may never practically reach the results
indicated. How that is, I do not know. Nor is it
important to settle. The lien, the charge, the mort-
gage given, as I have shown, is fixed on *all* the rev-
enues, save the specified exceptions. Like the case
of a man mortgaging all his lands, including his home-
stead right, for a debt; it may be worth more than
the debt at present, largely more, and *may* on sale
leave a surplus. But it may not; and all experience
shows the futility of human calculations to fix in ad-

vance what may be the result.    But by the mortgage
all his property is charged with the debt, and
thenceforward he holds only a qualified right in it—
an equity of redemption—the creditor the beneficial
interest, and the legal title.    Can a Legislature do
this at all, either for a small or large debt, is the
question.

This is a question of *power*, not of the extent of
its exercise in this particular case.    If the power be
conceded, that has no limitation.    Discretion may pre-
vent its exercise to the destruction of the State, but
that discretion is not for the judiciary, but the Legis-
lature to measure.    It then, if admitted as a power,
is arbitrary in that body, and there is no restraint
whatever upon its exercise.

To test certainly the question of power, let us see
what its admissions of necessity involves.    If the Leg-
islature can thus charge by such a mortgage, the whole
revenues of the State, to the extent of eight hundred
thousand dollars, it may give the same lien to the
extent of two millions, or five, or any other amount.
If it may do this, and mortgage to the extent of the
sum here proposed, then it could, after ascertaining all
its sources of revenue, proceed to assess all for ten
years, by an assessment law to the full amount it
would bear, and then transfer all these revenues by
contract to the holders of her bonds, to pay bonds
and coupons, and make both a tender for the whole
tax levied, and so deprive the treasury of all revenues.
If the bargain now under consideration is in the power
of the Legislature, the one supposed is equally so.

Under such a contract for ten years, the creditor possibly might thrive, but the State would inevitably, (to use the language of an indictment for murder), "of this wound languish, and languishing die." To say that an admitted and complete power to do a thing by the Legislature, can be restrained within harmless limits, or the discretion prevented from being abused, if dangerous, is not to reason on principle, but to trust to fortune. No such power is given; its exercise involves paralysis or death to the State. Therefore no concession of such power, involving such results, can ever be made at all. Where the limit could be fixed for the extent of its exercise is to be marked, no human sagacity has ever yet been able to define. It is in the nature of the thing, when conceded, unlimted—therefore cannot, for the reasons given, be conceded to exist at all.

In the consideration of this case, I dare not be influenced by the fact that the State is assumed to owe and be bound in honor to pay the bonds now outstanding, or that her plighted faith will be broken if it be not done. My own feelings or convictions on this question, be they what they may, I cannot allow to influence me in the slightest. That is not the question. It is simply one of law—of constitutional power. When I find that power is not conferred, but forbidden; when I see the act proposed to be done is inhibited by the constitution, and as I think may touch the vitals of the State, however meritorious the claim, however it may appeal to State pride and honor, and the love I bear to these and

for my own native land, I must push all these aside, and follow the lead of my judgment, the convictions of my duty, and where these point, must fearlessly go.

I have not gone into the cases in the Supreme Court of the United States, holding States may make contracts of perpetual exemption of property from taxation, as well as many other questions presented in argument. Nor have I made large citations from authorities or decided cases. I have found it too much labor, in view of the necessary discussion of the main questions presented, to do this. I have felt compelled simply to give my own conclusions, with some of the reasons for them, without undertaking to cite authority on every · point, or answer all objections. I have reached that conclusion on principles I think sound, and of which I have no doubt. The only cases bearing directly on the validity of the coupon feature, are the Virginia cases. They have been carefully examined. With great respect for the tribunal pronouncing them, I am not convinced by them, nor can I agree with them. I cannot, therefore, follow them, but my own judgment. See 22 Gratt., 833, approved in 24 Gratt., 159; and 30 Gratt., 134, for these opinions.

On the subject of bribery and fraud, the bill, among other things, substantially charges that · the members elect to the Legislature had maintained, in their canvass for election before the people of the State, that there should be a compromise and abatement of the amount claimed to be due the holders of the bonds; and that all, or nearly all, were elected solemnly pledged

to obtain such a compromise. And it specially charged that all were pledged to their constituency to oppose the coupon feature of the bill, or any measure of settlement that should have as one of its terms that the coupons should be receivable for taxes.

It is also definitely charged, that on a large portion of the bonds now proposed to be funded suits had been commenced in the Federal courts at Nashville, Knoxville and Memphis, by the bondholders, to enforce a lien claimed to exist by law in favor of the holders, on the railroads, for whose benefit said bonds were issued, and that a test case had been heard, and had been appealed to the Supreme Court of the United States, and now pending in that court for decision. In view of this litigation, it is alleged, said bondholders and railroad corporations entered into a combination and conspiracy to procure by improper means a settlement of the debt of the State dollar for dollar, with coupons receivable for taxes, with the understanding that when such settlement should be procured and effected, the said litigation between them should be dismissed and the liens claimed therein should be abandoned. This result, I may say here, would be the inevitable result of the execution of the act of 1881 by the acceptance of the new bonds, as the old ones are required to be given up and cancelled.

It is then charged that the combination supplied agents, called a "powerful, active and efficient lobby," with the means of corrupting the Legislature, or members thereof, one railroad company alone furnishing fifteen thousand dollars. It is averred as a fact that

large quantities of bonds, as much as six hundred thousand dollars, were furnished by the combination to be used in overcoming the majority against the proposed settlement. It is charged that members of the Legislature were invited by the agents selected to engage in speculations in these bonds, and many yielded to the temptation. The necessary capital and bonds are charged to have been furnished by the combination, and the profits, the amount of which depended on the vote of these legislators, it is charged were divided among the parties concerned.

The vote on the passage of the bill in the Senate is given, showing that it was at first defeated by one majority on the 1st day of April. A motion for reconsideration was made, and, on the 5th of April, the vote was reconsidered, and the bill passed by a majority of one vote, being, as the bill says, the vote of Senator Smith of Fentress, who changed from the negative to the affirmative, and thus gave the bill the majority of one. It is then stated, in substance, that in this he voted contrary to a pledge given on his nomination for his place—a pledge kept up, or not withdrawn, during his canvass; and that, pending the motion to reconsider and the final passage of the bill, no new argument or fact addressed to his reason or light shed on his conscience, was presented to him which could have changed his convictions and absolved him from his pledges to his constituents; that, by his own admission, he was offered fifteen thousand dollars to vote for the bill. It is then charged, on information and belief, that money and State bonds, and

profits in speculation on State bonds, were offered by
said lobby to certain members of the Legislature, who
received the same, in consideration of their votes in
favor of the passage of said bill.    It is then charged,
on information more particularly, that one Senator re-
ceived ten thousand dollars for his vote in favor of
the bill; another fifteen thousand to do so.    Other
facts and circumstances are added tending to sustain
the charge, clearly intended to be made, that the pass-
age of the bill was obtained by means of bribery of
members of the Legislature.

The substance of all this is, fairly understood, to
charge, that by means of the profits on bond specu-
lations (the bonds furnished by the combination), votes
were obtained for the bill sufficient to secure its sup-
port and passage.    And especially is it to be inferred,
from the statements of the complainants in their bill,
that the Senator who changed his vote on reconsider-
ation was influenced to do so by the use of consid-
erations other than reasons, or arguments to his judg-
ment or conscience.    This, in connection with the
suggestion that he is charged to have admitted that
he was offered fifteen thousand dollars to vote for the
bill, and the previously stated facts, can only fairly
mean that his vote was changed by the influence of
gain and not legitimate argument.    In other words,
that he was in some way bribed.

Taking all the charges on this subject, they pre-
sent the question fairly, though not as fully and defin-
itely stated perhaps as might be, of a charge of bribery
of sufficient members of the Legislature, who otherwise

would not have voted for the bill, to procure its ultimate passage.

As I have said, some of the facts that raise this question are not as definitely stated as they might be; but under the cases we have before referred to, as this case stands before us, even an equity defectively stated will reverse the decree of the chancellor and sustain the bill in court. If defects are found, they are matter for amendment in the court below.

Assuming the charge to be, that a majority was obtained for the bill by bribery, or the purchase of votes enough to secure its passage, the question presented for our decision is, Will these facts, if proven on definite allegation, if not so made now, furnish any ground on which a court of equity will enjoin the completion of the contract, which is authorized by the act so passed, by the board created to carry it into effect?

I may say in the commencement on this subject, that it presents no little difficulty, as I think, whether the one side or the opposite shall be attempted to be maintained. Much of weight may be presented on either side, and much that demands the gravest thought on the part of a court before a satisfactory conclusion can be reached either in the affirmative or negative. Certain, to my mind, the argument is not all on the side of the negative. I think the cases that have been cited before us, and the arguments so ably urged, do not fairly present the real question involved. It is not whether a law of the Legislature may be shown not to be a law, by showing the members of the

Legislature had been procured to vote for its passage
by means of bribery; but, whether a contract, if ob-
tained by such means, clearly shown, or admitted for
the purposes of the argument and decision of the
question raised, as in this case, would be ground on
which a court of equity could be invoked to prevent
its execution and completion, so as to fix a liability
and charge upon the property and estate of the tax-
payers of the State.   In other words, whether the
parties charged to have bribed the members of the
Legislature, shall be permitted to have the nefarious
scheme consummated into a complete and executed con-
tract; and the taxpayer, on whom the liability to pay
and bear the burden of the contract thus imposed, has
no remedy, and no possible means of legal redress or
legal help against the threatened wrong to be inflicted
on him.   If the affirmative be true, and there is no
remedy, it would strike every one that it is a radical
defect, either in our legal machinery, or in our reme-
dial justice as expressed in our system of jurisprudence.
Can it be possible that corruption is a means legally
effective, with no legal check in our law against it,
by which contracts may be fastened on the State, and
her people have to respond to the burden by paying
their money, the result of hard toil and unremitting
industry, and her courts be unable to afford any rem-
edy?   I confess, with a case standing as the case
made in this bill stands, the facts, for the purposes
of this opinion, to be treated as admitted, I can but
feel that it is the imperative duty of this court to
establish a principle, if not forbidden to do so by the

Constitution or some imperative and controlling reason found in the nature of things, or controlling interest of a wide-reaching public policy, too weighty to be disregarded,—to find a remedy and fearlessly apply it. Whether there be in our system of constitutional jurisprudence, or in the nature of the thing, fairly considered, or in weighty and all-controlling necessities of public policy, such a barrier as indicated, are questions demanding the deepest consideration, the profoundest thought of the judge, and if the answer be in the affirmative, he should submit and yield to the considerations that compel such a conclusion. But if not thus compelled, the highest mandate of duty is to assert the contrary, and boldly maintain the right as he may find it.

I may say further here, that in my judgment the question does not involve in any proper sense any invasion of the province of a co-ordinate department of the government on the part of this court, nor any inquiry into the *motives* of a Legislature, or of any member of that body, in any accurate use of the term motive; but that, in fact, it only involves questions of fact, that might well be examined by a court, under proper limitations, in order to ascertain and declare the result, as bearing on the right to obtain the contract proposed, and the benefits in this branch of the case, charged to have been the object and purpose of the alleged corrupt combination, which combination, and the use of the corrupt means stated, I am compelled to take as true, on the state of the record as it stands before me for decision. These benefits on

the part of the railroad companies are stated definitely to be, the dismissal of a suit for large sums against their property now pending on appeal, and an abandonment of the right thus claimed. On the part of the holder of the bonds, they are to secure a mortgage, that gives him a legal, enforceable preference in favor of his debt on all the revenues of the State for ninety years,—he giving an extension of time of payment, and abating half the semi-annual interest.

These are the parties who are to receive the benefits of the contract thus charged to have been procured, and these parties are charged to have been the bribers of the . members of the Legislature, in order to secure the advantages, great or small, which are stated.

In this view the real question is, shall these parties, under this state of facts, have their work consummated and sanctified, either by the approval of this court, or the admission that we are powerless to prevent the consummation? And shall the taxpayers of the State—our own people—be compelled to learn that they must submit, bear and pay all such contracts, or, in desperation, "bow the lip of honor in the dust," by repudiating an obligation that bears on its face the pledge of the "faith, honor and credit" of the State, with its broad seal thereunto affixed, as the assurance the pledge shall be made good?

I frankly say, that to such a conclusion I would come slowly, and with fearful apprehensions as to either its correctness as a matter of law, or its soundness as a matter of public policy. If compelled to so an-

nounce it, it must be with forebodings, in the light of history and sound legal philosophy, that would give to me monitions of danger and ruin to my proud State, before which I could but sadly bow, but which I would love to avert.

As to how the truth is in fact on this question, I can know nothing. The charges are not to be considered as true in fact, as if proven, but only as technically admitted on the record for the purposes of this decision. As to whether they be true in fact, that depends on the proof that might be made, after an answer, should the case be sent back to be further proceeded with on this issue. For the purposes of this opinion, I must treat them as admitted. Assuming this, it seems to me, the question stands before me in this light: The party who maintains there is no remedy, must be prepared to maintain either that bribery of members of the Legislature is a legal and constitutional method of obtaining a contract, and such contract therefore valid and binding, or that, conceding this is not so, then, for some cause, there is no power in the courts to investigate such a question. And, practically, the result is the same. The briber may have his bond, and the people, whose representatives have, on the assumption, been faithless to constitutional obligation, must pay the debt thus imposed, not only in this, but in all like cases, and there is no power in courts to give help or relief from this burden. If the contract is one that is not legally and constitutionally obtained, and one that a court would not on these facts, shown affirmatively in a proceed-

ing in court, enforce, it does seem to me, preventive justice might find a remedy to stay the consummation of such a wrong by its completion. If so, then the only means to do it is by a bill in a court of chancery, where an injunction to prevent threatened wrongs of this character is cognizable; and the only party against whom that remedy could be effectively applied, at this stage, is this funding board; and if enjoined, the result is certainly thereby attained.

I understand it to be conceded, probably—at any rate, not seriously contested,—that if these facts were shown in a case where such a contract was sought to be enforced by the party guilty of the bribery, it would be the duty of the courts to repel the claim and refuse the relief. To enforce actively such a contract obtained by such means, is too shocking to the sense of right to receive the assent of any court. It has been intimated very strongly by this court, in the case of *Furgerson* v. *Miners and Manufacturers Bank*, 3 Sneed, 624, that such a case would demand that the courts should disregard the authority of an act of the Assembly upon this ground, as said, on the ground of fraud and imposition on the Legislature. And so, in the case of *Sunbury, &c., R. R. Co.* v. *Cooper*, 33 Penn. St., 278, the same principle was announced.

If this be conceded, it is, it seems to me, an answer to nearly all that is said in the way of objection to the exercise of the jurisdiction by the courts in the arguments, either of courts or counsel. For this relief could not be granted, without either an admission of the facts or proving them. In either

case, it would be doing the precise thing that it is so earnestly argued cannot be done,—that is, ascertaining the facts as to the bribery of members of the Legislature, and then making a decree based on these facts when ascertained. It follows, that if what we are asked to do now is forbidden, it would equally follow, that it would be forbidden in the case of a proceeding to enforce the contract thus obtained, or to compel the defendants in this case to issue the bonds, if they had refused or declined to do so. I take it no one would deny they might have been compelled to perform the duty imposed by *mandamus*, if the law is a valid constitutional enactment. In such a suit, should it be answered the law was obtained by bribing members of the Legislature, and a stupendous scheme of bribery, such as is charged in this bill, made out, the question would be fairly presented: Would this court hesitate to repel the parties from such relief on such a state of facts?—supposing the case was simply heard on petition and an answer containing the facts, and stood on these as admitted. If such would be the result, then the court would act on these facts and no others. Would not this be equally in the face of all that has been urged, as would be the case now presented? If this is not what would be done by the court, and a decree would be rendered in the face of, and over these facts thus admitted, it must be on the ground that there is no remedy against obtaining a contract by bribery. Practically, this is to assume and make such contracts legal, and give them the stamp of the approval of the courts. To

this I cannot assent.    There is something wrong in any view that leads to such results.

But I think all the arguments based on the idea, that to make such an inquiry as is here proposed, is forbidden as an invasion of the sphere of a co-ordinate department of government, or taking the supervision or control over the Legislature, are fallacious.    I admit the principle fully of the necessity of the division of the powers of government, and the inhibition upon either department intruding upon the sphere of the other.    It is well expressed in our Constitution, art. 2, sec. 2: "No person or persons belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in cases herein directed or permitted."

If I can show that to do what we are called on to do, does not infringe on this principle, the main difficulty presented is met.

What power is exercised by the legislative department?    Law-making power.    That is, that body enacts laws, in its own way, as provided by the Constitution, and for its own reasons, and I may add, moved by its own motives.    All this is conceded. With all this we have nothing to do.    That body legislates; that is its function.    Now if we attempt to do this, we go out of our sphere, and into that of the other department.    If we should attempt to decree what action should be taken, or what should not be taken, by that body, we would be interfering with their powers.    If we should propose to enjoin that body, or any of its members, from acting freely

and from any motives it or they chose in the passage
of a bill, we would usurp power not belonging to us.
But to decide upon the validity of the act when done,
or contracts resulting from it, is our province.    This
we do on cases made presenting the issue, and in this
we do not legislate, nor in any proper sense control
the action of the Legislature.    We but declare their
action valid or void.    This is what is done almost
every term of this court.    But no one ever thought
that thereby we were taking control of, or subordi-
nating the Legislature to the power of this court in
any forbidden sense.    The Legislature might at any
time pass precisely the same measure if it chose, not-
withstanding our decision, or one obnoxious to the
same objection, and this court could not prevent, and
would have no power to interfere.    We could only
declare it void, if brought before us in another case.
We do not, in my judgment, in adjudging and de-
creeing upon facts proven or admitted, perform any
function of legislation, or exercise any power confided
to that body; nor would we in this case adjudge
anything against the 'Legislature, nor impede their fu-
ture action in any way.    We would only say, that a
contract obtained by bribery of members of the Leg-
islature, thus securing its passage, should not be exe-
cuted and made binding.    The same body could meet
again, and at once proceed to sell their votes in an-
other case,—if base enough to do it, which we would
not presume,—and our decision would not in the slight-
est infringe upon their freedom so to do.    That body
would be perfectly free to engage in as much corrup-

tion as it chose, so far as the action of this court is concerned, and our decree would not even purport to limit the enjoyment of this license to do wrong.

How, then, can it be that we are in any way intruding on the province of that body, or subordinating it to our jurisdiction in its action? No member is a party to this suit; nor is the Legislature. How, then, can that body be decreed against? The decree made is what is done by us. If that nowise interferes with or infringes on the powers of the Legislature, then there is no violation of the inhibitions of the Constitution in exercising the jurisdiction invoked.

It might and would render it more difficult for corruption to successfully attain its ends in the future. That is no undesirable end, however; but that would only be because such acts might be subjected to the scrutiny of courts. It might, for this reason, operate as a check on such practices in the future.; but this would only be a result, it would not be forbidden by our decree. By the decree made in such a case, the only parties controlled or affected by it would be the Board in its action,—the effect of which will prevent the parties charged with the bribery from reaping the reward of corruption. They would be controlled, and their scheme defeated. But the Legislature would be as free and unaffected in any constitutional function, as before the decree. Can that which leaves that body with all its powers—does not exercise one of them, or prevent their exercise—be in fact an infringement on the sphere of action of that body? I con-

fess I am unable to see how this effect shall follow; therefore, cannot see the force of the argument.

What would we do in this case, more than we would do in an indictment for bribery, charging that the defendant bribed a member of the Legislature with intent to influence his vote? To do so, is made a felony by sec. 4797 of the Code. Would we not hear proof that the member had received the money for the purpose stated? Members would be no party to the proceeding, but that would not be heard as an objection. If, however, such an inquiry is to control the Legislature; to subordinate it to the courts; to infringe on its province and powers, then the Constitution would forbid the inquiry; and the law authorizing such a prosecution is void. Such a prosecution could never be made out, except by showing that the member, or members, received the money—accepted the bribe; for there could be no bribery without this. It would only be an offer to bribe; which, also, is a felony by the same statute. This demonstrates that such an inquiry is not unconstitutional—not an intrusion by one department on the sphere of another; for this can no more be done in a criminal than in a civil case. Until a difference can be shown, the argument cannot be met.

This, it seems to me, disposes of all the arguments drawn from this source. If it is not forbidden by the constitution to prove in court the fact that a member of the Legislature has been bribed, even where he is not a party to the proceeding in such a case, it is not forbidden in any case. If no constitutional

inhibition, then it must be rested on the ground of indelicacy, and legislative regard for the feelings of the member or members, and that is as much applicable to the case of an indictment as in this case. The ends of public justice would be held to override all objection on this score. Would not the ends of public justice be equally served in this case, conceding the facts to be as charged? Would not justice to the whole people of the State demand that no such contract be fastened on them? What would an ordinary case of bribery in a petty case, be in this aspect, as compared with a debt of twenty-seven millions, and a mortgage on the revenues of the State for eight hundred and ten thousand dollars annually?

I may as well say here, that the fact that this is a renewal of an existing debt has no bearing on the legal question. If the inquiry cannot be made in this case, it cannot be done in the case of the creation of a new debt. The result would be, that a Legislature might, under this principle, be bribed to issue bonds to the railroads of the State for fifty millions, and pay a majority of the members one-half of the bonds to pass the law, and they might take the bonds, sell them, and the people be bound to pay them; or repudiation, which is no legal remedy at all, be the only resource—no help anywhere else. The facts might all be abundantly susceptible of proof, or proven, and yet the inquiry could not be made; the debt be fixed all the same. From such a consequence I am compelled to shrink.

But more. The principle goes further. If the

Legislature should put in the face of the enactment authorizing the issue of the bonds, that the law was passed in consideration of the corrupt contract, the bonds would be equally binding, especially in the hands of a third party, can it be that parties like this funding board would not be prohibited from executing bonds authorized by such a law? No one will affirm it would not be done. If this is conceded, the whole question is conceded. For to do this the court would simply do what is now proposed; finding the facts admitted, or clearly proven, declare what is the result, and decree that result. There is no escape from this conclusion, as I think.

The illustration given of the supposed working of the principle, in the argument of the other side, that in one case the proof would be made by a mere preponderance, and the contract held void, and in another less skillfully concocted, the proof would fail, and so the act be good in one case and bad in the other, has no force in this case, where the remedy is preventive, and goes to the decision of the whole contract. It would be stopped at its source, and no more cases could arise out of it; and I confine my opinion to the very case before me, not to another.

I confine the whole operation of the rule I would establish, to the obtention of contracts by individuals from the State, or other public agencies, by means of bribery. With these limitations it can be made effective, and will harm no one—might expose bribery—but no court can feel that that is not a most desirable end; certainly not a thing to be sheltered from exposure.

If the constitution forbids this inquiry, it can never be made by the courts in any case; and if it does not, it ought to be made in the case of contracts proposed to be made, if anywhere, for there is no other remedy.  If executed in the form of the bonds in this case, it is idle to say the Legislature can repeal the law.  The contract will be held unaffected, and enforced in spite of that.  To say the State shall repudiate the debt, is not a remedy, but only the act of force or will, that cannot be coerced.  That the member can be expelled from the Legislature is no remedy, it is only punishment inflicted by the State. To say that his constituency can refuse to re-elect him is equally futile; they could do that in any case. But it would not affect the liability on the bonds in any way.  That would remain precisely the same in both cases; and so the end sought would be totally ineffectual, and no remedy at all.  It certainly is almost farcical to talk of inflicting the penalty of non-election on a member who has ten or fifteen thousand dollars corruptly in his pocket, for his vote.  He could well afford to stay at home on these terms.  Such an argument would be 'cruel mockery to a burdened people, when that burden was fixed on them by corruption.  It would be as appropriate to say to a man whose name had been forged to a note of ten thousand dollars, that his remedy was complete, when the State had indicted the forger and convicted him of the forgery, but you must pay the forged note all the same.  Is not that this case?

The cases to which we have been referred as de-

ciding, or laying down a principle against the power of a court to hear evidence of bribery, on an issue of this kind, are the well known case of *Fletcher* v. *Peck*, 6 Cranch, 87; *Sunbury Erie Railroad Co.* v. *Cooper*, 33 Pa. St., 278; *Wright* v. *Defrees*, 8 Ind., 302; *Humboldt Co.* v. *Churchill Co.* 6 Nevada, 40; *Slack et al.* v. *Jacobs et al.*, 8 W. Va., 712; 38 Cal., 189; 25 Mich., 99; 22 La. Annl., 545; 5 S. Car., 312; 49 Mo, 604; *People* v. *Draper*, 15 New York. We have also the view of Judge Cooly, Const. Lim., 225, and perhaps some others.

All these cases to which we have been referred, and which have either decided or argued that no inquiry can be made as to the question of bribery of a member of the Legislature, have gone on two grounds:

First. That it was in violation of the principle of a separation of our government into departments; and

Second. That no inquiry into the motives of the Legislature could be make.

I shall not further notice the first. The second, I think, is a mistaken view of the question, as applied to the investigation like the present. What is the motive that prompts an act? It may be defined to be, the last and controlling impuse that impels to the act, or all the impulses combined that so prompt. If this be correct, then I say motive is *internal,* subjective, to use the language of philosophy, a thing we cannot ascertain—can only approximate at best, or infer from conduct. This is the only accurate sense in which the term can be used. In this sense I frankly concede that the motives of a Legislature, or any mem-

bor of it, cannot be inquired into by a court. It is beyond the range of his power. But it is a misnomer to say, that an inquiry into the *fact* of bribery is an inquiry into the motives of the Legislature, or of the motives which prompted a member to action.

It may have been that the weak member who accepts a bribe to vote for a measure, has been actuated and controlled at the time by the most approved motive, such as the thought of a helpless and indigent family being raised to affluence and ease, and the love of wife and child may have undermined his sense of right. It may have been that an honest debt, for which his brother or a son were bound as sureties, and which he could not meet, was pressing on him, and he yielded from the motive to save them from ruin. He may have reasoned, that I am going to vote this way anyhow, or at any rate. I am free to do so if I will, and no one can question it; therefore, I may take the offered money and save those to whom I owe so much, from suffering. All this may be true, and if the act was controlled and prompted by these things, these would be the motives of his conduct. But if indicted for the offense and all these things appeared clearly, it would not change the verdict of the law; he would be convicted. Why? Because it is not a question of motive in this sense, but it is a question of fact. The law says, when he took a bribe for his vote, that this act is corrupt, and forbidden, and he must suffer the penalty. The punishment might be in mercy mitigated by the jury, or the executive might pardon; but he is guilty of

the entire felony defined by the statute, regardless of all the motives that stirred his heart, and controlled his act, and prompted what he did. It is not an inquiry at all, then, as to the motives of a party, when you look into the facts constituting bribery, but one of fact.

The reasons are obvious. Public policy and the evil results of permitting such acts, require the *acts* should be forbidden; and when the act is proven, that is, that the party accepted the money for his vote, the offense is complete, when he in good faith agreed to give his vote for the money and accepted it. Whatever might have been the motive for such a contract; however praiseworthy it might have been to have desired it for appropriation to a generous or honest use, this does not relieve him, nor can it be heard to show him guiltless. A man might, it is true, receive money, with a view, not of *bona fide* selling his vote, but to detect and expose the party seeking to bribe him, and he not be guilty; because he does not *intend* to perform his contract nor do the act, and does it not to be bought, but with the purpose *not* to be bought. Therefore, while apparently this would seem to be a case of bribery, it is not, because the intent to be bribed and to vote as agreed is not present, and the purpose is not to sell his vote, but to expose and punish another party who has such guilty purpose. This does not contravene in the least the principle, but sustains it. The act, with the forbidden *intent* or purpose, is the only point of inquiry, not the *motives* that prompt to accept a forbidden contract.

The only inquiry in the case before us is, not the motives that prompted the members to enter into the contract, but did they enter into the contract with intent to vote, or agree to vote for money, as was bargained? If so, the bribery is made out.

It is really an inquiry as to whether a bargain or contract, forbidden by law, has been actually and in fact consummated—that and nothing more. So I cheerfully admit that no inquiry can be had into the motives of a Legislature in passing a law, nor is such inquiry possible or proper. The legislator is free to act from any motive he chooses, being responsible to his constituents only for his acts. The wisdom or policy of the act is for him, and we have nothing to do with these. In most of the cases referred to, it was strictly an inquiry into these that was in issue before the court.

But when we come to an enactment under the rule in the Dartmouth College case, which is a law, *plus* a contract, superadded, then I think quite a different question is presented. I would confine the rule strictly to cases where parties obtain contracts of this class from the Legislature, and thus deprive all of the temptation to seek them by corrupt means. The fact that the doctrine of the Dartmouth College case has turned such enactments into another and different thing than a law, makes it, as I think, not only proper, but public policy of the weightiest character demands imperatively the distinction suggested, and the principles settled as to the elements that enter into this contract sustain it.

The distinction between a law as such, and a contract, or the contract resulting from it, or found in it by construction, is clear. The law takes effect as the Legislature enacts, or at the time the constitution prescribes. It does so *propia vigore*, by virtue of its passage, and is dependent on no other will. This case is an apt illustration. The enactment is complete; the Legislature has done all it can do, but it is not a contract—it may never be; other parties, the bondholder, must act, and that freely and voluntarily, before it is a contract. They must assent to it, accept and execute it, before the contract comes into existence. The idea that a law can be made by the independent or conjoint act of these bondholders, is an absurdity. The Legislature alone can make laws, but they cannot enact contracts. That body can propose them, but the creditor or contractor, the other party, must complete the work; without his act it can never be done.

But to go further. It is settled by all the cases, that there must be, not only parties and assent, but also a consideration, in order to make it a contract; without this, it is a mere gratuitous license or privilege, and is not a contract. In addition, it has lately been held, that even all this may exist, and yet if the consideration be immoral, as in the case of an act of the Legislature for a valuable consideration incorporating a lottery: *Stone* v. *Mississippi*, 191 U. S. R., 820; that in such cases it is not a contract, but such acts of the Legislature may be repealed, and the contract not protected by the constitution of the United

States from impairment, because either not one, or not a valid one: See cases, *Christ Church* v. *Philadelphia*. 24 How., 300; *Newton* v. *Com.*, 100 U. S., 561, and other familiar cases.

From this it follows clearly, that all the affirmative elements that make a contract between individuals, enter into a contract resulting from an enactment of the Legislature—parties, assent, consideration—and they are vitiated by being against sound morality or public policy.

If all these affirmative and negative elements enter into this contract by law, then on what principle can it be, that the negative elements that destroy or defeat all other contracts, can be held as not applicable to such contracts? Fraud in obtaining them, bribery of an agent, who is authorized by his principal to act for him, will always, and in every other case, enable the party to be charged by the stipulation, to avoid it. Why is it, that the people who are to pay, are the only parties whose mouths are shut and cannot be heard, and legislators charged with the most sacred trust, are to violate it with impunity? If a portion of these bondholders shall authorize an agent to fund their bonds, if in his judgment he deemed it best, and solemnly enjoin it upon him to investigate and act fully and honestly for their interest, but the agents or officers of the State, or any party concerned, shoud bribe him by paying him ten thousand dollars to consent to fund, no man would say his principal could not avoid the act, whenever he could be heard to present his claim in court.

On what principle is it that all the parties to this attempted contract can be heard to assert the baleful influence of a bribe on a contract, but the people who are to meet and pay the debt thus sought to be fastened on them? I confess I am unable to see this, or any sound or controlling reason why such a rule should be established. It is not the law that is attacked in this view, but the contract authorized to be made by it, and this has all the elements in it of a private contract, or one made between individuals. Why shall it not be vitiated by what vitiates all other contracts, when you come to deal with it as such, and not as a law?

It is procured by corruptly purchasing the members of the Legislature. They were representatives of the people. That is what they are to be by the constitution. They are required, by the very character given them in that instrument and the very nature of the thing to be done, to act freely and of choice for the people. They are solemnly sworn "to vote without fear, favor, affection, partiality or prejudice." But when a man sells his vote for money, he votes under the compulsion of a contract, corrupt and forbidden, and thus ceases to be the representative of his people, and becomes the agent and tool of his purchaser. Is this the act he is authorized, required and sworn to do under the constitution? Is it not in violation of and outside all his constitutional duties— an utter abandonment of them? If so, why should this act be held as sacred and binding, when it makes an irrepealable contract, as if done in the precise line

of constitutional requiremet, or why should we hesitate to have the gross violation of faith exposed by investigation? Why, by refusal to act, give immunity to him, and impunity to the corrupt briber? The member will have an opportunity as a witness to deny the charge, and explain his conduct, if innocent. If guilty, he ought not to be shielded by any narrow technical rule. I concede that if the constitution forbids, he must go free; but if the rule is to be deduced from common law principles, based on sound public policy, where I am free to adopt that which the best interests of the State shall demand, then I cannot hesitate to say, that all history is full of the lesson, that Republics fall from this fruitful source of decay, that saps their foundation more surely than by all other means, and I would guard my own State from its fearful power for ruin. I cannot believe that our constitution can rightly be made to shelter bribery as an accredited means of procuring contracts from the Legislature. If it does, it is time for its amendment indeed.

The length of this opinion forbids a full discussion of this question. I would hold, that in all cases of private contracts, or contracts obtained by individuals for their own benefit or advantage, where it could be clearly shown the assent of the members or sufficient to pass the bill, was procured by bribery, the contract, as between the State, or her taxpayers and the parties so bribing, is one that may be avoided, and on proper case, the courts should fearlessly apply the remedy; no restraints of delicacy should make them hesitate.

I confine my opinion strictly to the case before me,

15—VOL. 8.

and to like cases—to acts of the Legislature making, or proposing to make contracts—expressly denying the application of the principle to legislation in the general sense, or in any cases except the ones indicated. Such an application of the principle, I think, is perfectly safe, and can do no injury to any one—certainly, as I think, is no infringement upon any affirmation, or implied inhibition of the constitution.

It is conceded that I have gone on delicate ground, where the steps must be cautiously taken. But it is like the case of a surgeon who finds his patient either threatened or suffering with a cancer near a delicate organ. He might well hestitate, but when it was settled that the knife was the only remedy he could apply, he would be unworthy of his place if he did not use it.

So I would in this case cut, as the only remedy, though I should have to go close even to the bleeding heart, to prevent the approach of the eating cancer of corruption and bribery to our legislative halls, or if it be true, as charged, it has already come, to crush out its first footfalls on the soil of my State, by all the power and agencies of the judiciary department, and thus fix upon it the seal at least of judicial condemnation, strong and deeply engraven in our jurisprudence.

The result is, that I hold the coupon clause unconstitutional and void; that the funding board should be enjoined from issuing the bonds proposed, and that on the charges of the bill, as to bribery, there is an equity; and the chancellor's decree should be reversed, and the case remanded.

McFARLAND, J., said:

No case of greater importance, I suppose, has ever been presented to this court; and no case has probably ever been argued before it more thoroughly or with more learning and ability. It demands a most earnest, careful and deliberate consideration by each member of the court. It indirectly involves political questions upon which the people of the State have been divided, and in regard to which deep feeling exists. As citizens of the State, the members of the court are not supposed to be entirely without such opinions upon these questions as may more or less affect their judgments; but the stronger instinct of every fairly educated and fairly balanced judicial mind is that sound principles of law shall be maintained. The bill presents certain well-defined legal questions. We have only to respond to these questions from a judicial standpoint, and as far as possible in a judicial spirit, and our duties are performed. I regard it necessary for the proper discharge of my duty to state my own views in a separate opinion. In discharging this duty, I am sure I have never felt more impressively the weight of individual responsibility.

The object of the bill is to prevent the execution of an act passed by the General Assembly, on the 5th of April last, authorizing the funding (by the issuance of new bonds) of much the larger part of the present bonded indebtedness of the State. The aggregate of the new bonds thus to be issued, it is said, will be

about twenty-seven millions of dollars. From this will be seen the magnitude of the power this court is called upon to exercise. We cannot, however, for this reason, shrink from the discharge of the duty the law imposes. I will, therefore, proceed to submit the results at which I have arrived upon the various questions, in the order most convenient to myself.

Among other things, the bill charges that suits were pending against certain railroad corporations of the State, brought by holders of Tennessee bonds, claiming a lien on the roads; and that during the session of the last General Assembly a conspiracy was formed between said bondholders and said railroad companies to procure the passage of the act in question, with the understanding that in such event the bonds would be funded and the suits against the railroads dismissed; and that for the purpose of carrying out this scheme, a large and powerful lobby was organized, and supplied with large sums of money and bonds to corrupt and control the Legislature, and procure that body to pass the law in violation of their pledges to the people and of the people's wishes; and that various improper influences were brought to bear upon members of the Legislature; and that the final passage of the bill through the Senate, by a majority of one vote, was procured by bribing two of the Senators who voted for it, one receiving ten thousand and the other fifteen thousand dollars for his vote.

The question is, Can this court take jurisdiction, and, upon proof of these allegations, set the law aside?

If half we read in the public prints in regard to the wholesale corrupting of legislative bodies by powerful moneyed organizations be true, it is a source of the gravest apprehension to every right-minded citizen. If allowed to go unchecked, the danger cannot be overestimated; and the progress of such a monstrous evil should be resisted at all points and on all occasions with a courage and firmness commensurate with the danger. It is to be hoped that the practice does not exist to such an extent as is often represented; and, at any rate, the intelligence, honesty and courage of the people will in the end triumph over all such conspiracies against republican governments.

The question is whether this court has jurisdiction of the question. I am satisfied, upon the most careful consideration, that it has not. This seems to me to be manifest from the organization of our form of government. The government of the State is divided into three departments—the executive, legislative and judicial. The three combined represent the entire sovereignty of the State. Powers vested exclusively in one department, cannot rightfully be exercised by the other. The legislative power is certainly vested in the General Assembly, and it is certain that the courts can exercise no part of this power; nor can either of these departments rightfully undertake to determine with what degree of fidelity the other has met its obligations. For this court to exercise the jurisdiction invoked, would be to assume that the co-ordinate departments of the government are liable to corruption but we are not. If we were to take jurisdiction, and

determine that this act was passed by bribery and corruption, the Legislature would have the same right to enquire whether or not our judgment was procured by the same means. These departments, within their spheres, are so far omnipotent that they possess all the powers of the State belonging to that department, and in the exercise of these powers they are independent, neither being subject to the will or supervision of the other. The members of the General Assembly, like the members of this court, are responsible to the people who elected them for the manner in which they discharge their trust; and they may be impeached in the manner pointed out by the Constitution. The people may relieve themselves of the consequences of the corrupt and faithless acts of their representatives, but it was never contemplated that one department should sit in judgment upon the conduct of the other. If so, we might set aside pardons granted by the Executive, upon the ground that they were corruptly granted, and the executive department might in turn refuse to permit our judgments to be executed, upon the ground that they were corruptly rendered; and from the collision and conflict, confusion and chaos would result. If we should take jurisdiction of this question, and an issue of fact be formed, it would then have to be tried upon the rules of testimony applicable to civil cases; only, a preponderance would be necessary to establish the allegations of the bill, or, as held by a majority of this court, only a slight preponderance; so that, if it be shown by a slight preponderance of testimony that one of the Sen-

ators who voted for this bill was corrupted, we would then be compelled to declare that the act was not the will of the Legislature, although it could not appear that the bribed member might, notwithstanding the bribe, have voted for the bill, and notwithstanding the bill was passed with all the forms of law. And, besides, this result would be reached in a case to which neither the State or the impeached member is a party, or has the right to be heard, and where we would have no right to consider whether improper influences may have affected the other side of the controversy.

The ground upon which courts set aside unconstitutional laws, as we shall hereafter see, is wholly different. In such cases the courts simply determine whether there is conflict between the two laws—the Constitution and the legislative act,—and if so, the former must prevail.

The remedy, where the passage of a law has been improperly obtained, is to repeal it, either by the same or by some succeeding Legislature, and the wrong sustained in the meantime is generally not irreparable; and, besides, the remedy, by repealing the law, can be more promptly applied by the Legislature than by the courts.

The correctness of this view as to ordinary legislation is conceded by the counsel for the complainants, but it is insisted that, as to contracts entered into by the Legislature on behalf of the State, the rule must be different; that when a State contracts, she lays aside her sovereignty and contracts as an individual,

and all the consequences must result. That is to say, as the contracts of individuals may be set aside for fraud, the contracts of States are subject to the same rules. When courts acquire jurisdiction of contracts made by States, they apply the same rules of construction to the State they do to the individual—give the same measure of justice to each. But it is a mistake to assume that, in making contracts, the State lays aside her sovereignty so as to give the courts jurisdiction, without her consent, to adjudge her liability. The State needs no such assistance from the courts. If its Legislature has been bribed and corrupted to assume obligations that the State does not rightfully owe, the remedy is, in the first place, to repeal the law before the contracts are complete. This power, with respect to the present law, is never fully possessed by the Governor and Legislature. If satisfied that the law was procured by bribery, it is a question for the consideration of the Governor as to whether or not he will call the Legislature together on the subject, and for that body to determine whether, for this or any other reason, the law should be repealed. It does not meet the question to say that they will not perform this duty. They have the power; we have not. And even after the law has been executed, and the bonds issued, if it should appear that, by corruption and bribery, an unjust debt has been assumed in the name of the State, its good faith and honor would not require the obligation to be met; and whether it would or not, would be a question for the people, through their representatives,

to consider, as the State is sovereign and cannot be coerced. · So that, whether future Legislatures would recognize the obligation, would be a question for them, and the people in their sovereign capacity need no relief from the courts.

But it is said, on account of a peculiar provision of this act, known as the "coupon feature," it will, when executed, be irrepealable, and the State, for reasons hereafter to be considered, then without remedy, and hence, unless the courts now interfere, the obligations entered into under a law thus enacted, will be fastened upon the people, and no means left by which they can resist them. I will consider this question when I come to the constitutionality of the "coupon feature," and it will then appear that, in my view, there is a remedy against such an emergency, but not the remedy we are now considering.

To assume the jurisdiction now insisted upon would not only be, as I think, wholly · unauthorized upon principle, but directly in the face of all the judicial opinions that have been expressed upon the subject, which, considering the sources from which these opinions have emanated, it would be bold if not rash to disregard. I refer to Chief Justice Marshall in *Fletcher* v. *Peck,* 6 Cranch, ·87; *Sunbury and Erie R. R. Co.* v. *Cooper,* 33 Penn. St., 283; *Wright* v. *Defrees,* 8 Indiana, 298; *McCullough* v. *The State,* 11 Indiana, 424; *Ex parte Newman,* 9 California, 515; *Slack* v. *Jacobs,* 8 West Va., 612; *State* v. *Hays,* 49 Missouri, 604; *People* v. *Draper,* 15 N. Y., 545. There is scarcely to be found an intimation to the contrary.

Whether a bill may be maintained to restrain in-dividuals or corporations from receiving the benefits of their own fraud practiced upon the Legislature, need not be considered, as I do not think this bill can take that shape, as the bondholders, or those supposed to be benefitted by the law, are not parties, the fund-ing board only being defendants.

I come now to consider whether this act violates the Constitution of the State. Several objections have been taken to it on this ground, but the argument has been addressed mainly to what is known as the "coupon feature" of the act, and this question, in importance, undoubtedly overshadows all others.

The bonds authorized by the act, as I have said, will aggregate about twenty-seven millions of dollars. They are to run ninety-nine years from the 1st of July, 1881, redeemable at the pleasure of the State at any time after five years. They are to bear interest at the rate of three per cent. per annum, evidenced by coupons payable semi-annually in New York. The 3d section provides that the coupons, on and after their maturity, shall be receivable in payment of all taxes and debts due the State, except for taxes for the support of common schools and for the payment of the interest on the common school fund, *and said coupons shall show upon their face that they are so re-ceivable.* The 9th section enacts that the bonds shall be substantially in the form there set out. The form of the bond there set out contains this provision, to-wit: "The coupons of the bonds, as they become due,

are receivable for all taxes and debts due the State of Tennessee."

I will not stop· to consider the effect of the discrepancy between the 3d section and the form of the bond set out in the 9th section,—the former making the coupons receivable for all taxes and debts *with certain exceptions,* and the latter making them so receivable without exception. I will assume that the third section is to prevail.

The purpose of these provisions is manifest. The stipulation that the coupons are receivable for taxes and debts due the State, especially as incorporated into the bonds and coupons themselves, will, if valid, constitute part of the contracts, and will be within the protection of the clause of the Constitution of the United States prohibiting States from passing laws impairing the obligation of contracts,—a provision which the Federal courts have jurisdiction to enforce, and this notwithstanding the Constitution of the United States denies to those courts jurisdiction of such suits directly against the States. The Federal courts take jurisdiction of the officers of the State, and enforce this provision of the Constitution, notwithstanding the contract to be enforced be the contract of a State and the State be the real party in interest. This is the well-settled law of the Supreme Court of the United States: *Osborne* v. *U. S. Bank,* 9 Wheat., 738; *Dodge* v. *Woolsey,* 18 Howard; *Bank* v. *Debolt, ibid.,* 380; *Furman* v. *Nichol,* 8 Wallace; *Hartman* v. *Greenhow,* 12 Otto; *Davis* v. *Gray,* 16 Wallace, and many other cases. So that, if the act be within the power of

the Legislature and the bonds be issued, the provision in regard to the receivability of the coupons for taxes and debts due the State, cannot be repealed so as to affect the holder's right during the ninety-nine years, or so long as any coupons remain unpaid, and any attempt to so repeal must be declared inoperative and void by the courts of the State in obedience to the mandate of the Federal courts.    The holders of the bonds and coupons, therefore, would have this security: that so long as each successive Legislature shall levy *any tax*—especially any tax over and above taxes for the support of common schools and interest on the school fund—they would have the prior right to appropriate it before it reached the treasury by tendering the coupons in payment.    The result, therefore, would be, that no future Legislature could, on any account, omit to levy the necessary tax to pay the outstanding coupons in addition to the current expenses and other debts of the State; and besides, when so levied, the holders of the coupons would have a prior claim on the whole fund, and whatever loss or delay might occur would fall, or be liable to fall, upon the current expenses and other debts of the State.    Her future Legislatures would have no other alternative, unless they refuse to levy the necessary taxes to support the government.    In short, the effect of the act is to place the question of the payment of these coupons, and the manner of their payment, beyond the control of any future Legislature, or even of the people themselves in convention assembled, for ninety-nine years, if any portion of the coupons remain unpaid

so long, and to take from such future Legislatures all right to control the revenues raised by them to the extent of the sum necessary to pay the coupons, or over eight hundred thousand dollars annually; and further, to vest in the Federal courts jurisdiction to enforce the demand. The objection is not to the power of the Legislature to make, by law, coupons receivable for taxes. This power is not denied. The objection is to the power to stipulate by *contract* that the *law* shall not be repealed. The question is, has one Legislature the power to make such a stipulation binding upon any future Legislature? I do not favor the doctrine, that courts may declare acts of the Legislature void upon the idea that they violate in some general and undefined way the principles of republican government. I also adhere to the doctrine, that, in general, State constitutions are to be construed as limiting and restricting, but not as granting, legislative powers. If the power be in its nature legislative, then it belongs to the legislative department, unless some limit or restriction be found either in the letter or spirit of the Constitution; and in applying these limits and restrictions, I have never been disposed to "stick in the bark," or to be too liberal or hypercritical in construing the Constitution. But when I regard a vital principle violated, then I deem it my duty to declare the act inoperative, without resorting, out of mere deference to the Legislature, to extreme or refined subtleties to sustain it.

I take it to be a sound and well-recognized principle, plainly deducible from our Constitution, that the

legislative power vested in each General Assembly as the representatives of the people to legislate upon any subject, is limited to the two years for which they are elected, and it is clearly beyond their power to enact any law on any subject that may not be repealed by the same or any subsequent General Assembly. This I take to be a self-evident proposition, and one that will not be denied. One generation cannot legislate for the next. The people, through their representatives, have at all times the right to change their laws to meet exigencies as they arise. But, while this is admitted, it is maintained that legislative enactments may also involve elements of *contract* that cannot be changed at the will of the sovereign power. The laws may be repealed, but the obligation of contracts cannot be impaired. Irrepealable laws may not be passed, but States may make *contracts* obligatory upon the people in the future. This is beyond question. By the custom of civilized nations, they have the right to contract public debts, not only obligatory upon the people who contract the debt, but upon future generations, otherwise they might in times of war be unable to preserve the life of the nation itself. But States, in creating such debts, act as sovereign, and cannot be coerced into payment. The faith, honor and credit of the State and of the people are pledged for the payment of the debt, but the people, through their representatives in each successive Legislature, must be left to redeem their part of the pledge. It is not contended that there is any mode to coerce the State into the payment of an ordi-

nary bond,—I mean one without the "coupon feature."
But it is equally certain, as has been shown, that
there is a mode by which payment of coupons of the
character we are considering may be enforced.

The provision in regard to the coupon is not only
a law regulating the collection and disbursement of
the revenue and the conduct of the State's officers,
but, under the construction put upon similar provisions
by the Supreme Court of the United States, it be-
comes part of the contract.    The question, therefore,
is, can one Legislature, in the form of a *law,* make
a *contract* which surrenders the power of future Leg-
islatures to enact laws for the public good?    Can one
Legislature surrender those attributes of sovereignty
which are absolutely necessary, not only to the well-
being of the State, but to its very existence?    Stated
in this form, there can be but one answer.    No such
power can or ought to exist.    The power, from time
to time, to enact such laws for the public good as
may then appear necessary, is an essential element of
sovereignty absolutely necessary for the existence and
well-being of the State, and cannot be surrendered.

But, it is said, if this proposition be carried to
its full length, it denies to the State the power to
issue bonds in any form; that the power to bind the
State by the "coupon feature" of the law, is no higher
than the power to issue an ordinary bond; that in each
case the faith, honor and credit of the State and its
future revenues are pledged for the payment of the
principal and interest of the debt, and nothing beyond
this in either case.    If the power exists to make one

form of bond, it must exist to make the other, as the power to provide the manner of payment must be co-extensive with the power to create the debt.

If the obligation contained in the "coupon feature" be allowed to stand upon the same basis as the bond without this feature—that is, upon the faith and honor of the State—and bear the same construction. then this assumption might be correct.

When questions of this character were first brought before the Federal supreme court, it was insisted that the clause of the Federal Constitution prohibiting States from passing laws impairing the obligation of contracts, related to contracts of *individuals,* and that mere legislative acts of the State should not be construed as. *contracts* which the Federal courts were vested with jurisdiction to enforce against the States, especially when, by the Constitution, the court could not take. jurisdiction of the State directly, but that such acts were no more than ordinary legislation regulating the. State's local affairs, and subject to repeal as other laws. Had this construction prevailed, then the form of the obligation entered into by the State would not be very material. The State being sovereign, could not be coerced to perform the obligation in either. event; and in making such contracts, no higher power would be exercised in the one case than in the other. But, as we have seen, the decision of the question was otherwise. It was held that when provisions like the present are enacted as to the manner of payment, the Federal court will take jurisdiction of the State's officers and enforce the law *as a contract,* denying the

State all right to repeal or impair it; and virtually, in that event, the State ceases to be sovereign in respect to her own obligations; and hence, in making such contracts, the State has surrendered her rights, not only to act as a sovereign with respect to her own obligations, but also to enact such laws as may incidentally affect them. And we must bear in mind that, by this construction thus given to acts similar in this respect to the "coupon feature" of this act, the law out of which the contract results becomes irrepealable. The difference, therefore, between the two character of bonds is this:

The ordinary bond pledges the honor and faith of the State. Each successive Legislature, as the representatives of the people, is left to meet its part of the obligation. In doing so, they act from the sense of honor and good faith which is supposed to actuate the people of a sovereign State and their representatives. It is for them to determine what honor and good faith require, but there can be no power to coerce their action. They are not bound by previous legislation further than honor and good faith require they should be bound, and of this they are to judge. By the issuance of the ordinary bond, the power to legislate in the future for the public good is in no sense relinquished.

On the other hand, the bonds with the "coupon feature" not only pledge the honor and faith of the State, but practically takes the matter entirely out of the control of the people or any future Legislature while the obligation lasts, not only as to the question

16—VOL. 8.

whether the coupons shall be paid, but also as to the manner of their payment. The revenues to be raised by future Legislatures are, to this extent, not only pledged, but actually appropriated and put beyond their control. To this extent they are deprived of all power of legislating upon the subject. So it is apparent that the powers exercised in the two cases are essentially different.

Had the Legislature the power by contract to place the coupon provision of the law absolutely beyond repeal while the coupons remain unpaid?

It is said that the question can never arise, unless we suppose that future Legislatures may disregard their obligations and refuse to levy the necessary taxes to meet the interest on the debt and the other expenses of the State. Without this, the necessity for a repeal can never exist, and it cannot be presumed that they will thus disregard their duty. I agree that we are to predicate no argument upon a presumption that any future Legislature will violate its duty or act in bad faith. But the error of this argument is in the court assuming to decide that it will, under all circumstances, be the duty of every succeeding Legislature to levy the taxes to pay the coupons. This is not a question for the court. If a future Legislature should become satisfied that the debt was unjust and fraudulent, procured by bribery and corruption, the honor and faith of the State would not require that it should be paid. Of this the Legislature would have to judge. It is said that this debt is an honest and just debt. If so, I trust the legislative de-

partment will always so recognize it.    I certainly in-
tend to express no doubt in regard to its validity;
but the court has no jurisdiction to pass upon the
·question.    The State, as a sovereign power, must de-
termine for itself, through its Legislature, the measure
of justice that good faith requires it to render to its
creditors.    Of course the State has the *power* to repudiate
·an honest debt, but we are to presume that the power
will not be exercised.    But however just and honest *this*
debt may be, if one Legislature has the power thus to
tie the hands of future Legislatures as to the payment
of *honest debts*, they may equally bind them for the pay-
ment of unjust debts.    It is, perhaps, not impossible
that Legislatures may be bribed and corrupted to en-
ter into obligations that ought not to be binding upon
the people of the State.    In such an event, the State
could not go into the courts to set aside its own ob-
ligations upon the ground that its own Legislature had
been bribed and corrupted.    And when the action of
the Federal court should be invoked to enforce the
coupon contract and protect it from impairment, they
would not listen to the charge that the State Legis-
lature had been bribed to make the contract.    So
that, in such an event, the State could, practically,
no more resist the payment of a debt created by
bribery than any other.

    But aside from this, and assuming that no future
Legislature will ever doubt that this is a just debt,
will it, under all circumstances, be their duty to levy
taxes to pay the coupons?    Public debts are to be
paid by taxation;    the creditor has no direct claim

against the citizen. I do not undertake to define the extent to which the taxing power may go; but the right of the people and of the State to exist, is superior to the claim of the creditor. The creditor who takes the bonds of a sovereign government, risks not only its honor and good faith, but also the possibility that its debts may become too onerous to be borne. The government must exist; its people must live; otherwise all ability to pay debts would be destroyed. And, whatever may be said of it, we know that upon the supposed want of ability to pay, or for other cause, the power to repudiate public debts. in whole or in part has been frequently exercised in modern times, even by the most enlightened governments. There are infirmities attaching to all debts of this character. But I am not to be understood as advocating the doctrine of repudiation or encouraging any tendency in that direction. I only assert that the right of the State to preserve its own existence and good government, and the right of the people to support and maintain themselves, is superior to the right of the creditor. This principle is recognized even in regard to private contracts by our liberal exemption laws. In the event of war, famine or pestilence, is it possible that a Legislature would not have the power to suspend the payment of these coupons, or postpone them, to the superior demand for the preservation of the State and the people themselves? In such an event, I do not think it can be denied that the power to repeal the law would exist. We cannot know that such emergencies may not arise

within the next ninety-nine years. It will not do to say that the Legislature that passed this act determined that no such emergency would ever arise, and that it would never be necessary to repeal it. This is absurd. It is said that such emergencies are improbable, extreme cases that may never occur, and that we need not now undertake to provide against them. True, we need not; but we must preserve in the government the power to provide for such emergencies if they should occur,—the power to protect itself and its people in times of calamity and peril. Extreme cases may always be supposed in order to test principles. This is not arguing that the act in question may *become* unconstitutional upon such future contingency. The happening of such future contingency is referred to for the purpose of showing that the act was in excess of legislative power at the time it was passed. Then if it be conceded that, under any emergency that may reasonably be supposed, the power to repeal the law would exist, it seems to me to follow inevitably that the act, which, according to the construction placed upon such acts, stipulates that it shall not be repealed, was beyond legislative power. It will not do to say that the Legislature might make such a contract, but that we will annex to it the implied qualification, that upon sufficient emergency the law may be repealed and the contract impaired. This qualification necessarily destroys the whole contract. If the law may be repealed in any emergency, then who is to judge of the sufficiency of the emergency? Certainly not the courts. It cannot be said

that the courts would uphold a repeal of the act if, in their opinion, it was upon an emergency justifying it, and disregard the repeal if the emergency was not deemed sufficient. The considerations upon which the sufficiency of the emergency would have to be determined are not judicial in their character, but purely political and legislative. If, then, we concede that the sufficiency of the emergency is to be determined by the Legislature, it inevitably results that they may repeal the law at pleasure, and the contract is without validity.·

But it seems to me that if the power to make such contracts be conceded, then the right to repeal the law and abrogate the contract would not be recognized in any emergency. The question would come directly within the jurisdiction of the Federal court. The decisions of that court, at least as they now stand, leave no room for doubt. They say if the State Legislature makes the contract, and has the power to make it, then it cannot be impaired by any subsequent legislation; and to ascertain the meaning of the contract, they disregard the construction of the State courts and construe it for themselves. That court would not undertake to enquire into the circumstances of emergency or necessity under which the State Legislature may have undertaken to repeal the law and impair the contract. It is said, however, that the jurisdiction is vested in that court, and whatever it might decide would be the law of the case; and we must presume they would decide correctly. Jurisdiction is vested in that court to enforce the Federal

Constitution against State laws impairing the obligation of contracts, and so it must determine whether the contract has been impaired.     Their decisions are the supreme law upon this subject.

But whether our Legislature has the power to bind the State by the contract supposed to be impaired, is not a question for the Federal Supreme Court.     This is a question depending upon the construction of our own Constitution, and belongs to this court.     If our Constitution denies to the Legislature the power to make the contract, and this court so declare, I do not understand that the Federal Supreme Court has any jurisdiction to review our decision.     It is certain it would not if the law be declared unconstitutional, and the proposed contract without authority, in advance, and its execution prevented, whatever it might decide in the event the question were to come up after the bonds are issued.     So. that, when it is found that legislative acts of the character of this one are construed to be contracts, by which the State is subjected to the jurisdiction of the Federal court, and by which its sovereign power, necessary for its own existence and well-being, is surrendered, the State court is well justified in declaring that no power exists in the Legislature to make such a contract.     The State must reserve to itself and to each succeeding Legislature the sovereign power to protect itself and attend to its own local affairs.     Its Legislature can surrender no power not already vested in the Federal Government.

Again, assuming that the debt will always be re-

garded as a just debt, and that no calamity will ever occur rendering the people for the time unable to meet the interest; that each successive Legislature will be w'lling in good faith, to discharge the duty of levying the necessary taxes; still it might, in their opinion, be necessary for the public good to change the manner of payment and repeal the coupon section,—collect the taxes in money and pay the coupons at the treasury. This might become necessary to prevent the various tax collectors in the State—many of whom are unskilled in business—from receiving counterfeit coupons. The delay in the collection of taxes, even when an ample amount is levied, may, on account of the prior claim of the coupon holders, be found to operate unjustly to the other creditors of the State, and create embarrassments for want of funds to meet the current expenses. The Legislature might desire to obviate this by levying a separate tax, payable in money, to. meet the current expenses, leaving an ample amount, payable as before in coupons, to take up all that remain outstanding. Neither of these changes supposes any purpose to repudiate the debt. They would be perfectly fair and just, and not inconsist with perfect good faith. Yet, if the contract be valid, neither of these changes could be made. Such changes in the law might be necessary for the public good, and yet the Legislature of a sovereign State be without the power to pass them.

We cannot determine, nor was it in the power of the last General Assembly to determine, that these changes would never be necessary or important. It

is a power constituting an essential element of sovereignty necessary for the purposes of government, and cannot be surrendered, but must remain with the people and their representatives for the time being. The extent of the power is not important. If one essential element of sovereignty may be surrendered, why may not all? Where is the limit?

It is argued, however, that for a consideration a Legislature may relinquish part of the sovereign power, though not all. I know that this doctrine is established by numerous decisions of the Supreme Court of the United States, with reference to provisions in charters of incorporations, by which, for a consideration, the right to levy taxes in the future has been held to be released. We are bound by these decisions in similar cases, but we are not bound to apply the same doctrine elsewhere. The soundness of the doctrine has always been denied by some of the ablest Judges of the Supreme Court, and has been met with solemn protests by some of the ablest State courts; and Mr. Justice Miller has shown, in one of his dissenting opinions, that if the power be conceded to exist, no limit can be fixed to its exercise.

These decisions must be left to stand upon their own peculiar grounds, if indeed they stand upon any sound principle. I have carefully examined the case of *Antoni* v. *Wright* (22 Gratt.,) decided by the Supreme Court of Virginia, and given to it the respectful consideration due to the decision of the courts of a sister State. But I cannot concur in the reasoning or the conclusion. I have already examined the grounds

upon which it mainly rests. The case of *Hartman* v.
*Greenhow,* 12 Otto, did not present the question. The
decision in *Antoni* v. *Wright,* afterwards re-affirmed by
the same court, had been acquiesced by the State offi-
cers of Virginia. The coupons in the latter case were
not refused. The only effort was to deduct from them
a tax upon the bond. While the reasoning of the
Virginia court is recited with apparent approval, yet
it is manifest that decision was regarded as settling
the question, leaving only the question as to the pro-
posed tax to be decided in the latter case. The case
of *Furman* v. *Nichol,* 8 Wallace, 44, decides that the
12th section of the charter of the Bank of Tennessee,
making its notes receivable for taxes, was a contract
attaching to the notes that could not be impaired by
subsequent legislation. The question, of course, has
some analogy to the present, but is not identical.
The notes were intended to, and did for a time at
least, circulate as money. At all events, the question
as to the power of the Legislature to bind the State
by a contract like the present, was not considered or
decided. The same may be said of *Woodruff* v. *Trap-
nall,* 10 Howard.

'    The Supreme Court of the United States has not,
in general, been disposed to question the power of the
State Legislatures to make such contracts. I presume,
as I have said, the construction of the State constitu-
tion as to *the power* would be a question for the State
courts. Though in enquiring whether the contract of a
State has been impaired, the United States courts do
not yield to the *construction given* by the State courts,

to the statutes out of which the contract arises: *Jefferson Bank* v. *Shelly*, 1 Blach., 436; *Wright* v. *Nayle*, 11 Otto, 794.

We ought to entertain no feeling of antagonism towards the Federal Supreme Court. We should adopt its decisions, where they are controlling, without hesitation. We should not regard its decisions as those of a foreign jurisdiction. It is not to be denied that the extension of the jurisdiction of these courts over the States is, from a political stand-point, regarded with jealousy in some quarters as indicating a tendency to encroach upon the rights of the States and strengthen the General Government. In this contest it is not the province of this court to enter with anything of a partizan spirit. Upon this character of questions, however, Mr. Justice Miller, in a vigorous dissenting opinion, in which Justice Field and the Chief Justice concurred, in the case of *Washington University* v. *Rouse*, 8 Wallace, 442, uses this language: "But we must be permitted to say, that in deciding the * * validity of the contract, this court has been at times quick to discover a contract that it might be protected, and slow to perceive what are claimed to be contracts are not so by reason of want of authority in those who profess to bind others." This, he adds, has been especially apparent in regard to contracts made by Legislatures of States. When it is seen that the result in cases of this character is, by *contract* to surrender to the Federal court jurisdiction over the State itself in its local affairs, it cannot be wondered if, in view of the above statement, State courts shall here-

after be a little slow to see the power to make such contracts. I trust that at this day I have so special "mania" upon the subject of "State sovereignty," but I cannot decline to assert so much of the power of sovereignty as are yet conceded to the States.

It is said, however, that the bill attacks the act upon the ground that the Legislature cannot pass an irrepealable law, and hence this law is repealable; and at the same time assumes that the act is unconstitutional because it it is not repealable. This argument is earnestly pressed, and it is insisted that the law is either repealable or it is not repealable; if it is repealable no relief is now needed, and it will be for the Legislature to repeal it at pleasure; if it is not repealable, the complainants are entitled to no relief by their own showing. This, though ingenious, savors of "special pleading." If the section in question was only a law, it would of course be repealable, but it involves also elements of a contract, and if the power exists to bind the State to these stipulations, and the terms be accepted, then the contract could not be impaired. As to neither of these propositions can there be any doubt. Nor can there be any doubt, under the decision of the Federal Supreme Court, that this is a contract. No difficulty can exist as to its construction and meaning. It was intended to prevent the repeal of the law. The question is not whether it is or is not a contract, or as to the meaning of the contract; but the question is, whether the Legislature had the power to bind the State to these stipulations. It is not an accurate statement of the po-

sition of the complainants to say that the act is, unconstitutional because it is not repealable, but it is, because it professes to authorize a contract on behalf of the State which the Legislature had not the power to make—that is, a contract relinquishing part of the sovereign power of the State. Of course, if the law be unconstitutional, it may be so declared, even after the bonds are issued; but it does not follow that it may not be so declared in advance. It is assuming that the question cannot arise until there is an attempt to repeal the law—that until then there is no real case. But this overlooks the fact that this is not only a law, but professes to be a contract. If the court has jurisdiction and the proper parties are before it, no doubt can exist as to the right to declare in advance the want of power to make the contract, and prevent its consummation.

If such jurisdiction exists, it would in every view be better to exercise it now, rather than allow the bonds to be issued and afterwards allow the coupon section to be repealed and the contract changed. Of course we cannot know that the attempt will ever be made to repeal it; but the bonds in the form proposed would contain an unwarranted assumption upon their face and be calculated to deceive and mislead innocent purchasers, and create litigation. The Supreme Court of the United States enjoined the board of liquidation of Louisiana from issuing bonds of the State to certain persons, upon the ground that an act of the Legislature authorizing it, indirectly impaired the rights of complainants under a former act: 2 Otto,

531, In *Davis* v. *Gray*, the Governor of Texas was enjoined from issuing grants to a large body of land, upon the ground that it would interfere with other titles: 16 Wallace. And there are various other cases holding that it is proper to grant the relief in advance: *Mott* v. *Pennsylvania*, 30 Penn. St. Rep., 1; *Bradley* v. *Commissioners*, 2 Hum., 428; *Winston* v. *T. & P. Railroad*, 1 Baxt., 60.

If this law, in terms, authorizes the defendants to enter into contracts in the name of the State, containing stipulations to which the State under the constitution cannot be bound, then there ought to be no reluctance in so declaring, or any "straining of the timber" of the law to avoid the result.

It may no doubt be thought that there are strong reasons why the court ought, if possible, to sustain the settlement. The State, it may be said, has large re- sources; the debt is not beyond our means; it has been a disturbing element in the State; the reputation of our people for honor and integrity is at stake, and the court ought, from these consideration, to resolve all doubts in favor of the law, brush aside all technicalities and abstractions, and sustain the action of the Legislature, if possible, because it is a favorable settlement, and it is of great importance to the State that it should be sustained.

To defeat this settlement of the public debt is, I know, assuming a great responsibility. I certainly could not undertake to join in doing so upon a mere technicality or abstraction. I cannot, of course, know that this law would ever injuriously affect the State;

it might not; the burdens imposed might be submitted to and borne without injury or complaint. But if it involves a vital principle of 'constitutional law, essential in its nature to the preservation of the State and the rights of the people, then this principle cannot be surrendered, upon the suggestion that in this instance it would do harm, and that it is for a good purpose. A radical error once established may do incalculable injury. I cannot undertake to speculate as to the consequences; my duty is to respond to the question presented by the record. The political considerations are not for the court.

It simply resolves itself at last into the question, whether the sovereign power of the people of this State to deal with their public debt, to raise revenue by taxation and appropriate it, and enact laws in regard to the manner of such collections, shall remain with them and their representatives as they shall from time to time assemble, or shall that power be held to have been surrendered by the contract of one General Assembly for ninety-nine years, and the jurisdiction thereby vested in the Federal court to coerce the State into the performance of the contract. It must be remembered that if the contract be valid, the people of the State cannot change it even by constitutional amendment—they cannot even in this mode impair the obligation.

The last General Assembly, actuated no doubt by a patriotic desire to redeem the honor of the State and do justice to its creditors, undertook to satisfy their demands by putting 'the obligation in such form that no future legislatvre could question the settlement

or change the manner of payment. This feature of the law seems to have had its origin in a want of confidence in the integrity of the people and their future representatives. In this I think the Legislature exceeded its power. The responsibility of making provision for the debt, the honor and good name of the State, must be left with the people. If they in an evil hour should choose to violate their faith and bring reproach and dishonor upon themselves by repudiating debts that in justice they ought to pay, it will indeed be a sad calamity; but I am not to presume that such an event can ever occur. The people of this State cannot be guilty of so great a folly and so great a crime; but if they choose to do so, I do not know how they shall be prevented. One Legislature has no power to act upon such a presumption, and bind the people by a contract which surrenders their sovereign powers.

It remains, then, to be seen whether the court has jurisdiction, and the necessary parties to render a decree. It is argued with great earnestness and force, that the court cannot take jurisdiction of this case, because it is in effect a suit against the State, or against "officers of the State acting by authority of the State, with a view to reach the State."

The constitution allows suits against the State in such manner as the Legislature may provide; but as there is now no law providing for such suits, it is conceded that they cannot be maintained. On the contrary, the act of 28th February, 1873, declares that no court in this State shall have jurisdiction "to en-

tertain any suit against the State or against any officer of the State acting by authority of the State, with a view to reach the State, its treasury, funds or property." We have decided quite a number of cases since this act was passed, awarding the process of mandamus against the comptroller, to compel him to issue warrants to parties having claims against the State allowed by law: *Baxter* v. *Burch*, 12 Heis., 601; *Publishing Co.* v. *Burch*, *Ib.*, 607; *Uhl* v. *Gaines*, 4 Lea, 352, besides quite a number of unreported cases. The effect of the act of 1873 seems not to have been considered in those cases; but it would certainly not be construed to deprive the court of jurisdiction to compel a ministerial officer to perform a plain ministerial duty; and when the demand of the relator is allowed by law, it is the plain ministerial duty of the comptroller to issue his warrant, even though in determining this question the court may have to declare legislative acts unconstitutional. Otherwise, the decision of the comptroller would be final, and the party having a demand allowed by law without remedy. Such proceedings, so far from being suits against the State, are in fact such in the name of the State to compel its officers to perform their duty.

There are cases, however, where the ministerial officer is vested with discretion in the discharge of his duties—a discretion which the courts cannot control. They may compel him to perform his duty, but may not determine how his discretion shall be exercised. The principle upon which mandamus is awarded against ministerial officers in such cases, is not that the State

17—VOL. 8.

is coerced, or its officers compelled to perform acts against the will of the State, but precisely the reverse; they are compelled to perform the will of the State as expressed by law—in general the only manner in which it can be expressed.  It is claimed that the defendants in this case are officers of the State acting by authority of the State, and hence cannot be interfered with in the discharge of the duty imposed by the act of 1881, without directly violating the act of 1873, above set out.  The only evidence that they are in this matter acting by authority of the State, is the act of 1881, under consideration; if it be out of the way, then they have no authority.  In that view, so far from their proposed acts being by authority of the State, they would not only be acting without authority, but in direct violation of the will of the State.  The State cannot be supposed to be standing behind its officer urging the execution of an unconstitutional law, especially when where there is nothing to show this but the unconstitutional law itself. Otherwise, a void law for this purpose would be as effectual as a valid law.  But it is said the court cannot reach the question of the validity of the law— that the jurisdiction is defeated *in limine.*

It is true the court cannot take jurisdiction of the State for any purpose, but it has undoubted jurisdiction of the defendants.  The objection to the exercise of the particular jurisdiction against them is, that they are officers of the State acting by authority of the State.  To determine this the court must look to their authority—it cannot accept their mere assumption.  If

the authority be wanting, or the law which they claim gives them authority be void, then they are not acting by authority of the State. It is true they would have *color* of authority—a law being *prima facie* valid— but if the court can look far enough to see this much, they can look farther and see that it is in fact void.

This doctrine is firmly established as respects the jurisdiction exercised, by the Supreme Court of the United States, in enforcing the clause of the Federal constitution against State laws impairing the obligation of contracts, even where the contract to be upheld is the contract of the State. In such cases, although the State officers may be acting under the authority of a law of the State *prima facie* valid, and although the 11th amendment to the Federal constitution prohibits the suits against the State, yet the Federal courts take jurisdiction of the officer; and if the law of the State under which he is acting be found to impair the contract embraced in any previous act, the former is declared void, and the officer is compelled to execute the law as the court may declare it. The courts say that such suits are not suits against the State, although the State be the real party in interest: *Osborne* v. *Bank U. S.,* 9 Wheaton, 738; *State Bank of Ohio* v. *Knoop,* 16 Howard, 369; *Dodge* v. *Woolsey,* 18 Howard, 331; *Bank* v. *Debolt, Ibid,* 380; *Jefferson Bank* v. *Skelly,* 1 Black., 436; *Davis* v. *Gray,* 16 Wallace, 220; *Murdock* v. *Governor Woodson,* 22 Wallace, 351; *Board of Liquidation* v. *McComb,* 2 Otto, 351. In the latter case the board of commissioners of Louisiana, of which the Governor was a member, was

restrained by injunction from issuing bonds of the State *which were expressly authorized by an act of the Legislature of Louisiana.* They pleaded the authority of the act. The court said the State could not be sued, but that an unconstitutional law was no authority for the non-performance or violation of duty, but would be regarded as merely void. So, notwithstanding the act authorizing the bonds to issue, it was held to be the plain duty of the board not to issue the bonds, and one about which they had no discretion. So in *Davis* v. *Gray,* the Governor of Texas was restrained from issuing grants for land in the State, although expressly authorized by an act of the Legislature *prima facie* valid. It is said, however, that these decisions only establish the rule of the United States courts when exercising the jurisdiction of that court to enforce · the constitution and laws of the United States, that is to say, the clause prohibiting States from passing laws impairing the obligation of contracts; but when they exercise concurrent jurisdiction with the State courts, dependent upon citizenship, the rule is different. In the cases first named the · rule must be the same in the State as in the Federal ceurts. It is as much the duty of the State as the Federal court to uphold the constitution of the United States, and declare void all laws impairing the obligation of contracts, and for this purpose to entertain suits against officers of the State. They cannot escape this duty by holding a suit against an officer to be a suit against the State. A judgment on this ground would be reversed by the Federal Supreme Court, and · by its mandate the State

court would be required to enter a judgment against the officer.

So that the argument insisted upon would lead us to this conclusion: In cases involving the provisions of both the State and Federal constitutions against laws impairing the obligation of contracts, the rule would be that a suit against an officer is not a suit against the State. If it involve any other provision of the State constitution, the rule would be exactly the reverse. It would seem that upon principle, the rule ought to be uniform. We have a number of cases in which officers and agents of the State have been restrained by injunction from carrying out laws which result in violating the constitution; as, for instance, the establishment of new counties. The leading case on this subject is *Bradley* v. *Commissioners*, 2 Hum., 432, which has been repeatedly followed; see, also, *Mott* v. *Pennsylvania*, 30 Penn. St., 1; also, *Galloway* v. *Chatham*, 63 North Carolina; also, *Winston* v. *T. & P. Railroad*, 1 Baxter.

The cases, however, of *Bradley* v. *Commissioners*, and others of a similar character, were before the act of 1873, and the mandamus cases before referred to, did not consider its effect.

This question was considered in the case of the *State* v. *Sneed*, 9 Baxt., 472, in which it was held that the act of 1873 deprived the court of jurisdiction by mandamus to compel the tax collector to receive the notes of the Bank of Tennessee issued after May, 1861, in accordance with the 12th section of the charter. It will be seen, however, that the real ground upon

which this decision rests is, that by another act of the same session, ch. 44, acts of 1873, a new remedy was given, that is to say, to pay the taxes in money under protest, and sue the collector to recover back the sum paid; and in this view, chapter 13 of the acts of 1873 did not impair the contract contained in the 12th section of the bank charter, and it was upon this ground the validity of the act was recognized by the Federal Supreme Court. The act of 1873, ch. 13, does profess to take away all jurisdiction against officers of the State in the cases named. The act was no doubt intended to protect the treasury and taxes of the State and its property, even against claims that might be valid. It was principally intended no doubt to protect the State from being compelled to litigate with the taxpayers as to their right to pay their taxes in the new issue of the Bank of Tennessee, and have the collection of taxes suspended by these suits. The necessities of government require summary remedies for the collection of revenue, and to secure this was the principal object of the act; and it may be that in some cases this court has extended the act to an unwarranted length in protecting State officers. I think it could not have been intended to deprive the citizens of all remedies in any case to protect themselves by injunction against the execution of unconstitutional laws by officers of the State. The object is not to reach the treasury, funds or property of the State, or to reach the State, or interfere with its laws or the administration of its public affairs. It is precisely the reverse. It is to protect the treasury, funds and property of

the State, and to protect the State from the consequences of unauthorized acts about to be performed in her name. The only ground, I repeat, upon which it can be assumed that it is the will of the State that the bonds be issued, is the unconstitutional void law.

There are cases where executive officers are vested with sole discretion to determine the validity of the laws under which they act, and where their action cannot be controlled by the court or its validity questioned afterwards. Such was the case of *Jonesboro Turnpike Co.* v. *Brown,* 9 Baxter.

There are other cases where, although the court will not control their action, the same question may come before the court and be decided differently. Such was the case of *Williams* v. *Register,* Cooke, 214. The executive department of the government cannot be delayed and embarrassed by the execution of the laws necessary for the administration of its affairs, until the constitutionality of the laws be determined by the courts: *Mississippi* v. *Johnson,* 4 Wallace, 475.

The question of the constitutionality of this law is one ultimately for the courts. It cannot be held that the funding board were vested with exclusive jurisdiction to determine the validity of the law. Their decision could not, in the nature of things, be final. If they were to determine the law unconstitutional and refuse to issue the bonds, the court would no doubt have jurisdiction by mandamus, if it deemed the law valid, to compel them to act. On the other hand, the court deeming the law unconstitutional, had the jurisdiction to restrain their action by injunction,

as in such cases mandamus and injunction are correlative remedies: . *McComb* v. *Board of Liquidation,* 2 Otto. So that in any event it is a question for the courts. It therefore only becomes a question whether it is to be decided now or after the bonds are issued. If the court has jurisdiction and the proper parties before it, there is every reason why the injury should be prevented, rather than attempt to remedy the wrong afterwards: *Mott* v. *Pennsylvania,,* 30 Penn. St., 1; *Davis* v. *Gray,* 16 Wall.; *McComb* v. *Board of Liquidation,* 2 Otto.

It is said the State is an indispensable party. If the State can be made a party in such cases it should be done; that it cannot, is a sufficient reason for not doing so: *Davis* v. *Gray,* 16 Wall. The Attorney General for the State, or any counsel employed by the Governor, would have been heard had they so desired. The funding board are the only persons who could have been made defendants. The creditors have as yet taken no benefit under the act, and are besides unknown and too numerous to be made defendants: *Davis* v. *Gray,* 16 Wall.

The complainants only have the interest of citizens and taxpayers of the State. This would clearly not give them the right to prevent the execution of an unconstitutional law that might incidentally affect them. But such an interest has been held sufficient to entitle them to prevent the establishment of a new county: *Bradley* v. *Commisstoners,* 2 Hum. The issuance of illegal bonds by a county: *Winston* v. *T. & P. Railroad Co.:* 1 Baxter. Also, to prevent the execution of

an unconstitutional law, by which the State's right of taxation was to be relinquished : *Mott* v. *Pennsylvania*, 30 Penn., 1. Also, to prevent the issuance of unauthorized bonds : *Galloway* v. *Chatham*, 63 N. Carolina.

To suspend the execution of this law will not interfere with or embarrass the general administration of the public affairs of the State, either with respect to its internal government, or in the consummation of any public enterprise upon which the prosperity of the State may be supposed to depend.

The creditors already hold the bonds of the State. To suspend the execution of the act will only prevent the exchange of these bonds for others which, in my opinion, would contain stipulations by which the State cannot be bound; and if in this I am correct, it is to the interest of the creditors to have it so now declared.

These are the conclusions at which I have arrived, after most earnest consideration. I announce them with no feeling of undue confidence in my own opinion. And I may say, without affectation, that it is to me a matter of deep regret that these conclusions are not sustained by a unanimous bench. I would certainly feel far better satisfied could I have also the opinion of the Chief Justice and the venerable Associate Justice who sits under a special commission in this case, to lean upon, knowing full well the weight their superior learning, ability and experience and high character, will give their opinions on questions of this character. I must, however, stand upon my own convictions; and while these convictions are announced, I

trust in a spirit of moderation, and with the highest respect for those who differ with me, yet they are as strong and as free from doubt as any question of this character can be to the mind of any one who realizes how much may always be said upon both sides of of any question.

I am of opinion that the decree of the chancellor dismissing the bill is erroneous.

EWING, Special J., said:

It is with no little regret that I find myself compelled to differ in this case from a majority of the regular members of the court. But as I should feel myself recreant to my duty as a judge were I to concur for the sake of conformity in opinions and conclusions, contrary to my most deliberate convictions, I proceed, without excuse, to give my opinion in this case.

The bill in this case was filed in 1881, in the chancery court at Nashville, by certain alleged citizens and tax-payers of the State of Tennessee, to enjoin the carrying out and enforcement of an act of the General Assembly of said State, passed at its regular session of 1881, entitled "an act to compromise and settle the bonded indebtedness of the State of Tennessee." This act provided for funding all of the legally issued bonds of the State, except the bonds issued for the permanent school fund, and except the bonds held

by the University of Tennessee, and by educational
and charitable institutions, &c., and all outstanding
coupons thereon up to and including those falling due
.July 1, 1881; these bonds and coupons are to be
funded into bonds of the State bearing interest at
three per cent., with coupons receivable for all taxes
and dues to the State, except taxes for the support
of the common schools and for payment of the inter-
est on the common school fund, the bonds to be
styled the "compromise bonds" of the State of Ten-
nessee, and to have ninety-nine years to run, though
redeemable at the pleasure of the State after five years;
for the punctual payment of the principal and interest
of said bonds the faith, credit and honor of the State.
are "solemnly pledged." The Secretary of State, the
Comptroller and the Treasurer are constituted a board,
to be designated a "funding board," for the carrying
out of this act. The funding board may sit when
and where they may deem best to enable the holders
of the outstanding bonds to fund the same. It is
their duty to examine and audit such legally issued
outstanding bonds of the State as may be presented
to them for funding, and if found to be genuine, to
prepare the necessary compromise bonds, which, when
signed by the Governor and the great seal of the
State affixed thereto, and the original bonds registered
in the Comptroller's office, and a full memorandum of
the same made by the Comptroller and signed by the
party to receive the compromise bonds, are to be de-
livered to such party upon his receipting therefor.
Certain compensation also is allowed for their services

to the members of the funding board. These are all of the provisions of the act necessary to be stated.

By the general appropriation bill of the same session of the General Assembly, $1,125,000, or so much thereof as might be necessary, was appropriated to meet the coupons upon the compromise bonds as they might fall due for the next succeeding two years. The revenue bill of the same session fixed the State tax for the year 1881 and thereafter at forty cents on the one hundred dollars, of which thirty cents was to be for State and ten cents for school purposes. By existing law the county courts were authorized to levy an amount annually by taxation for general purposes, not to exceed the State tax exclusive of the tax for public roads and schools. Under the revenue bill aforesaid, a State tax of forty cents on the hundred dollars has been collected, or is in process of collection, thirty cents on the dollar of which may, by the terms of the funding bill, be applied to the coupons of the compromise bonds. All of these facts appear by statements in the bill. The bill was filed before the funding board entered upon the discharge of their duties.

The grounds for injunction stated in the bill are: That the "funding act" was procured to be passed by bribery and corruption of certain members of the General Assembly; that the tax-coupon feature forestalls the revenue and diverts it from current exigencies, narrowing the scope of subsequent legislation by an enactment in the form of a contract binding the revenue, and the political power of the State over the

same, and directing this revenue exclusively and preferentially to the discharge of such contract, thereby denying to the State "that benignant supervision that will both allow and prompt her to temper and adapt her rule to the circumstances and vicissitudes which the coming years may bring"; that this same feature violates sec. 24, art. 2, of the Constitution—that "no money shall be drawn from the treasury but in consequence of appropriations made by law"; that the same feature violates sec. 12, art. 11, of the Constitution, which says that the interest on the common school fund "shall be inviolably appropriated to the support and encouragement of common schools"; that it breaks in upon the previous revenue system adjusted to what has heretofore been receivable for revenue, thereby amending that system, yet without referring thereto, and thereby violating sec. 17, art. 2, of the Constitution; that the act amends the revenue act of 1873, which prescribes what shall be receivable for taxes, by adding the compromise coupons to the list of tax-receivables, and yet does not recite in its caption or otherwise the title or substance of the law amended; that the act violates sec. 2, art. 2, of the Constitution, forbidding any person belonging to one department of the government from exercising any power belonging to either of the other departments—in this, the "funding board" being given judicial powers; and that the Legislature (looking to the possible consumption of the revenue actually provided, by the coupons) did not make adequate provision for the ordinary expenses of the government. The persons des-

ignated in the act by their official titles as a funding board, were made defendants to the bill in their own names—M. T. Polk, J. N. Nolan and D. A. Nunn—"hereinafter styled the 'funding board.'" The injunction prayed for was granted, and thereupon the defendants, having been served with process and enjoined according to the prayer of the bill, appeared in the chancery court at Nashville and moved the court to dissolve the injunction for want of equity on the face of the bill. That court dissolved the injunction, and, in addition of its own motion, also dismissed complainants' bill. From the decree thus made, complainants appealed to this court, and the cause is now here upon this appeal.

The case has been argued with admirable ability and ingenuity by the counsel on both sides. It was a pleasure, rather than a labor, to hear them. It comes now to be decided.

Is this in substance, though not in form, a suit against the State, and therefore upon general principle, as well as under the act of the 28th of February, 1873, inadmissible? The second section of that act is as follows: "No court in the State of Tennessee has, nor shall hereafter have, any power, jurisdiction or authority to entertain any suit against the State, or against any officer of the State, acting by authority of the State, with a view to reach the State—its treasury, funds or property; and all such suits now pending, or hereafter brought, shall be dismissed, as to the State or such officers, on motion, plea or demurrer of the law officer of the State or counsel employed for the State."

This case having been dismissed by the chancellor *sua sponte* in the court below, presents itself here as upon a motion by defendants to dismiss for want of equity on the face of the bill.    To this it is objected that the motion cannot be made, if made under the above recited act, by anybody but the Attorney-General or counsel employed by the State.    It scarcely lies in the mouth of the complainants to make this objection, as they insist that the State is not sued, nor an officer of the State acting by authority of the State to reach the State, but persons acting, or about to act, under an unconstitutional act of Assembly, and as such, mere wrong-doers, or, at most, wrong-doers *colore officii.*    But as the defendants, who are supposed to make the motion, contend that the State substantially, and its officers acting by its authority actually are sued, it may be proper to give this question consideration.    The act of 1873 is perhaps a mandate to the Attorney-General, or counsel employed by the State, to make such a motion.    It is competent, however, I apprehend, for any one impleaded in a court of chancery, and against whom a decree and injunction are sought, to make such a motion.    If the court should be of opinion that either the State or its officer acting by its authority is the real party, then the counsel making the motion will be taken, in the absence of any questioning of their authority when the motion is made, to be the counsel of the State; and if the court should be of a different opinion, still the motion might be made, whatever its result might be.    So that I see no objection to the motion in

either aspect, or any aspect looking to the general sovereignty of the State, the act of 1873, or, on the other side, to the unconstitutionality of the act.

It is further said, however, by complainants that on such a motion all of the facts stated in the bill to constitute equity are admitted, and that the question of jurisdiction cannot be considered; that this must come up later upon specification in a demurrer. The more correct statement in regard to admission of facts upon such a motion would perhaps be this: The facts stated, if true, do not make a case for the interposition of a court of equity, and cannot be noticed by it. Substantially, however, there is no difference between these two. The cases cited to show that the court on such a motion cannot look at the question of jurisdiction, are *Merriman* v. *Norman,* 9 Heis., 268; *Mays* v. *Biggs and Wife,* 3 Head, 37; and *Earles* v. *Earles, id.,* 366. I have carefully looked into these cases, and find no warrant in them for the assumption. If the *facts* stated in the bill be all taken to be well pleaded, as it is insisted they are, the whole of them taken together *may* not make a case that can be considered by a court of chancery. Jurisdiction is not a fact admitted on the motion. There may be natural equity in the facts as stated, but it may be such equity as the courts of chancery, neither from inherent power nor from power communicated by the Legislature, can consider. It may be not an equity of the court. The case of *Anderson* v. *Mullenix,* 5 Lea, 289, holds that on such a motion as the present, the court will not dismiss a bill for a *defective*

statement of a real equity, of which real equity the court would have jurisdiction if accurately and fully set out. Now all the equity that complainants have is fully and completely set out, and however real, as natural equity may not come within the remedial powers of a court of chancery. The fraud charged may be no fraud in legal view, and may therefore need no answer at the hands of the present defendants under the present bill. When the time comes in the order of pleading for a demurrer, the want of jurisdiction must be specially set out, or it will be waived; but before this time comes, the court may look and see that it has at no time anything to do with the bill, and dismiss it. * The motion to dismiss can then be entertained.

Upon the question of jurisdiction, then (disassociated from the special equities set up in the bill), as the most advanced question, I proceed with some discussion to announce my opinion. As it is not denied by complainants that if this be a suit against the State, or its officers acting under its authority, to reach the State, its treasury, funds or property, in form or substance it cannot be maintained, that question need not be discussed. But there is a difference between the parties here as to the proper construction and meaning of the act of 1873. It will be necessary to settle that before proceeding further. Does the act mean to protect the State and its officers acting by its authority only when the State is reached through its treasury, funds or property, or generally, when it is in any manner reached, if indeed it can

18—VOL. 8.

be reached in any manner except through its treasury, funds and property? To give full effect to the second section of the act of 1873, it must be held, I think, to mean that the State is not allowed to be reached in any way through its officer so far as that its interests of any kind can be affected. I do not think the words "its treasury, funds or property," are to be used as the definition of what is meant by "reach the State," but are superadded for abundant caution, as those are the most probable and usual objects of attack when the State is attempted to be reached. Are there not other modes in which the State may be reached besides these? Suppose the negotiation of a large loan for the benefit of the State in a case of urgent necessity to be proposed in an act of Assembly, and the matter placed by the act in the hands of the Comptroller, and certain citizens (taxpayers) should undertake to enjoin the Comptroller from negotiating the loan, on the ground, not that the act was unconstitutional, but that it was unwise or impolitic,—would not this be a suit to reach the State through its officer acting by its authority, and yet not to reach its treasury, funds or property? Suppose an act to establish a general school system, which should be sought to be enjoined through an injunction upon the Superintendent of Public Instruction. This would certainly be an attempt to reach the State through its officer, and yet not through either its treasury, funds or property. Such bills are certainly forbidden to be filed. Aside from the question of constitutionality, such is the scope of the pres-

ent bill.    But it is said that it is in the very fact
of its unconstitutionality is founded the right to have
it enjoined; that the act, though in form a law, is
a nullity, and being such, the State officers, if the
funding board be its officers, are not acting by au-
thority of the State, and the State will not be reached.
It is immaterial, I think, to inquire whether the "fund-
ing board" is constituted of officers of the State, such
as are contemplated by the act of 1873, or are to be
regarded as agents of the State.    Whether they are
the one or the other, they are equally beyond reach
under this bill.    If they are agents, then to sue them
is in effect to sue the State itself, as the State would
be thus affected in its interests.    The act is one
clothed with all of the forms of the law, and is one
of vast importance to the State for good or for evil,
and is *prima facie* a law.    Can the constitutionality
of an act be questioned by a proceeding making the
State *a party* in such way that neither its sovereignty
nor the act of 1873 would offer an obstacle?—a party
in such a way as that she could be said not to be
*sued* because the allegation of unconstitutionality of the
act would make it not her act, but an act passed
without her authority?    It might be said that the
court was merely asked by the allegations of the bill
to declare the act unconstitutional, as not the act of
the State, and that these allegations clearly made it
out so.    Would not such a bill at once bring the
Attorney-General to his feet to throttle it?    Such a
bill would not for a moment be entertained by the
court.    But by the act of 1873, the officer is clothed

with the same inviolability as the State itself. But you say that he is not acting by authority because the act is void and communicates no authority, and that you are not suing the officer clothed with authority, though he seems to be so by the act, but merely asking the court to declare that void which purports to clothe him with authority but does not. Is the person thus sued, being an officer in form at least, to stand still as officer and make no defense? or, must he not contest the point and defend what seems to be his position as officer, and thus consummate that *contestatio litis* against which he as well as the State is intended to be protected by the act of 1873? In either of the cases above supposed—that of making the State a party, or that of making the officer a party—you assert in the one case that you are not attacking the sovereign, in the other that you are not attacking the officer, though in either case you ask injunction against that which it is to be presumed the State would defend, and also that the officer would defend. You would make with the State a contest; you do the same with the officer here, calling him, however, not an officer *pro hac vice*. Now, are not the complainants endeavoring to do here precisely what they could not do, if they should attempt to bring those who are *prima facie* interested in this question of constitutionality before the courts. The State cannot be made a party; the officer cannot be made a party; though the State is deeply interested in the question of the constitutionality of the laws passed by her Legislature, in favor of which

there is every presumption.    By her sovereignty does she not stand, and by her expressed will in the act of 1873 has she not placed herself, where she cannot be directly questioned?    Can others proceed directly to annul what are her laws *prima facie* in spite of the barriers she has thrown around herself, and in a manner much easier because of these barriers?    She is a necessary party, but she cannot be made a party, and therefore what seem to be her behests may be flanked and held as nullities.    This is an attempt to do what she has said expressly, in substance, by her act of 1873 shall not be done.    There will be a time when this question can be made,—when the holder of the coupon presents it to the tax-collector, it is refused, and paying the tax, sues the collector.    Here the question can be made, and the State reached under its own laws.    Then the controversy becomes a real one, the State can intervene if it thinks proper, and the proper parties litigate.    In the case of *Gibbs* v. *Greene*, 54 Miss., the court say: "This court has no power to examine an act of the Legislature generally, and to declare it unconstitutional."    "The limit of our authority in this respect is to disregard, as in violation of the Constitution, any act or part of an act which stands in the way of the legal rights of a suitor before us."    In the case of *Black* v. *Fleece*, 2 Lea, 566, this court held that such an anticipative proceeding as the present could not be entertained.    An abstract proposition looking to speculative possibilities, is not a proper subject of legal cognizance.    Courts look to rea conflicts of interest, not to shadowy prophecies.

A bill *quia timet* does not lie to protect against re-mote contingencies. It is only when the heavens are black with storm, that precautionary measures of a doubtful nature can be demanded. The present pro-ceeding seems to me to be rather one of the phases of a political struggle, than an earnest effort to assert legal rights. Passing this, however, suppose the court in the present case should take jurisdiction, and should hold that the law is constitutional,—will not these tax-payers have reached the State in effect through its officer acting by its authority, and had their contest with it? Suppose it should hold the act to be un-constitutional, and the officer be enjoined, or the in-dividual (and it is immaterial which), would not the State be stopped from doing that which, but for this bill, it would have gone on to do through its Gov-ernor, Secretary of State, Comptroller and Treasurer, whether with or without the authority of the Consti-tution? Now, it is precisely this, among other things, that was intended to be prevented by the act of 1873—a *contest* without the State's license, in its own courts, against the State, or its officer, to test the validity of its laws. Such a contest, if it is to arise, is rele-gated to the citizen tax-collector (of whom there are nearly one hundred in the State, who will also prob-ably be a tax-payer), whose duty it will be, when coupons are offered for taxes (if he believes this act unconstitutional), to refuse them. Relief will then come, if due, under the contest which will necessarily arise as to the validity of this law. Practically, no difficulty will ever arise to bring this matter to an

issue.    Under the act of March 21, 1873, authorizing
citizens to pay their taxes under protest, the State
itself being made in effect, by its own license, a de-
fendant, can come forward to have this act declared
unconstitutional, and that will not be too late for the
protection of citizens generally against the execution
of this act.    The Governor of the State is entrusted
with the duty and the power to see that the laws
are faithfully executed; and correlatively, it seems to
me, with the duty of seeing that an unconstitutional
act is not executed at all.    Yet he has not thought
proper to intervene here *ex mero motu* through the
Attorney-General, nor does it appear by any allegation
in the bill that he has been applied to for that pur-
pose.    The character in which the counsel for defend-
ants appear, has not been brought properly to the at-
tention of the court.

But the question is asked at last, Is there no way
of stopping *in limine* a vicious unconstitutional act—
one *ultra vires* legislative competency?    This very
question would seem to have been in the mind of
the General Assembly when the act of 1873 was
passed, and that, balancing the advantages and evils
on the one side and the other of allowing suits to
be brought for such a purpose, the conclusion was to
deny the right to sue with that or any other object
in view.    In the meantime no citizen is suffering.
There is a large bonded debt of the State outstand-
ing, by every one's admission; the taxes are laid for
the two current years, and must in any event be col-
lected; the bondholder takes his bond subject to the

possible unconstitutionality of the act; the tax-collector (any one of the hundred in the State) can make the question of constitutionality by refusal to receive the bonds or coupons, and then comes the real controversy, in which the State really though not formally, and the bondholder or coupon holder nominally and really, are the parties. Why shall we precipitate this quarrel, which may otherwise never arise? The compromise seems to be one favorable to the State and its citizens; one that will probably be accepted by the bondholder at his own risk; one that for the present, and probably in all the future (in view of the growing strength and prosperity of the State), can really oppress nobody; one that provides only for the legally issued bonds of the State, of which legality the State's own officers are to be the arbiters; one that provides for a debt, against the *validity* of which there is scarcely a murmur in the bill now before the court; one that promises to stretch the rainbow of peace over a long agitated and divided people. Certainly there can be no irreparable mischief in denying the right to agitate this question in advance, which may otherwise never be agitated. There may be irreparable mischief in hastening a conflict which time and deliberate thought may indefinitely postpone.

But it is said that if this question is not decided now, and the seeming contract offered is completed and the coupons go into the hands of the bondholders, the Supreme Court of the United States will hold that to be a real contract, which, by injunction *now*, before the transaction is a *fait accompli*, we can stop

*in limine.* To do this as argued above, this court must have jurisdiction to act at all, and they must be of opinion also that the proposition to the bond-holder is *ultra vires* as respects the Legislature. If they are of the latter opinion, it is because the contract would, in their view, be unconstitutional. If, when complete, it should be unconstitutional, it will be so declared by the Supreme Court of the United States, and it is not legitimate to argue that they would do otherwise than right. Is it legitimate to argue that this court should seize an opportunity to declare one of our own acts unconstitutional for fear that some other court of competent jurisdiction might sometime decide otherwise? There is a great deal of grandiloquent talk about State sovereignty, some of which is rather frothy. The truth is, by the union of the States Tennessee has surrendered part of her sovereignty, the present Constitution of the United States is the exponent of this Union, and upon the matters surrendered the Supreme Court of the United States is the ultimate expounder. It is neither legitimate argument to a court to deprecate it, nor decent action of a court to attempt to evade it. It is scarcely insisted by any one that this is not substantially a suit against the State if the act is constitutional. Many authorities might be cited to the effect that in that case it is; indeed, it is inevitably so. It is alone upon the supposition that the act is void in some way, that this court can now assume jurisdiction. If it be void and its execution should somehow be stopped, yet if the State is not a party, nor

its officers, and if the individuals who are made defendants choose to fold their hands and make no defense, or a mere sham defense, then an act of the Legislature, or what seems to be an act and has all of the forms of an act, may be declared unconstitutional and void, and enjoined from execution, without having anybody before the court to contest such a decision who is interested in the issue—the tax-payers, thirty-five in number, against three individuals who do not represent the State. This exercise of the *gravest* power that can fall as a duty upon this court, might affect the purpose of preventing the preparation and issuance of the bonds, but could the decree stand upon any precedent or any known principle of law? Is it possible to try the constitutionality of what purports to be a State law with the State or its officers? Certainly not, looking to the principle of State sovereignty and the act of 1873, without the State's license. Is it possible to try such a question between a tax-payer (whom for the present I suppose to have an interest) and a stranger? The very question, thus asked, is startling. Is it possible to try such a question between a tax-payer and an officer of the State, who *quoad hoc* does not act by authority of the State, but who, of his own perverse will, assumes to possess authority which he has not? Does his *ultra vires* assumption of authority take him out of the category of mere strangers to the act?

From these considerations, it would seem to me to result that no general injuction, in any case under the laws of Tennessee to be administered in her own courts,

siuce the act of 1873, can, without her own license, ever be obtained against what purports to be an act of her Legislature, where the act is of a public nature affecting the rights of citizens generally. There is no precedent of such a case. Such acts may be declared "void as between other contestants and one party or the other be enjoined from taking benefit or acting under it. As to local public acts, such as acts to create new counties, remove county seats, etc., the rule may be different, and the commissioners appointed to lay off and organize the new county, etc., might possibly be enjoined. No case of this kind has occurred since the act of 1873, and none before that act in which the question of jurisdiction was made. The jurisdiction, however, seems to have been assumed more than forty years ago, in the case of *Bradley* v. *The Commissioners to lay off the county of Powell:* 2 Hum., 427. And this case has been followed and approved since. The assumption of jurisdiction by the courts and acquiescence in it, is strong evidence in general that it was properly assumed. If this class of cases be an exception to the rule laid down, it is the only one. But is it an exception? The tax-payer who filed the bill in the case above from 2 Hum., was the tax-payer of a county whose interests were to be affected by the proposed action of the commissioners. There could be no objection to him as a complainant. The commissioners were in a condition to do and proposed to do an act which, whether the act of assembly was constitutional or not, would be irrevocable and not ever thereafter *examinable.* The county when once

laid off would become a political entity beyond the reach of the courts, as decided in the case of *Ford* v. *Farmer*, 9 Hum., 152. The mischief would be irreparable. What might have been said in so extreme a case by the court if the question had been made we do not know, but whatever they might have said, the case would have been no authority here. How far the act of 1873 might be applied as a bar to injunction in such a case it is needless to inquire. I think, however, it could scarcely be said that the State would be reached in such a proceeding, which could in fact only reach the interests and feelings and convenience of the citizens of at most one or two adjoining counties between whom the State stood as a sort of indifferent common arbiter. The cases in regard to the removal of county seats can have no possible analogy to the case before the court, as these were cases between the new and old positions litigated by citizens and partizans on each side. The unreported case of *Ensley* v. *Knight*, referred to by counsel, as stated, in no manner applies here. The tax-collector who issued the *distringas* in that case did so before the law authorizing it took effect, and of course the State had nothing to do with it even *prima facie*. My position so well supported as I think upon principle, is also supported by the following authorities: Act of 1873; *Black* v. *Fleece*, 2 Lea, 566, as to real controversy; *Hartranft, Gov.*, 35 Penn., 444; 40 Wiconsin, 205–211; *Williams* v. *Register*, Cooke, 215; *Jonesboro T. P. Co.* v. *Brown*, 8 Baxt., 490; *Morgan* v. *Graham*, 1 Woods, 134; *Decatur* v. *Paulding*, 14 Peters, 497;

*Gaines* v. *Thompson*, 7 Wall., 348; *Gibbs* v. *Greene*, 54 Miss., 593; *Mississippi* v. *Johnson*, 4 Wall., 475; *State ex rel. Bloomstein* v. *Sneed*, 9 Baxt., 472; *Watson, Trustee* v. *Morrow, Treasurer*, with many other authorities. The cases cited upon the other side are those of *Burch* v. *Baxter*, 12 Heis., 601; *Dowrie* v. *Francis*, 2 Yer., 555; *Britton* v. *Fry*, 2 Heis., 306; *Furman* v. *Nichol*, 3 Cold., 432 and 8 Wall., 44; *Union Co.* v. *Akers*, 12 Heis., 606; *Uhl* v. *Gaines*, 4 Lea, . 352; *Osborn* v. *U. S. Bank*, 9 Wheat., 846, and the cases founded on it; *Mott* v. *Penn. R. R.*, 30 Penn., 33, with other authorities.

These authorities of complainants have been zealously pressed upon the court, but as it seems to me for various reasons applying to each case, they fail to sustain their position as to jurisdiction. Of course it is impossible, within the limits of a judicial opinion, to give each one a discussion to show its inapplicability. The case of *Burch* v. *Baxter*, and several others like it, are cases where the jurisdiction was submitted to and the question not raised. These were cases besides to compel the officer to do what the State had ordered; or to abstain from doing what the State had forbidden. There is no case where the officer has been prohibited from doing what the State seems to have ordered to be done, with the possible exception of the case of *Bradley* v. *The Commissioners*, and like cases. These have been already sufficiently commented upon. The Federal court cases, beginning with *Osborn* v. *Bank*, were cases decided against States, in effect making State officers parties and shutting the eyes of

the court to the fact that the State stood behind the
officer, and looking only to the record where the State
was not formally a party. These cases have not been
followed in our State and could not be, at any rate
since the act of 1873. They had their origin in fact,
in my opinion, pretty much upon the maxim *aut in-
veniam aut faciam viam,* and their principle has not
been followed in the Federal courts where the officers
were officers of the United States, their own sovereign.
This has been shown by the citation of a number of
cases in the courts of the United States, notably the
case of *Mississippi* v. *Johnson,* 4 Wall., 475–491–501.
In that case, too, it was held that it was immaterial
whether the party was described as an officer or an
individual. Our courts have followed the rule in re-
gard to their sovereign, Tennessee, followed by the
Federal court in regard to theirs, the United States.
Giving all due weight to these authorities relied on
by complainants, it seems to me that the great pre-
ponderance of authority is with the defendants. This
is then substantially a bill against the State of Ten-
nessee, to enjoin its action through its officers in the
execution of one of its laws, and contrary to the prin-
ciple which forbids a suit against the sovereign in his
own courts, and especially in conflict with the act of
1873, which forbids such suits. The act attacked be-
ing *prima facie* a law of the State, is to be considered
conclusively so against the present mode of assailing
it, and to attempt to obstruct its execution in this
mode is to attempt to enjoin the State in its own
courts. A decree of injunction in this case would

Lynn v. Polk.

present the strange anomaly of stopping the execution of a law where there was no party interested in that law but the complainants (if they are) before the court. The authorities besides hold this to be correct doctrine, that if the State is a necessary party and *cannot* be brought before the court, no decree can be rendered. What might be the effect of a decree against defendants as individuals it is not necessary to inquire, in view of what has been already stated.

I may remark in passing, that as a citizen I was not in favor of the passage of the 100–3 act, as it is called, nor of the coupon-feature in it; if anything better could be done which would be accepted by the creditors. I preferred to reduce the capital of the debt and pay a larger interest on the reduced amount, and to induce the creditor to be satisfied, if possible, with the pledge of the faith, credit and honor of the State; but other ideas prevailed and I have now, in conjunction with others, to pass upon the binding nature of the measures adopted so far as they can, if at all, come within the scope of judicial cognizance.

The bill then in this case, upon the considerations above set forth, should in my opinion be dismissed. The discussion of other questions under this view might be unnecessary; but as other questions of great importance have been discussed, and as it may be desirable that opinions should be expressed upon them, I proceed to consider the question whether the complainants, as tax-payers and citizens of the State are in their right (otherwise admitting the jurisdiction of the court) in filing their bill. It is not easy to conceive how

the *mere* citizen and tax-payer can intervene against the law unless it be in the present manner and at the present stage of the proceedings under the act. But let us see first whether as citizen or tax-payer, or in his joint character of both, he can in any event or at any time assert himself through the courts, or in any other way than through his political representtives. The act is not one proposing to contract a new State loan, nor one proposing to pay a doubtful or unrecognized debt, nor one in anyway proposing to increase the present or future burdens of the State in a pecuniary point of view. It only proposes to pay hereafter *three* per cent, by way of interest on the *legally issued* bonds of the State on *all* of which I mean *the legally issued bonds* we are now bound to pay six per cent. Now it was competent for the Legislature itself to have fixed what bonds and what amount of bonds we owe, and the citizen and tax-payer could have said nothing against it. All agree that he could have done nothing toward enjoining the tax laid to meet the interest on the debt thus ascertained now or hereafter. Hereafter, through his representatives, if there should come a time when he desires that the tax should no longer be laid because it would be oppressive from a change of times and circumstances, he can endeavor to elect a representative who will refuse to lay the tax, which it is to be recollected is now reduced on the *legally issued bonds* of the State from six to three per cent. If his representative should, under the pressure and exigency, decline to lay the tax, the tax-payer would not have

it to pay, and so much the better for him pecuniarily.
If, however, the representative should lay the tax not-
withstanding the wishes of the tax-payer, he would be
bound by it—his pecuniary burden would not be in-
creased though his ability to pay might be diminished.
This is a matter to address to his representative.
Pecuniarily the burden of the tax-payer could never
be increased under the law, relatively it might become
more onerous.    But it may be said the hands of the
representative would be tied by the constrictive power
of the coupon so that he could not listen to the cry
of distress of the tax-payer.    That he may listen to
that cry this court is asked now to unbind his hands.
But his hands will be free whenever it becomes to be
a question between starving out the government and
the payment of interest on a debt.    This solution may
not apply to every fretful clamor which may be raised
by the people from short crops or small losses aggra-
vated by the cunning and declamation of demagogues.
Bnt it will apply whenever there is a radical change
in the circumstances of a people.    All public contracts
are subject to this inherent infirmity.    The coupon-
feature of the act will be discussed in another place
in this opinion.    The question, however, of ability or
inability to pay taxes to be applied to an existing
debt can scarcely arise in the discussion of the pecu-
niary interest that a tax-payer has in the passage of
a law for its payment.    The interest that an indi-
vidual has as a citizen generally in the future of a
State, demands no consideration under the head just
now being discussed.    To allow, as in this case, thirty-

19—VOL. 8.

five citizens and tax-payers of the State, upon a bill
sworn to by one of them who has manifestly but small
personal knowledge of the facts stated, in a bill, to
arrest a great public measure which *may* be of vast
importance to the State and for its good, seems some-
what startling, and the more so when possibly these
may be the only dissatisfied persons in the State.
And this too without any allegation that the Governor
or Attorney-General has been applied to and refused
to act.    This would at least seem to have been ne-
cessary if there be anything in the analogies attempted
to be run between tax-payers in this case and tax-
payers of counties and other corporations and *quasi*
corporations:  See *State* v. *McConnell,* 3 Lea, 332.  Un-
der secs. 3409 and 3417 the legality and authority of the
funding board could perhaps have been tried and de-
termined and in the meantime its action restrained.

On the other hand the question comes back always,
have not these tax-payers an interest in the matter,
and have they not a right to have that interest pro-
tected?    It is not every interest of every individual
in a civilized republic that can be *separately* protected.
Though the community consists of the individuals that
compose it and each has a right and interest in any
of the common purposes, it does not follow that this
right and interest may be pursued at all hazards and
under all circumstances through courts, at whatever
risk to the rights and interests of others.    Commu-
nities exist upon the principles of surrender and com-
promise as well as upon those of individual independ-
ence and self-assertion.

As a question of authority the case seems to stand thus : The complainants have cited many authorities where tax-payers have been allowed to sue as citizens, tax-payers of counties and of municipal corporations and other *quasi* corporations, partaking in part of governmental and in part of purely corporate functions. These by analogy are attempted to be applied to a case where the rights of a tax-payer are or seem to be affected by the laws of a State.    The most notable of these are the cases of *Bradley* v. *The Commissioners*, 2 Hump., with other like cases which have been already commented on for another purpose; *Winston* v. *Tennessee & Pacific R. R. Co.*, 1 Baxter, 60, and other cases.    All of these stand upon the idea that the party to be affected by them and who sues is to be injured in his corporate relation to city, county or town, where the corporate funds procured by taxation or otherwise may not be applied to any but corporate purposes.    But the State is not a corporation.    She is sovereign.    She sustains no trust or *quasi* trust relation, in a legal sense to her citizens.    The State may, subject so far as the Legislature is concerned to the constitution, do what she pleases with her own. Her acts, if they be her real acts, can be questioned by nobody even when she allows herself to be sued. How then can she be considered a trustee and liable to be assailed by her tax-payers as *cestuis que trust?* There are but two cases cited by complainants that seem to allow such suits to be brought, one is that of *Mott* v. *Pennsylvania R. R. Co.*, 36 Penn., 9, the authority of which in the two main points decided by

it has been overturned in numerous other cases since decided; one in the courts of the same State—(*Hart-raft, Gov.,* 85 Penn.) The case itself went off as between other parties clothed with other characters, though as to some of the parties otherwise properly before the court it is stated that they were tax-payers and thus had an interest in the question and had a right to be heard. The other case is that of *Gallo-way* v. *Chatham R. R. Co.,* 63 N. Carolina, 147. In this case the jurisdiction was submitted to and indeed asked to be assumed by both parties. The court does, however, remark: " It is better for all sides to have the matter settled now and here; and we were grat-ified to find that the court has jurisdiction and can determine the question in the mode in which it is presented in this bill." The court cites as authority for this, *Manly* v. *The City of Raleigh,* 4 Jones' Eq., 370, which was the case of a tax-payer against the city, and the above case of *Mott* v. *Penn. R. R. Co.* On the other hand the defendants have cited the case of *Morgan* v. *Graham,* 1 Woods, decided by Judge Bradley of the Supreme Court of the United States. This case seems to be almost at one with the case now before the court, and most emphatically denies the right of the tax-payer to sue in such a case.

The general rule in regard to cases where the in-jury complained of is one to the general public, is, not to allow a person to sue who can show no special damage to himself, but only such damage as he may incur in common with all others. It is *damnum absque injuria.* If the present case were one clearly

of irreparable mischief, I should hesitate much to deny the right of complainants to sue, if this were the only difficulty in their way. But being of opinion that it is not a case of irreparable mischief, if indeed any mischief at all, I am of opinion that as citizens and tax-payers they have no right to a *status* in this court.

The next charge in the bill of complaint to be considered, is that of fraud, bribery and corruption against a portion of the members of the Legislature (part of the majority) that passed the act of 1881, now under consideration. I was at first of opinion that this charge was not made with sufficient definiteness to demand the attention of the court; in other words, was not well pleaded. But in view of the case of *Anderson* v. *Mullenix,* 5 Lea, 289, this being a general motion to dismiss for want of equity, I changed that opinion. It seems, however, somewhat contrary to ordinary fairness that the characters of members of the Assembly should be put on trial without their being parties to the bill and without opportunity of defense. On this motion to dismiss, as I understand the law, the facts stated in the bill are not in strictness admitted to be true, but it is said in effect, take them to be true and yet they are irrelevant and immaterial to any relief demanded upon them.

Can, then, the bribery of a member or members of the Assembly be looked to, to impugn an act of a general nature making or offering to make a contract between the State and individuals? If the bribery

appeared in the face of the act, no right could be claimed or asserted under it. The party setting up rights under it would be repelled from the courts, the turpitude appearing upon the face of his muniment of title. This is the rule in the case of usury appearing on the face of a note sued on. There is no case where an act of a Legislature has been held invalid, where the legislator was not imposed on by falsehood or fraud of some other person. In such cases, those in which fraud was practiced on the law-maker, courts might hold the act was not his act and therefore void, and even then it would be only practicable as between parties who set up claims under the act as against other private parties. These general declarations are, I think, warranted in view of the searching examination of authorities by counsel in the present case. The legislator's own wickedness has never been made a subject of inquiry in courts—*treachery* to the State's interests by the legislator has never been made a ground to invalidate an act. The cases are numerous where such an inquiry has been sought, but it has been uniformly denied. One individual it may be is not allowed by *deception* to make a cat's paw of the Legislature to obtain a private advantage. So far and no farther has any court gone or evinced a willingness to go. The cases of the *State* v. *Reed*, 4 Harris & McHenry, 10 and 11, and of *Williamson* v. *Williamson*, 3 Smedes & M., 744, have been cited by complainants in support of their doctrine. Both of these were cases where the Legislature was imposed on by the fraud of one who sought an advantage under

a private act.    The motive of the Legislature was not
sought to be inquired into or impugned.    In the first
no relief was granted; and no relief in the second,
I think, on the ground of fraud practiced on the Leg-
islature, though it is stated in both of the cases that
relief might be granted on this ground.    In the pre-
sent case the legislator is charged with treachery to
his trust to the State, and thus the motives of his
vote are put in question.    Here the act is the act of
the legislators—their will;  in the cases cited the leg-
islator being imposed on it is not his act, and to prove
fraud against the beneficiary of the act brings no
scandal on the Legislature.    The State is not con-
cerned as it is only one individual cheating another
through the mistake—the instrumentality of the Legis-
lature;  but if bribery was allowed to be shown, and
could be shown, should it avoid the law, it may be
a good one and the legislator may have voted as he
intended without the bribe.    Again, when you get into
motive, what shall be considered an illicit one?    Any-
thing but money paid in hand?    Shall owning bonds—
a friend or relative owning bonds—yielding to cajole-
ment—pushing the fortunes of a political leader—act-
ing to mortify and defeat a prominent political oppo-
nent?    This worse than Serbonian bog in which we
should find ourselves floundering can only be avoided
by according without question to that branch of gov-
ernment (the Legislature) the powers with which it
has been *entrusted* by the Constitution.    It may be re-
marked properly in this connection, that equally with
acts procured by fraud *on* the Legislature, would acts

procured or extorted by force or fear—military power—
a mob—an insurrectionary force—be void on the ground
that they expressed the will of the ruffians who sur-
rounded them and not the will of the legislators them-
selves. One other case adduced by the complainants,
is that of the *State* v. *Cincinnati Gas Light Co.,* 18
Ohio, 301. This was the case of a city corporation
where, agreeing with our case of *Memphis* v. *Kimbro,*
12 Heis., 13, the court took a distinction between the
law-making and the contracting power of the *corporate*
authorities, and said that as to the ' latter power and
its exercise fraudulent motives might be inquired into.
In the same breath, however, the court say that the
motives of a State Legislature cannot be inquired into
if its act be within its constitutional sphere. The
court does not as to State laws recognize the distinc-
tion so urgently pressed here between municipal and
*contractual* legislation. The simple question as they
said and as I hold is, is the act an exercise of the
legislative power conferred by the Constitution? These
are all the cases referred to by complainants in sup-
port of their claim to inquire into the motives of the
Legislature. Some *obiter dicta* from other cases are
quoted as supporting complainants' position, but when
examined in their connection afford it no aid. Of
this class is especially a small excerpt from the case
of the *State* v. *Ward & Briggs,* 9 Heis., 110, where
Judge Nicholson says that the persons appointed to
arbitrate a matter with Ward & Briggs were not a
State commission or special court, but simply arbitra-
tors. He says further, quoting, "but it is simply a

proposition by the State to divest itself of its sovereignty *pro hac vice,* to meet two of its citizens on equal terms in establishing a board of arbitration. When the proposition was accepted it became an ordinary arbitration—nothing more—nothing less." It is certainly true that the State may, as to the party with whom it contracts, put itself in many cases on a level with it—it may even become a stockholder, a *quasi* partner, and as to the other stockholders and partners be held as an individual, but the act by which it is enabled to become such partner or stockholder is a sovereign act between it and the citizens of the State, and the motives of its authors cannot be inquired into.

This is all that can be found in support of complainants' position on the subject of bribery. What is there on the other side? Judge Cooley, in his Treatise on Constitutional Limitations, under the head of "Inquiry into Legislative Motive," page 225, says, "and although it has been at some times urged at the bar that the courts ought to inquire into the motives of the Legislature where fraud and corruption were alleged and annul their action if the allegations were established, *the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered on."* Dillon, in his work on Municipal Corporations, vol. 1, sec. 311, says: "It is well settled that the *Judicial Branch of the Government cannot institute an inquiry into the motives of the Legislative department in the enactment of laws.* Such an inquiry would not only be impracticable, but the assumption and exercise of such a power would result

in subordinating the Legislature to the courts." Supporting these opinions and deductions of Judges Cooley and Dillon, the following cases are referred to: *Fletcher* v. *Peck*, 6 Cranch, 27; *Sunbury, etc., R. R. Co.* v. *Cooper*, 33 Penn., 878; *Wright* v. *DeFrees*, 8 Ind., 302; *Humboldt County* v. *Churchill County*, 6 Nevada, 40; *Slack et al.* v. *Jacob*, 8 W. Va., 612; *Harpending* v. *Haight*, 38 California, 189; *Flint, etc., Co.* v. *Woodhull*, 25 Mich., 99; *State* v. *Fagan*, 22 La. Ann., 545; *State* v. *Cardovo*, 5 S. C., 312; *State* v. *Hays, Treasurer*, 49 Mo., 604; *People* v. *Draper*, 15 N. Y., 545; *McCulloch* v. *State*, 11 Ind., 424. This last was a case of a private act, and even there it was held that the motives of the legislators could not be inquired into. These cases have been sharply criticized by complainants' counsel, but their force has been in no manner broken. The lack of space in an opinion forbids the discussion of each particular case; the curious can examine them, and they will be found to sustain the conclusions of Judges Cooley and Dillon above referred to.

The power to pass a law being conceded, the *integrity* of the Legislature cannot be inquired into. With a sufficient motive, *bribery might always be proved by perjury*. The fullest representative of the State is the Legislature. For mistakes of power under the Constitution, the courts whose business is the study of laws and constitutions are a corrective, for their lack of honesty there is no corrective. The Constitution entrusts the Legislature (within certain bounds) with making laws both properly municipal and laws binding the State by contracts, both are legislative powers

and conferred in one and the same grant. There are no limits to them in the Constitution except as to power. Can courts make other limits? What a quaking bog would Tennessee stand upon in regard to its projects and enterprises, if of all the States, the contracting power of its Legislature should be subject to this impeachment? With what face could it go into the markets of the world with this weak spot upon its credit? Its constitution, its laws, its bonds might all be looked to, fair on the outside but with this possible canker at the root. Let one case of bribery upon a bare preponderance of evidence be established and it would affix a stain upon her name which no time could efface. There must be trust somewhere. The charge of bribery is to be submitted to a judge who may himself be secretly bribed. *Quis custodiat custodes.* A General Assembly does not pass in which contracts are not made or sanctioned or acted upon. The magnitude of the present case does not make it differ in principle from other cases which may arise. The precedent once set, the world would ring with the scandal of such inquiries, which would have their only home and abiding place in Tennessee. And whether such charges failed or were successful, the disgraceful inquiry would almost equally in either case damage our reputation. Ten men tax-payers (of whatever amount) need only be found to raise the clamorous cry and with means to bring it into court against any contract made or proposed by the Legislature, carry on an unseemly struggle which could not fail to bring discredit if not dishonor upon the State.

Where, then, would be the security that the judiciary would not absorb the legislative, which it was intended should be at least its equal. The judiciary have long assumed the power to say when the Legislature has exceeded its authority under the Constitution; to allow it to say that department *has abused its powers*, would utterly destroy its independence. The absorption by the judiciary would be complete.

But it is said the judiciary itself is not, in respect to this kind of a charge, more independent than the Legislature. The judgment of a court cannot be assailed for bribery of a judge, it may for fraud upon him; so perhaps may the act of the legislator. The judge may be impeached, I will not say that he may not even be sued for a corrupt judgment, though I know of no such case; the legislator may perhaps be indicted. All this, however, is aside from the question of the absorption of the powers of one department by another. However the judge may be put on his trial upon his motive, it will be the judiciary acting upon the judiciary and not one co-ordinate branch subordinating another. The high court of impeachment itself is but an extraordinary court the functions of which are in no manner legislative. Is there then no remedy against the act of a bribed Legislature? In the nature of things there are many evils for which there is no precise remedy. The *vis medicatrix naturæ* must be relied on where the pharmacopœia furnishes no specific nostrum. Patience and the action of the people *must be relied on* to set such things right.

What, then, becomes of that absolute sovereignty

which is said to reside somewhere under all forms of government—that sovereignty which, under an absolute monarch or an omnipotent parliament, may afford relief? The arbitrary omnipotence of parliament exists nowhere under our political and social system, nor the unbridled will of a czar or sultan. By the division of power and its deposit in co-ordinate branches, it may be that something of this ultimate sovereignty is lost. Is such a loss to be deplored? Is it not a necessary surrender of wild liberty in order that a chastened, disciplined and balanced freedom may be thoroughly enjoyed? The power of an *individual* to sin, to lie, or steal, or murder, may be *necessary* to that moral agency ·by which he may qualify himself for a residence in the everlasting dungeon built of old .for evil-doers, or the brighter mansions builded for the blest. The loss even of this power, it may be, would be all the better for the majority. The limitations of power in an organized civilized republic do not affect its absolute power *as the representative of the social system of humanity.*

But I have said enough, perhaps, upon this position of complainants as one founded whether upon reason or authority, though the reasons against it are by no means exhausted. One other remark, and I dismiss the point. This proceeding, it is said, is to reach the bondholder; but the bondholder has not accepted the proposition; he neither is nor could he be before the court now, nor could ` he be reached under the authorities if he were before us. Certainly, however, the time to use the argument is when the

bondholder shall demand something under his new bond.

I conclude, then, that this charge in the bill, even if well pleaded in the ordinary sense, is, if true, irrelevant and immaterial, and forms no ground to impugn the act of Assembly in question.

The next question demanding the attention of the court is the objection to what is called the "coupon feature" of the act.

The precise question raised by this objection has never, so far as I know, been presented to a court, except in a late case in Virginia—that of *Antoni* v. *Wright*, 22 Grattan, 833. The objection in that case was held not to be well taken, by the supreme court of that State. That case is at one with ours, with two apparent or real exceptions,—one, that there the contract had been executed, while in our case it is only offered to the bondholder; the other, that there was a provision in the Constitution of Virginia that warranted the contract. In *Hartman* v. *Greenhow*, 12 Otto, the Supreme Court of the United States had before it some of the Virginia coupons, and sustained and in all respects approved the case of *Antoni* v. *Wright*. There being no authority upon the other side in a case in any way similar to the present one, these two authorities might well be followed by us, if there is nothing in the exceptions above stated. The question now under consideration being only one of power on the part of the Legislature to enact this coupon feature, it would seem to me obvious enough that the same power that would enable the Legisla-

ture to make such a contract, would justify them in offering it. If they have no power to make the contract, then it might be well argued that now, if possible, it should be arrested *in fieri*. It has been so argued, but this argument is met by the want of jurisdiction. The other variation may be more serious. The constitutional provision of Virginia which was quoted by the court in *Antoni* v. *Wright*, upon which some reliance was placed, and which is not to be found, in form at least, in our Constitution, was as follows: "The General Assembly shall provide by law a sinking fund to be applied solely to the payment of the principal of the State debt, which sinking fund shall be continued until the extinguishment of such State debt; and every law hereafter enacted by the General Assembly creating a debt or authorizing a loan, shall provide a sinking fund for the same." "This provision," says the Virginia court, "does not invest the power in the Assembly to appropriate a part of the annual revenues in advance, but *imposes the obligation on it* to exercise the *recognized power* with which it was invested for the purpose indicated in the way prescribed. And now, if it is a legislative function of the General Assembly to create a sinking fund by an appropriation of part of the revenue thirty-four years in advance to extinguish the principal of the public debt at its maturity, which appropriation cannot be disturbed or diverted from its object by subsequent Assemblies, it would follow, that to make an appropriation in advance for the payment of the interest of the public debt, is not contrary to

the legislative function. And being stipulated for in
this case and made a part of the contract, its repeal
by a subsequent General Assembly would fall within
the prohibitory clauses of both the Federal and State
Constitutions above recited." Now, in all this, the
Virginia court does not regard the Constitution as
*enabling* the Legislature to create a sinking fund by
anticipation out of part of the revenue for each year,
but, *recognizing their power* to do so, imposes it upon
them as a duty. This power, then, existing as to
the sinking fund with a duty added, the same power
*exists* as a legislative function to provide by anticipa-
tion as to the interest. Now, here the duty to pro-
vide for the interest of an existing debt by the Leg-
islature is perfect, and would not be strengthened by
being expressly made so in a Constitution, especially
as there would be no mode of enforcing the duty in
either case. The Legislature of either State might
have refused to discharge its duty; the duty to pro-
vide for *interest* being as imperfectly sanctioned in
Virginia as with us. What, then, has the Constitu-
tion of Virginia to do with the coupon feature of
their law. It was the result of the general delega-
tion of legislative power to the General Assembly;
and so in our case. If the Virginia act of 1871
was held valid by its court, and the decision approved
by the Supreme Court of the United States, why may
not ours be? At any rate, I have the decision of
this highly respectable court (bolstered by that of the
Supreme Court of the United States), adhered to on
rehearing, and approved by the same court with dif-

ferent members, in 24 Gratt., 159; 30 Gratt., 134, and 33 Gratt., 237, as a warrant, in a case precisely similar, for this opinion. The court, in *Antoni* v. *Wright*, did not seem much troubled by the objection that they were forging an *infrangible shackle* upon future revenue legislation, but only as to the question of making anticipative appropriations of any character, and without reference to the danger of the creditors seizing the revenue before it should reach the treasury. To show more fully the analogy between this last case and ours, some further statement of it is perhaps necessary. An act of the Virginia General Assembly of 1871 made the coupons · of its bonds receivable for all taxes and dues of the State, on a bonded debt as large as ours, and with an interest of six per cent. This act having been carried into effect by acceptance of the bondholders, was repealed by an act of 1872. It is the validity of this latter act which came under consideration in the case of *Antoni* v. *Wright*, the State allowing itself to be sued under a general law. The decision was by a majority of the court (one judge dissenting) against the validity of the act of 1872, and in support of the act of 1871. The case was well considered, and the opinion is long and able. It rests itself upon reason and principle, and upon the following cases: *New Jersey* v. *Wilson*, 7 Cranch, 154, opinion by C. J. Marshall; *Woodruff* v. *Trapnall*, 10 How., 190; *Furman* v. *Nichol*, 8 Wall., 44, decided unanimously by the Supreme Court of the United States; *Exchange Bank of Va.* v. *Knox*, 19 Gratt., 739; *Home of the*

*Friendless* v. *Rouse*, 8 Wall., 430; *City of Richmond* v. *R. & D. R. R. Co.*, 21 Gratt., 604. Substantially, every argument that has been urged here against our act was urged there, and met and answered, I repeat, with signal ability.

After all, however, this case of *Antoni* v. *Wright*, supported as it is by other authorities and by the approval of the Supreme Court of the United States, is not binding authority upon this court. I proceed, then, further to examine this question upon principle and reason, and shall endeavor to see, with such lights as I have, whether there is anything in this coupon feature manifestly in conflict with the Constitution of Tennessee. I have been struck in this case especially, as many times before in my life, at the wonderful intellectual superstructures which can be built on a few false assumptions, but they are at last houses built on the sand and cannot endure. But proceeding: If the coupon feature, once adopted, be in fact irrepealable, it is because it makes a contract that the Legislature was competent to make. If it does not make a contract *because* it is in form irrepealable and therefore unconstitutional, it binds nobody, hurts nobody, and may be disregarded by any future Legislature when exigency demands it. It would stand upon the same footing as *mere* municipal law, which, though bad and unwise, is beyond the reach of the courts. For the current two years the tax is laid to meet both coupon and other expenses, the appropriation is made, and to this extent all agree the law might be constitutional. The presumption of sufficiency of rev-

enue is absolute, and the mode in which the appropriation is made is matter of form and immaterial. If the Federal court should hereafter enforce the act when accepted, as making a contract, it will be *because it is a contract;* they being the ultimate judges of that question, constituted such through our surrender of sovereignty to that extent. If it be not a contract because irrepealable and unconstitutional, they will not enforce it. It is not legitimate argument to say that they will. The real ground of opposition to this law, as it seems to me, is not that it is against the Constitution of Tennessee as limited by the Federal Constitution, but it is, in a recalcitrant temper and feeling, against that limitation itself. Can we now enjoin the execution of an act which may never become operative, as an unconstitutional law, and which, whenever it does, can be repealed by the Legislature at once upon a call of that body by the Governor? The law may be unwise, but is not for that reason unconstitutional. If it be unconstitutional upon future contingencies, there is no possibility of its becoming oppressive, as relief could always be had by legislation, which must be sustained by the courts. It is upon the possibility of its becoming oppressive that the argument is made against its constitutionality. But it is neither unconstitutional *in presenti* nor *in futuro* because of these possibilities. Its oppression under changed circumstances may be relieved against. The fear that this, which is called an unconstitutional act, may be enforced by the Federal courts as a constitutional law, is not, I repeat, a legitimate argument in favor of an

injunction, because it supposes that the Federal courts. will not do right. What then? If our Legislature had no Federal restriction, and the omnipotence of parliament, the law would be repealable and therefore valid. Does this *legal* restriction, then, determine the character of the law? The Federal restriction reducing our sovereignty may disable us from repealing acts, right or wrong, and therefore may make it unwise for us to pass laws of contract which we may not repeal; but does it affect the power? The *legal* restriction should be looked to in the exercise of the power, as in any event it attaches. Every law which makes a contract is, under ordinary circumstances, under our system, irrepealable. It is the making of a law which contains within itself the power of enforcement that is really objected to. Now, if such a law be unconstitutional, its enforcement will not be aided by the Federal courts. If it be not unconstitutional, then there can be no relief against it here. If relief. against such a law were *needed,* now and before it is attempted to be enforced, and we should think it unconstitutional, it might be our duty; if we had jurisdiction, to enjoin it now and never let the matter reach the Federal courts. But as already shown, and indeed not denied, relief is not now needed, and cannot be demanded, except upon remote and contingent ulterior considerations. But to come more closely up to the question of the unconstitutionality and *irrepealability* (barbarous word) of this act. If it is unconstitutional at all, it is upon speculative possibilities. *If it were absolutely certain* that the State would al-

ways retain its present ability to meet interest and provide for ordinary government expenses, there would .be no ground for the charge that its sovereignty was infringed upon. Absolute sovereignty in a republic may consist with moral obligation and ability to perform, and the chain imposed by such obligation is neither ·coercive nor derogatory to sovereignty. The wild privilege of ruining one's self and bringing ruin and disgrace upon all around one, is not such independence as may demand the support of courts or as should be sustained by civil guarantees. When the ability is lost, it may well be that the moral obliga-· tion ceases or is suspended. The new circumstances may justify a repeal, and this repeal we must suppose would be sustained by the Federal courts as not impairing the obligation of contracts. · In this view the coupon feature becomes merely a convenient mode of providing for payment of public debt. To borrow money for public purposes, all will agree, is within the competency of the General Assembly. Suppose the same law that authorizes the borrowing of the money provides also for its payment and mode of payment, by such a provision as that here, and that lenders part with their money under such a law, expressed on the face of the bond. To promise to pay interest on the loan indefinitely until the principal is paid, may certainly be done; to get five years or more of credit ŏn the loan, and agree to pay interest in the meantime is competent. To provide that this ·interest shall come out of the taxes as a fund, these being the only means of payment the State has; to pledge the

faith and honor of the State that this shall be so;—
all of this is competent. But to undertake to make
it certain that the interest shall be paid by making
the law self-enforcing at the hazard that there may
not be enough of the taxes to pay this interest, and
at the same time pay the expenses of the govern-
ment,—there is the trouble. Public contracts are not
obligatory under all circumstances. See *Hartman* v.
*Greenhow*, 12 Otto, 672–681; *Antoni* v. *Wright*, 22
Gratt. The organized civil republican government of
Tennessee cannot be brought to a dead-lock or stand
still in the enforcement of any contract, however it
may be written or under whatever guarantee or sanc-
tions it may be placed. *Oportet vivere*—it must live,
and it has a first law of nature. But it cannot in-
dulge in sham pretenses of starvation, and under these
withhold its surplus. Public debentures look to the
ordinary vicissitudes of the life of a State as the
measure of their obligation. The extremes of famine,
pestilence and war, volcanic eruptions and earthquakes,
taking away the means to pay taxes, would break
the chains of contract and justify the refusal of a
State to allow the last morsel necessary to its life to
be snatched from it or its inhabitants. Extreme cases
of this description would demand of every jurisdiction
that there should be a suspension or denial of reme-
dies provided for cases reasonably within human fore-
sight. The pound of flesh never was and never can
be demandable. To suppose that the Supreme Court
of the United States would otherwise administer the
law, is, in my opinion, a libel upon our highest ju-

dicial tribunal.   But to make no obligatory contracts,
to get no good and beneficial compromises out of State
creditors where the contract may run through years
for convenience, and be secured by a heavy stress oc-
casionally upon human labor and capital, would, in
my opinion, be to act upon a fine-spun philosophy of
possibilities rather than upon the practical experience
of every-day life.   Such contracts may, at intervals,
harass and somewhat distress the obligors, but in the
main may be salutary and beneficial.   Such conse-
quences are but the common evils of a large indebt-
edness.   If such contracts are made by competent au-
thority at the time, they should be, and they will be,
enforced, not as a shackle upon the proper free will
of the State, but as a gentle but necessary curb to
mere savage impatience of restraint.

Shall we now in this case, before the contract is
complete, which may be beneficial to the State, out
of which probably no inconvenience will ever arise,
and from which, if accepted and yet void, no obliga-
tion can arise,—undertake to say that it *shall not be
operative?*   If the coupon feature be *ultra vires*, it is
so only because it is a shackle.   The moment in
which it is to become a shackle, it drops off or breaks
of itself, or is declared to be no shackle because in
its terms obligatory.   The plain result from this is,
that we cannot now declare that a limit and obstruc-
tion to future legislation which loses that character
the moment there is a necessity to overleap it; or,
if it really puts bounds to legislation at all, it is be-
cause it is a contract which the Legislature was com-

petent to make. It may be a mischievous law, but
this is not to the purpose; it may be that policy
would demand its being enjoined, but this could not
be done by the court for want of power. Pushing
this question, however, further, a new consideration
arises,—who is to be the judge when the exigency has
arisen that may justify the suspension or repeal of
the law? If it be the exercise of a political right
which rises superior to the right under a formal con-
tract, the Legislature must be regarded as the final
authority in the premises. How the Supreme Court
of the United States would regard this under a case
of the last necessity in behalf of the State, it is, I
think, easy to say. That they would not regard a
repeal under *ordinary* circumstances as a political act,
is manifest from their decision in the case of *Hart-
man* v. *Greenhow* above referred to. That court would,
in my opinion, hold the *absolute necessities* of the State
as above the obligation of the contract. It is only
to these absolute necessities we need look, as these
could form our only excuse for what would otherwise
be a dereliction of duty. But the Supreme Court of
the United States would, in any event, be the ulti-
mate judge in a matter which we have surrendered to
them in becoming members of the Federal Union.
From time to time many things have been made re-
ceivable for taxes besides gold and silver, bank notes,
treasury notes, etc.; this was, however, in most cases
a mere privilege liable to be at any time withdrawn,
or if to be considered a contract, for comparatively
small amounts, or chargeable on special descriptions of

revenue, and differing, as I apprehend, in principle from the present case. The magnitude of the issue of coupons, the contract appearing on their face, the time to which they are extended as a tender for all taxes and dues to the State, causes them to stand on a different ground from that of other tax receivables, but not on such a ground as that they can ever become an obstacle to the freedom of *proper* legislation by the State. It is not every irrepealable law that is unconstitutional, it is only such laws as are an *improper* restraint upon future legislation. Grants and contracts pure and simple are certainly incapable of repeal and yet are constitutional. In the words *improper restraint* lies the gist of this controversy. The *right* of repudiation of a just debt, if not a contradiction in terms, is a something which is not entitled to any guarantees. To give such a debt sanctions and guarantees of whatever nature is not an improper exercise of power, provided they do not reach to the obstruction of the healthful exercise of other governmental functions. These coupons can never reach the point of such obstruction under a proper discharge of duty by subsequent Legislatures and a proper administration of law, in other words, can never be an *improper* restraint.

Something has been said upon the subject of appropriations as connected with the coupon feature. The provision of the Constitution quoted in this connection is as follows: "No money shall be drawn from the Treasury but in consequence of appropriations made by

law; and an accurate statement of the receipts and expenditures of the public money shall be attached to and published with the laws at the rise of each stated session of the General Assembly." In view of this provision of the Constitution is money to be drawn from the Treasury under this act, and if so, is it without appropriation? If the mode of payment of the coupons is drawing money from the Treasury, the appropriation for the two current years is already made. And so no tax-payer is yet hurt. The coupons come in, the statement of receipts and expenditures can be made, and all things will be right. The same thing may go on for the next two years and all will still be right. But a third term of the General Assembly comes on and the taxes are laid only to meet the government expenses, and the tax-collectors are forbidden to receive coupons for taxes. Then for the first time comes up the practical question with which alone courts interfere. A bill *quia timet* is not needed, if the Legislature has the power to pass such a law. If it have not, it will be because the Legislature had the power in 1881 to thus anticipate appropriations by valid contract and no appropriation in form is necessary. There is no threatened damage to the tax-payer and no room or role for a bill *quia timet.* Yet under this bill we are called on to do the GRAVE thing of holding an act of the Legislature void for this anticipative appropriation—one of the highest if not the very highest exercise of judicial power, without necessity. The bondholder cannot complain, as he takes the contract with the full knowledge of its infirmity,

if any. He must take his chances of future Legislatures and of the Federal court. Again, a law thus anticipating the revenue in the future is valid *prima facie*, there being no limit in the Constitution on this subject. It is at the utmost only voidable or repealable at the will of the Legislature, to be exercised only when an exigency demands it, and subject to the check of Federal jurisdiction. But the money, in the case before the court, is not to be drawn from the Treasury. The act of 1873, in regard to suing the State, distinguishes between the treasury, funds and property of the State. A direction that a particular individual shall be paid out of a fund before it reaches the Treasury, is not drawing money from the Treasury, though it is an appropriation. An appropriation, then, for a longer term than two years is not forbidden, even if appropriations to be drawn from the Treasury are. But there is no such limit as to time when the money is to be drawn from the Treasury. The limitation is, that if money is drawn from the Treasury it must be by appropriation. The constitutional limitation or inhibition is made to prevent the Treasurer from paying out money on unadjudged or uncertified claims, at his own will, or that of the Governor or other person. It has no reference whatever to such contracts as the Legislature may be competent and choose to make fixing time and place and mode of payment in money, in land, in debts due the State, or other means whatever, including uncollected taxes: See *Smith* v. *Speed*, 50 Ala., 281–2; Story on Contracts, sec. 1348; *Antoni* v. *Wright*, 22 Gratt., 353.

The first of these authorities says that this provision is in the Constitutions of most of the States, and was only intended to prevent such unauthorized payments as those above referred to, and cites Story on Contracts as above. The case in Grattan fully sustains the views above stated, in regard to appropriations.

By an unwarranted assumption of analogy between the power of exemption denied to the legislative department by the Constitution of 1870 and the present pledge of future revenues for coupons of interest, by recurrence to that Constitution, which denies also the privilege of creating private corporations—both of which powers existed under the Constitution of 1834—an argument somewhat plausible is advanced that the State of Tennessee, under its last Constitution, took a new departure upon the subject of State sovereignty. That whereas before the adoption of this last Constitution, the State influenced by the *false* doctrine of the great Dartmouth College case, and looking to it with reverence, had been pursuing in the main a sort of centralizing policy and running in the grooves of a worn-out lego-political philosophy. This argument is attempted to be fortified by the fact that in the convention which adopted the Constitution of 1870 a proposition was introduced and rejected to make coupons of the public bonded debt receivable for taxes. The case of *Mott* v. *Penn. R. R. Co.*, 30 Penn., 9, is introduced as authority to show that a State Legislature cannot permanently alienate its right of taxation and thus put fetters on future Legislatures, and finally it is argued that the tendency of the courts in these later times

is to get rid of the authority of the Dartmouth College case; that many regrets have been expressed that it was ever decided, and much doubt now hangs over its principles. These arguments have been elaborated and presented · with much force and ingenuity, but they have failed to reach my convictions. That the convention ·of 1870 might well refuse to put this coupon feature into the organic law and still leave such a power in the discretion of the Legislature, I can well understand. It is certain, too, that if the large majority by which this proposition was rejected in the convention had thought it a power dangerous to be entrusted to the Legislature, they had only to speak and it would have been denied. What they did is only to be looked to, not what they omitted or failed to do. If there had been a proposition to grant this power to the Legislature and that had been refused, some deduction might have been drawn from it in favor of complainants'' position.

The question here is not like that of a proposed exemption even of a partial character. · We have an existing debt which every consideration of morality and our true interests should prompt us to bring to a speedy and favorable settlement with our creditors. The proposition involves at most a partial and probably temporary anticipation of revenue, and no permanent shackle upon legislation. It brings about in a practical way a favorable abatement of interest upon a debt the payment of the principal of which is at our discretion in a short number of years. The only direct and analogous authority upon the subject sustains

the exercise of power in the act of 1881 and by clear
and cogent reasoning.   This reasoning is sanctioned
and approved by the highest court of the United States,
and the vague fears expresed here of future danger
are looked upon as illusory and visionary.   Without
being an ardent advocate or defender of the teachings
and principles of the Dartmouth College case, I may
say that they have never been by the best courts dis-
regarded nor their authority broken or abandoned.
The case in Pennsylvania referred to has in effect as
to the action of the court (directing a mandamus against
the Governor) been overruled in that State by the
subsequent case of *Hartranft, Governor, etc.*, 85 Penn.,
444–5, and as to the question of exemption, overborne
by a number of existing and subsequent authorities in
the Supreme Court of the United States.   Among
these are the cases of the *Piqua Bank* v. *Knoof,* 16
How., 369; *Mechanic's Bank* v. *Debolt*, 18 How., 380,
directly overruling an Ohio case upon appeal; *Dodge*
v. *Woolsey, Id..* 331.

The Ohio cases on this subject of exemption cited,
though some of them are reasoned with ability, do not
demand much consideration here, as some of them have
been reversed and all others overruled by the compe-
tent authority of the Supreme Court of the United
States.

At last it seems to me scarcely legitimate to argue
against the constitutionality of a law upon the suppo-
sition that future Legislatures will not discharge their
duty, and this, in my view, is what the argument of
complainants' counsel comes to in the end.   If they,

the General Assembly, do their duty in imposing the necessary tax to meet interest and also government expenses, in times when the coupon does not endanger the healthful action of the organs of the State; and if they do their duty when the life of the State is threatened, by legislative withdrawal of the privilege of presenting a coupon as a tax receivable, the imaginary fetter will never become a real one. The real danger is that the Supreme Court of the United States may not regard this last as a duty, but as an unauthorized attempt to rid the State of a binding contract. If this result should arise, it will be because the Legislature of 1881 had the *power to offer as well as to make such a contract,* and that being so, ends the question here. We may fret at this restraint, but when we reflect upon the unbounded blessings that flow to us otherwise from this partial surrender of our sovereignty, and that the apprehended danger is remote and really improbable, our minds should be quieted and we should rest in a dignified submission.

This court is asked to seize upon the opportunity which it is said now occurs to forestall the anticipated difficulty. In my view of the act under discussion the court ought not to do so if it could, and *in duty* could not if it would.

Something has been said in argument of the right of a State to scale its debts. With the assent of the creditors the debt as it now exists will be heavily scaled under the pending proposition, and if such a right really exists, when the proper time comes it may be scaled again with or without the creditor's' consent,

but such a scaling must be done always subject to our relations as a member of the Union of States. But I have already said enough upon this question.

There are some minor objections to the act of 1881 stated in the bill to which I shall give a brief notice, that they may not seem to have been forgotten. It is said that the first section of the bill of rights, in which it is declared that the people have the right to alter, reform or abolish the government, etc., is violated. But as even the people have not the right to abolish the State, or to destroy or weaken its status in the Union of States, or to annul a just debt of the State, or to take away a provision for the payment of such debt legally made by an ordinary Legislature, it is somewhat difficult to see how this section is violated.

Sec. 8 of Art. XI,, which provides against any law granting peculiar privileges to individuals. It is said that a preference is given by the act of 1881 to bond-holders over other creditors. No more, it seems to me, than paying one in full and not paying another, at the same time having the ability and the duty, and so far as appears the will to pay both and all. The construction contended for would cut the State Legislature off from all power to make favorable settlements and compromises with creditors who, foolishly or otherwise, might wish something more that the bare promise of the State. But this is merged in the larger question of the coupon feature, which has been already so extensively discussed.

The 9th sec. of the act (though in the form of

the bond it is said "receivable for all dues and taxes ") would be controlled by the 3d section. The act is referred to in the bond. The coupon need not have these words of the form of the bond, but might have them with the exception of taxes for common schools.

Sec. 12, Art. XI. of the Constitution, which provides for the inviolability of the school fund, is said to be disregarded. But in view of the duty of the Legislature (with an unlimited power of taxation) to provide for this, which it is to be absolutely presumed they will discharge, I can see no violation of this section in the act of 1881. A special tax might perhaps be laid for the schools and the fund so appropriated that it could not be reached by the coupon. This, however, is immaterial.

It is said, however, that this section, Art. II., sec. 12 of the Constitution is further violated by the act of 1881, as being in contravention of this clause of that section: "The State taxes derived hereafter from polls shall be appropriated to educational purposes in such manner as the General Assembly shall from time to time direct by law."

This poll tax is now appropriated by sec. 962 $a$ of the Code to common schools, and as the law now stands could not be reached by the coupon feature of the act of 1881, as the taxes for common schools are excepted by the 3d section of that act. Suppose a future Legislature should wish to take this fund away from the common schools (a very improbable supposition), would the coupon holder have the power, in case the poll tax was applied to another educational

purpose. to pounce upon and intercept it? By aaccept-
ance of the offer in the act of 1881, the coupon holder
would preclude himself from presenting his claim to
be accepted for any tax *now* devoted to common schools.
It would be nothing to him what the State might do
with a fund to which he had relinquished all claim
under his coupon-right. Suppose the act had said,
except the poll tax and other taxes devoted to the
support of common schools (and this in effect it does
say), could he come afterwards and say, because the
Legislature has taken the poll-tax away from common
schools and devoted it to some other educational pur-
pose, he had a claim on it. Suppose the Legislature
should take away from the common schools all taxes
but those for their *perpetual* fund, certainly the coupon
holder would have no right to say that anything was
taken from his clutch to which he had a right, be-
cause these taxes were devoted to another purpose.

But at last suppose when the poll tax was thus
taken away by the Legislature and applied to another
educational purpose, the coupon holder should attempt
to seize it. What would be the answer of the tax-
collector? "You never had any claim to this by the
terms of your bargain; and more, if your bargain
could by any strained construction be held to include
this tax, plainly you are repelled by the constitutional
provision as to *its* application." The coupon holder
certainly could make no effective answer to this. Shall
we then, as a court, when now and in all probability
forever the coupon holder will not be fool-hardy enough
to make such a claim, and if he should, would be

instantly repelled, *upon an abstract notion* that there is a conflict which may possibly be brought to issue some day between the 3d section of the act of 1881 and the clause in the Constitution above referred to, undertake to enjoin the execution of a great public measure which the Legislature had in other respects the power to adopt?

It has been somewhat faintly argued that certain acts of Assembly of former dates have been, or purport in effect to have been amended, modified or repealed by the present act, without the proper reference thereto, as required by the Constitution, either in the caption or the body of the act. In view of the various decisions of this court upon this part of the Constitution, I feel clear to say that this is a mistake, and that the Constitution has not been violated in this respect.

It is said that the funding board, without being a court but mere executive agents, have been given judicial powers, thus intermingling the executive and judicial departments. Now the duties imposed upon the "funding board," though not merely ministeral, are strictly executive. Their action upon a bond as to its admission or rejection is not a judgment, is not final, and in no manner binds the bondholder as to the ultimate assertion of his rights in case his bond is rejected. *Pro hac vice* as to the issuing of a new bond for an old one, some judgment in exercised and must necessarily be exercised by somebody who is to discharge the duty. Certainly it is not to be expected that every bondholder was to come into court to es-

tablish his right to the issuance of a new bond.   The
analogies between this case and others where similar
duties are required, are numerous, where no one ever
suspected that judicial powers were intended to he
communicated.   The remarks of Judge Andrews, in
the case of the *State* v. *Staten,* 6 Cold., 257, are per-
tinent in this connection.   He says:  " There is a large
field of judicial inquiry in which action is had which
is · judicial in its nature but which is nevertheless
not that exercise of judicial power, the exercise of
which is restricted to the courts by the Constitution.
Judges of election, assessors of revenue, commissioners
for assessmet of damages on the taking of property
under the right of eminet domain, clerks in taking
the probate of deeds, and various other officers, exer-
cise to a greater or less extent judicial functions, and
by their decisions determine questions of fact and con-
clude rights, though they are not courts."   These
remarks would seem to be conclusive on this matter,
that the Constitution is not violated in the duties im-
posed on the " funding board."   Besides, there is really
now no dispute worth consideration as to what are the
legally issued bonds of the State.

The objection that the State did not make proper
provision for the interest of the bonds and other de-
mands upon the State, need not be further noticed
than to say that it is, for the present at least, an
*absolute* presumption that they did.

The bonds for war interest are denied by the bill
to have been legally issued, but it scarcely seems that
an issue as to these was to be raised and made mat-

ter of serious contest. However, it is well enough to say, as matter of history, that the State has long ago concluded herself on this subject by an issue of new bonds which have gone out into the markets of the world and are in the hands of innocent holders. Nothing, however, is intended to be said as to the question whether, if taken in proper time and in the proper way, some defense might not have been made against the claim for war interest, especially where the debt was not held by an alien or an enemy.

This disposes of all the minor objections to the bill.

There remains, however, one consideration in view of this whole matter which has some force at least with me, and that is, that there is some prospect if this act is sustained it will tend much to the repose of society, and this has heretofore been made a ground of decision in less important cases. There are, it seems to me, no real evils in sight in allowing the act under discussion to be executed, and on the other hand much apparent good.

In my opinion the bill should be dismissed.

Deaderick, C. J., said:

The main questions arising in this case have been so elaborately and exhaustively discussed in the four opinions already read, that I deem it unnecessary to repeat reasons already given, or cite authorities already referred to, to sustain the conclusions at which I have arrived upon the several questions involved. I content myself, therefore, with the simple announcement of the conclusions at which I have arrived, upon the several propositions contained in the bill, and discussed at the bar.

First. I am of opinion that the title of the act to compromise and settle the bonded indebtedness of the State of Tennessee, sufficiently expresses the subject thereof; that it contains but one subject; the several sections of the act being pertinent to the object expressed in the title. And therefore it is not void as being repugnant to sec. 17 of art. 2 of the Constitution of Tennessee.

Second. I am further of opinion that the courts of this State have no power to review or reverse the legislative action of the General Assembly, except for the reason that such action is violative of the Constitution; and that such action, if within their constitutional power, cannot be questioned by the courts of the State, upon allegations of fraud and bribery.

Third. I am also of opinion that tax-paying citizens may file their bill to protect themselves from the

injurious operation of a threatened and impending act, which is alleged to be unconstitutional, although such act is about to be performed under the apparent authority of the State. The court may inquire if there exists legal authority for the act; if so, it will not impede or obstruct it. On the other hand, if it appears it is prohibited by the fundamental law, it should restrain it—upon the ground that the injurious act about to be done is unauthorized by law.

Fourth. I am, therefore, of opinion that the constitutionality of the act is fairly presented to this court for its decision; and that the question for our determination is, had the Legislature the power to pass it? And in my opinion it had the power, there being no inhibition or restraint in the Constitution to prevent it from doing so.

I therefore concur with Judge Ewing in holding that the act is constitutional and valid, and that the chancellor's decree, dismissing the bill, should be affirmed.